CARLOS E. NEEDHAM (SBN 202777)
28494 Westinghouse Place
Suite 213
Valencia, CA  91355
Telephone:  (661) 843-6174
Facsimile:  (661) 430-5595
cneedham@needhamlegal.com

Attorney for Plaintiff
SCRIPSAMERICA, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCRIPSAMERICA, INC., | Case No. CV 14-03962 MMM (AGRx) |
| Plaintiff, | Hon. Margaret Morrow |
| | **SECOND AMENDED COMPLAINT FOR** |
| | **(1)     SECURITIES FRAUD** |
| vs. | **(2)     BREACH OF CONTRACT** |
| | **(3)     TORTIOUS BAD FAITH** |
| | **(4)     DECLARATORY RELIEF** |
| IRONRIDGE GLOBAL LLC d/b/a IRONRIDGE GLOBAL IV, LTD. JOHN KIRKLAND, BRENDAN O'NEILL and DOES NOS. 1-5 | |
| Defendants. | |

Plaintiff SCRIPSAMERICA, INC. sues IRONRIDGE GLOBAL LLC,

JOHN KIRKLAND, and BRENDAN O'NEILL as set forth herein and alleges:

1.     This case arises from a fraudulent and deceptive scheme by Defendant

IRONRIDGE GLOBAL LLC ("IRONRIDGE") and its agents and control persons

JOHN KIRKLAND ("KIRKLAND") and BRENDAN O'NEILL ("O'NEILL") to acquire stock of Plaintiff and then artificially manipulate the price of the stock.  The genesis of the scheme was IRONRIDGE's proposal for an agreement under which Plaintiff was to provide stock to IRONRIDGE under a formula based on Plaintiff's stock price.  In order to enrich itself at the expense of Plaintiff and its shareholders, IRONRIDGE willfully and knowingly manipulated the market price of Plaintiff's stock in order to increase its ownership share in Plaintiff, to the detriment of Plaintiff.  By engaging in such conduct, IRONRIDGE and its Defendant directors violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.  The Defendants' tortious misconduct further violated applicable provisions of state law.

## SUBJECT MATTER JURISDICTION AND VENUE

2.     This Court has federal question subject matter jurisdiction over this case under 15 U.S.C.  § 78aa  (exclusive jurisdiction in federal court for actions based on alleged violation of SEC Rule 10b-5).   Under 28 U.S.C § 1367, this Court has supplemental jurisdiction over state law claims asserted herein.

3.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) and (2).  A substantial part of the acts and omissions giving rise to the claim occurred in this district.  IRONRIDGE is a resident of this district for venue purposes, as it is subject to personal jurisdiction in this district by reason of, among other things,  its substantial and ongoing activities in this district,  including its maintenance of a permanent office in Los Angeles for the conducting of its business. Defendant KIRKLAND, on information and belief, is also a resident of this district for venue purposes as he works out of IRONRIDGE's Los Angeles office per the IRONRIDGE website.  Defendant O'NEILL is listed as working from IRONRIDGE's San Francisco office.

## PARTIES

4       Plaintiff SCRIPSAMERICA, INC. ("SCRIPS" or 'Plaintiff" or "issuer") is a corporation incorporated under Delaware  law with its principal place of business in Pennsylvania.  Plaintiff, which is in the business of distributing pharmaceuticals, is a public company whose stock is traded  over-the-counter ("OTC") as "SCRC."

5.       Defendant  IRONRIDGE GLOBAL PARTNERS LLC, which does business under the name IRONRIDGE GLOBAL IV, LTD., ("IRONRIDGE")  is a limited partnership existing under Delaware law with its principal place of business in California.

6.       JOHN KIRKLAND is a managing director and principal of IRONRIDGE, and on information and belief is a resident of California and this judicial district.

7.       BRENDAN O'NEILL is also a managing director and principal of IRONRIDGE and on information and belief is a resident of California.

8.       DOES NOS. 1-5 are other entities or persons who are responsible for the breaches and/or wrongs described herein.

## FACTUAL ALLEGATIONS

9.       IRONRIDGE is in the business of exploiting an exemption from the registration requirements of the Securities Act of 1933, namely the section 3(a)(10) "court approval" exemption.  15 U.S.C. §77c(a)(10), ("section 3(a)(10)") exempts from registration requirements securities issued "in exchange for" other "outstanding securities, claims or property interests" so long as the fairness of the exchange is "approved" after notice to interested parties "by any court…."   The court approval exemption allows for the issuance of shares by an issuer to IRONRIDGE without registration, which shares are immediately and freely tradeable without normally applicable restrictions such as a six-month holding period.

3

10.     In its dealings with Plaintiff, IRONRIDGE used its business model as part of a plan, scheme, and course of conduct which was intended to and did (1) acquire shares in Plaintiff in a transaction induced by fraud; (2) make untrue statements of material fact and omit to state material facts necessary to make its statements not misleading; (3) artificially deflate and manipulate the price of Plaintiff's stock; and (4) engage in acts, practices and a course of business which operated as a fraud and deceit upon the Plaintiff (and others); all in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5.

11.     It was a part of the scheme to defraud and manipulate that IRONRIDGE, through its officers, directors and agents KIRKLAND and O'NEILL, in several meetings and telephone calls in August and September of 2013, presented what was portrayed as an advantageous business deal to Robert Schneiderman, Chief Executive Officer of Plaintiff.   The first interaction between the parties was a telephone call on August 28, 2013, in which KIRKLAND and O'NEILL explained to Mr. Schneiderman that IRONRIDGE could pay off Plaintiff's accounts payable in exchange for stock of Plaintiff.  In return for IRONRIDGE's satisfaction of certain bona fide debts of Plaintiff, in the approximate amount of $700,000, Plaintiff would receive stock in Plaintiff, the amount of stock being set by a contractual formula.  IRONRIDGE further represented that under the IRONRIDGE arrangement the stock need not be registered before it could be delivered to IRONRIDGE.  In essence, this was a means by which Plaintiff could legally receive value in exchange for stock which had never been registered.  Subsequent telephone calls occurred on September 4, 2013 and October 2, 2013 between Schneiderman, KIRKLAND and O'NEILL in which the details of the arrangement were further explained.

12.     It was a part of the scheme to defraud and manipulate that in the above-described telephone conversations with Plaintiff, IRONRIDGE (through KIRKLAND and O'NEILL), requested, expressly and solely for its own protection

4

against downward falls in the price of Plaintiff's stock caused by exogenous market forces, an adjustment mechanism.  This mechanism provided that, in case of a fall in the price of Plaintiff's stock over a defined calculation period, IRONRIDGE would receive more stock than the amount that would be required at the time of the inception of the exchange, and Plaintiff agreed to a potential "final adjustment" on that basis.  At the time of these conversations, Defendants possessed the subjective intention to use the shares they acquired from Plaintiff to intentionally reduce the price below the fair market price, and then, based on the manipulated lower price, obtain unlimited additional shares.  The Defendant's ownership of shares in Plaintiff allowed the potential abuse of those shares to manipulate the market price downward, for the purpose of increasing the number of shares that would go to Defendants, to Plaintiff's detriment.  To allay Plaintiff's concerns in this regard, Defendants expressly promised that they would not engage in such manipulation of the Plaintiff's share price.  This was a knowingly false representation of the Defendant's then-existing intention, on which Plaintiff reasonably relied in entering into the transaction.  In order to make the presentation to the Plaintiff not misleading, Defendants should have disclosed their true intentions to Plaintiff, and should have disclosed that in previous situations (discussed below) Defendants had ruined other companies by their market manipulation.  Had the true facts of their prior transactions and their present intentions with respect to Plaintiff been disclosed, Plaintiff would not have entered into the transaction.   IRONRIDGE, KIRKLAND and O'NEILL did not disclose to Plaintiff their intent to reduce the price of Plaintiff's stock through their own illegal market manipulation to increase the number of shares at Plaintiff's expense.  In so doing, IRONRIDGE acted knowingly, willfully and with intent to deceive Plaintiff.

//

//

//

5

13.     It was a part of the scheme to defraud and manipulate that a term sheet proposing a transaction of the general nature described above was provided to Plaintiff by IRONRIDGE, on or about September 27, 2013, a true copy of which is attached as Exhibit 1 hereto (the "Term Sheet").

14.     It was a part of the scheme to defraud and manipulate that IRONRIDGE, which had previously and subsequently used its own name in emails and on the Term Sheet, used the name of a purported separate entity, a limited partnership called IRONRIDGE GLOBAL IV, LTD, and its supposed division, Ironridge BioPharma Co.  Notably, IRONRIDGE's Court filings do not recite any state of incorporation or address for the supposed limited partnership.  This limited partnership was a mere instrumentality of IRONRIDGE, used in an attempt to insulate IRONRIDGE and its officers and agents from responsibility for its fraudulent and manipulative conduct and wrongdoing.  If such a limited partnership entity as IRONRIDGE GLOBAL IV, LTD. exists at all, the entity veil should be pierced and IRONRIDGE held responsible for the actions and wrongdoing of its agents and instrumentality entities.

15.     It was a part of the scheme to defraud and manipulate that, in discussions leading up to the drafting and entry into a binding agreement, agents of IRONRIDGE, specifically KIRKLAND (Chief Operating Officer and principal of IRONRIDGE) and O'NEILL, had further conversations with Mr. Scheiderman of Plaintiff.  One particularly important telephone call between the three occurred on October 4, 2013.  In that telephone call, KIRKLAND and O'NEILL addressed the potential  effects that the sale of stock delivered to IRONRIDGE could have on the price of Plaintiff's stock by making the representation to Plaintiff that IRONRIDGE, unlike others who had funded Plaintiff in return for stock, would take no action to manipulate or effect Plaintiff's stock price, and that any sales that might be necessary to fund the satisfaction of Plaintiff's receivables would be made in such a way that they would never be more than ten percent of the volume of sales

on any given day.  These representations were knowingly and willfully false, and made with intent to deceive Plaintiff.  At the time of these conversations, Defendants possessed the subjective intention to use the shares they acquired from Plaintiff to intentionally reduce the price below the fair market price, and then, based on the manipulated lower price, obtain unlimited additional shares.  The Defendant's ownership of shares in Plaintiff allowed the potential abuse of those shares to manipulate the market price downward, for the purpose of increasing the number of shares that would go to Defendants, to Plaintiff's detriment.  To allay Plaintiff's concerns in this regard, Defendants expressly promised that they would not engage in such manipulation of the Plaintiff's share price.  This was a knowingly false representation of the Defendant's then-existing intention, on which Plaintiff reasonably relied in entering into the transaction.  In order to make the presentation to the Plaintiff not misleading, Defendants should have disclosed their true intentions to Plaintiff, and should have disclosed that in previous situations (discussed below) Defendants had ruined other companies by their market manipulation.  Had the true facts of their prior transactions and their present intentions with respect to Plaintiff been disclosed, Plaintiff would not have entered into the transaction.

16.     It was a part of the scheme to defraud and manipulate that IRONRIDGE, through its deceptive representations and fraudulent omissions, obtained the agreement of Plaintiff to enter into such an arrangement, and that thereafter, on November 8, 2013, a stipulation and proposed order (approving the stipulation) were presented to a state court judge in California.  The order was signed by the judge after reviewing the papers briefly in chambers.  The stipulation/order provided for the immediate issuance and delivery of 8,690,000 shares of common stock in Plaintiff to IRONRIDGE.  A true copy of the California court order, and underlying stipulation, approving the issuance of the stock to IRONRIDGE is attached hereto as Exhibit 2.  (Exhibit 2 is referred to hereafter as

7

the "Stipulation.")  Upon receipt of the court approval order, Plaintiff delivered the stated number of shares to IRONRIDGE.

17.    While the Stipulation recited that the acquisition of shares could have a "dilutive effect" on Plaintiff's stock and that Ironridge could sell any of its shares "at any time," these statements were consistent with the deal as stated to Plaintiff. Plaintiff was in fact aware that the issuance of additional shares would dilute its stock and that Defendants would be selling the stock issued.  However, these recitals were simply a further part of Defendants' scheme to deceive Plaintiff in that the Defendants' intention to manipulate the market price of Plaintiff's stock by dumping shares to enrich themselves at Plaintiff's expense was materially omitted. In fact, any such intention to abuse Defendants' ownership of shares was expressly, albeit falsely and fraudulently, expressly denied by Defendants (as reflected in the Stipulation's prohibition against short-selling). (Ex. 2, at ¶ 14.)  The Stipulation is simply being used to extend their scheme to defraud into these proceedings.

18.    IRONRIDGE's scheme to defraud and manipulate included a "bait and switch."  While the Term Sheet contemplated only one potential "Final Adjustment" that might provide additional shares to IRONRIDGE, the Stipulation included language (at paragraphs 7, 8 and 10) which IRONRIDGE would later contend allowed IRONRIDGE multiple opportunities to seek additional shares of Plaintiff's stock.  Indeed, the "adjustment" mechanism contained in the final Stipulation is incredibly convoluted and virtually unintelligible.

It provides:

"7.    The period from the date of this Stipulation until that number of consecutive trading days following the Issuance Date required for the aggregate trading volume of the Common Stock between 9:30:00 a.m. and 4:00:00 pm Eastern, i.e., excusing after hours trades, to exceed $7 million shall be referred to as the "Calculation Period".  The final number of

8

shares of Common Stock to which Plaintiff will be entitled under the Order ("Final Amount") will be that number of shares with an aggregate value equal to (a) the sum of the Claim amount, a third party agent fee of 10%, and both parties' reasonable attorney fees and expenses, (b) divided by 80% of the following: the closing price of the Common Stock on the trading day immediately preceding the date of entry of the Order,  not to exceed the arithmetic average of the individual volume weighted average prices of any five trading days during the Calculation Period, less $0.01 per share; all as reported by the Bloomberg Professional service of Bloomberg LP ("Bloomberg").

8.     If at any time during the Calculation Period the shares issued to Plaintiff are less than any reasonably possible Final Amount or a closing price is below 80% of the closing price on the trading day before entry of the Order, Plaintiff may request that Defendant reserve and/or issue additional shares of Common Stock (each, an "Additional Issuance") within one trading day….

9.     Under no circumstances shall Defendant issue to Plaintiff at any one time a number of shares which, when aggregated with all shares of Common Stock then beneficially owned or controlled by Plaintiff or its affiliates, at such time exceed 9.99% of the total number of shares of Common Stock outstanding after such issuance.

10.     At the end of the Calculation Period, (a) if the sum of the Initial Issuance and any Additional Issuances is less than the Final Amount, Defendant shall issue additional shares of

9

Common Stock to Plaintiff as soon as possible, up to the Final

Amount, and (b) if the sum of the Initial Issuance and any

Additional Issuance is greater than the Final Amount, Plaintiff

shall promptly return any remaining shares to Defendant or its

transfer agent for cancellation, ("Final Adjustment")."

19.     At least one court has already declined to enforce the very same language, because of its fatal ambiguousness.  (Exhibit 3 attached hereto is a copy of that decision, in a case involving another IRONRIDGE prey, Green Automotive.)  While the Stipulation certainly did mention the possibility of substantial dilution (whatever that means), it was not at all clear that the extremely convoluted "adjustment" language would result in the absurdly large volumes of stock issuance that IRONRIDGE has exacted, and seeks to exact against Plaintiff and many other companies.  In fact, as noted above, the parties' understanding that there was not going to be predatory selling of stock is reflected, in part, in the Stipulation's prohibition against short-selling.  (Exhibit 2, at ¶ 14.).  Clearly, it was not contemplated that IRONRIDGE could simply sell shares in any manner it wished.

20.     It was a part of the scheme to defraud and manipulate that, contrary to its repeated commitments to Plaintiff, IRONRIDGE entered into a scheme of selling Plaintiff's stock with the intent of deceiving investors in an otherwise efficient market and thereby artificially lowering the price of the security.

21.     It was a part of the scheme to defraud and manipulate that IRONRIDGE repeatedly sold Plaintiff's stock in a volume exceeding ten percent of all sales on many days.  A chart of the volume of sales by IRONRIDGE, as a percentage of all sales, is attached as Exhibit 4.  As one example among many, during the week of January 6, 2014, sales by IRONRIDGE represented 28.4% of total sales; during the week of January 21, 22.6%; throughout February 2014, from

10

30 to 50%; and a high of 57% during the week of April 7, 2014.

22.    IRONRIDGE, however, did not simply sell more shares during certain periods than Plaintiff thought it would. IRONRIDGE engaged in trading activity that was intended to manipulate share price.  Plaintiff employed an expert to do a granular analysis of trading transactions in its stock during the period between December of 2013 and April of 2014.  The expert concluded that IRONRIDGE manipulated share price through a technique known as "bid whacking."   He wrote:

"The analysis of this data was painstakingly done on a minute-by-minute trading chart of SCRC.  Multiple sources were researched and cross-referenced.

After the above analysis was completed, I was able to come to the conclusion that the method that IronRidge used to trade the SCRC stock was to simply manipulate the stock to trade downwards in any given trading period by employing what is called "bid whacking" in the trading community.  "Bid whacking" is accomplished when the selling party offers to sell their shares "at the bid" instead of a higher price - this has the effect of lowering bids further and if the selling parties continue to reduce their demanded price (agree to sell again at the lower bid price), this will have the effect of lowering the overall share price for the day and often at least into the next trading day.  If a selling party continues this day after trading day, the share price will start dropping due to the manipulation as well as panic in what were previously "long" holding stock holders; whom now lose confidence in the stock and sell out their positions.  If they are successful, and /or if other "funders" are in the stock also selling, their model is to consistently "bid whack" the stock in an effort to "entice" others to sell, causing the decline in price to the point where they would be able to request more stock."

23.  The voluminous transactional data supporting the expert's analysis are

11

attached hereto as Exhibit 5 and are fully incorporated herein.   The data are organized in various ways.  First, they are organized on trade-by-trade basis, with sales indicated in red, and IRONRIDGE sales identified in yellow.  Second, the data are organized to show the "position" of participants in the stock on a weekly basis.  Third, the data are organized to show trading volume on a daily basis, with daily opening, closing, high, and low prices.  Fourth, the data are organized to show a summary of IRONRIDGE trading on a monthly basis.  In connection with this last set of data, the expert notes: "In reviewing the data for trades Ironridge made in the month of Dec., 2013, it is clear that the **majority** of the shares they sold, they sold at the lows of each trading day.  This is typical of Ironridge trading.  It is argued that they do this to drop the share price of a company so that the company is then obligated to issue Ironridge more shares to comply with their contract."  The same statement is made for the month of January of 2014.

24.    The data show that IRONRIDGE's manipulative trading activity had the effect over the five month period of driving the price of Plaintiff's stock from seventeen cents to ten cents.  Based on the business valuation and success of Plaintiff in this time period, in the absence of IRONRIDGE's manipulation the Plaintiff's stock price would have been nineteen to twenty cents at least.  After all, revenues had gone from $600,000 in 2013 to $30 million in 2014.  As the events described in paragraph 32 below illustrate, the Plaintiff was on a dramatic upward trend.  The deleterious effect of IRONRIDGE's trading could not be more stark.

25.    As the expert explained, "bid-whacking" is when stock is sold at the bid price instead of seeking a higher price as would ordinarily occur in trading in order to maximize money received.  This practice has the effect of lowering bids further.  As such, it constitutes manipulation of the price downward.   If sellers agree to sell further at the reduced price, this has the effect of reducing the price of the stock for the day and often into the next day.  This is intended to and often does cause panic and loss of confidence in the stock by other holders of it, causing a

further downward pressure, or "death spiral."

26.    IRONRIDGE's direct motivation was to fraudulently and via downward manipulation of the price of Plaintiff's stock acquire more stock from Plaintiff, at a fraudulently reduced price, which could ultimately be sold for a profit when the stock over time returned to its natural level.  The manipulative sales by IRONRIDGE created an artificial downward pressure on stock in precisely the same manner as manipulative short sales and are illegal for precisely the same reason.  Investors, as IRONRIDGE knew and intended, would believe that the downward movement of Plaintiff's stock price was indicative of a decline in the value of the underlying security, when this was not true.  The result would be sales by other investors, and decisions not to purchase due to the artificially falling price, which, in the same manner as manipulation by short sellers, would in turn tend to reduce the price further.  In the case of IRONRIDGE, this benefit was intended, as it would mean under the adjustment formula it would receive all the more of Plaintiff's stock.   Plaintiff relied on the fact that the market for Plaintiff's stock would be governed by natural supply and demand factors, which in the normal course of events would be positive for the stock price of Plaintiff based on positive business developments expected for Plaintiff's business (as described below in paragraph 32).  Plaintiff entered into the agreement with IRONRIDGE in ignorance of the fact that the price would be affected by manipulation by IRONRIDGE. Other investors also were misled to believe that the price of Plaintiff's stock was being set by the normal interplay of supply and demand.

27.    Various jurists and scholars have noted that the market efficiency analysis typically required in traditional "fraud on the market" cases based on classic misrepresentation theories should not logically be required in market manipulation cases—or at least should be a very different kind of analysis.  After all, the "fraud on the market" serves to establish the causation/reliance element, and in a market manipulation case the impact on price, due to the manipulation, by itself

13

establishes the causation.  Indeed, it has been observed, an "inefficient" market for a thinly traded stock is much more at risk of manipulation than the "efficient" market for a very widely traded, marquis, blue chip stock, and consequently is even more in need of the protection of federal securities laws.

28.     Nevertheless, the market for Scrips stock comfortably qualifies as an efficient market under the traditional criteria.

29.     As the trading data (in Exhibit 5) show, the weekly trading volume in Scrips stock is large enough to at least establish a substantial presumption of efficiency (at well over 1% of the total amount of shares).

30.     Scrips stock had numerous market makers and arbitrageurs, including Knight Capital Americas LLC, Stockcross Financial Services, Inc, BMA Securities, Cantor Fitzgerald & Co., BNY Mellon Capital Markets, LLC, Biltmore International Corp., Wilson-Davis & Co., Inc., Vfinance Investments, Inc. and Guggenheim Investor Services, LLC.

31.     Also, there are considerable empirical facts showing a cause and effect relationship between financial releases and an immediate response in stock price—which is the hallmark of an efficient market.  On October 21, 2013, ScripsAmerica, Inc. announced that the Company had signed an agreement to acquire PIMD International, LLC, a wholesale distributor of prescription drugs as well as medical supplies and devices. Immediately after this press release share price went from nineteen cents to twenty-six cents.  On October 28, 2013, ScripsAmerica, Inc. announced that the Company's due diligence team would travel to China in November to begin formal RapiMed® distribution negotiations in preparation for a product launch into the Chinese OTC market, valued at over $32 billion. Immediately after this press release share price went from twenty-three cents to twenty-eight cents.  On October 30, 2013, it was announced that PIMD International, LLC had shipped its first order since entering into an agreement to be acquired by ScripsAmerica.   PIMD International also announced that it expected

overall revenue to continue growing with the recent launch of its new medical supply product website.  Immediately after this press release share price went from twenty-eight cents to thirty cents.  On November 11, 2013, ScripsAmerica Inc. announced that it had agreed to invest in WholesaleRx  in exchange for an equity position in the company. Immediately after this press release share price went from nineteen cents to twenty-three cents.  On November 25, 2013, ScripsAmerica, Inc. announced that the Company's recent business development trip to China had generated strong interest from multiple large entities for the distribution of its RapiMed® children's pain reliever throughout Asia.  Immediately after this press release share price went from sixteen cents to eighteen cents.  On December 19, 2013, ScripsAmerica Inc. announced that the Company had received and processed a record high $51,920 in orders during the week ending December 13, 2013 and $84,821 in orders for the first two weeks of the month from its recent pharmaceutical distribution joint venture.  Immediately after this press release share prices went from twelve cents to fourteen cents.  On January 31, 2014, ScripsAmerica, Inc. announced that the Company had entered into a business management agreement for a New Jersey compounding pharmacy.  Immediately after this press release share prices went from nineteen cents to twenty cents.  On February 3, 2014, ScripsAmerica, Inc. announced that the Company had entered into a joint venture with Global Pharma Hub, an international pharmaceutical marketing and distribution company, to license, market and distribute its RapiMed® Children's pain reliever and fever reducer.  Immediately after this press release share prices went from twenty cents to nineteen cents.  On February 10, 2014, ScripsAmerica, Inc. announced that the Company had received registration approval for its RapiMed® Children's Pain Reliever & Fever Reducer from the Government of Hong Kong.  Immediately after this press release share prices went from thirteen cents to fourteen cents.  On February 12, 2014, ScripsAmerica Inc. announced that during the month of January, the Company's equity venture,

Wholesale Rx, received and processed $268,696 in orders, setting a second consecutive monthly revenue record. Immediately after this press release share prices went from fourteen cents to sixteen cents. On February 18, 2014, ScripsAmerica Inc., announced that the Company had commenced the prepayment of its outstanding convertible debt by issuing the first payment on its convertible note with the largest principal and closest conversion date. Immediately after this press release share prices went from twelve cents to thirteen cents. On March 5, 2014, ScripsAmerica, Inc. announced that the specialty pharmacy it had recently entered into a management agreement with recorded $494,643 in prescription sales for the month of March. Immediately after this press release share prices went from ten cents to eleven cents. On June 2, 2014, ScripsAmerica, Inc. announced that its managed specialty pharmacy had reported $1.6 million in prescription sales during the month of May. Immediately after this press release share prices went from eleven cents to twelve cents.

32.   As the various above factors demonstrate, Plaintiff's stock was in an open and developed market in which Plaintiff's stock was actively traded, and in which information about the company was reflected in volume and prices over a long period of time.

33.   In summary, it was a part of the scheme to defraud and manipulate that IRONRIDGE knew and deliberately intended that its sales would send false information as to supply and demand into an otherwise efficient market, thus inducing other sales by the general public at reduced prices, creating a further market distortion as to the price for Plaintiff's shares, and ultimately further increasing the number of shares of Plaintiff's stock that would be received by IRONRIDGE. IRONRIDGE was guilty of manipulative conduct, *i.e.*, knowing and willful conduct designed to deceive or defraud investors by artificially affecting the price of a publicly-traded security.

34.   IRONRIDGE, by invoking the highly convoluted and unintelligible so-

called "adjustment" mechanism, has already received 10.3 million of shares of Plaintiff's stock, and is seeking a further 1.6 million shares through the California courts, and has indicated that it will seek even more in the future.  Indeed, it has recently made demand for 15 million additional shares, which at the current amount of capitalization would clearly violate the agreement because it would exceed the 10% ceiling.

35.     IRONRIDGE sold far more of Plaintiff's stock than was necessary to fund the payment of Plaintiff's receivables.  IRONRIDGE's sales of 10,305,550 shares of Plaintiff's stock led to proceeds of at least $1.2 million.

36.     The Plaintiff has given IRONRIDGE stock worth at least $1.4 million in exchange for satisfaction of less than $770,000 of debt.

37.     Plaintiff has been further damaged by, among other things, the loss of millions of shares of its stock, with the final number remaining undetermined.

38.     Numerous factors give rise to a strong inference of scienter.  First, there is the manipulative trading activity itself.  The trading data, and the expert's analysis of the data, point to an intent to manipulate.  As the Court has indicated, trading data and analysis showing manipulative intent, if presented with particularity (as has now been done at the most granular level possible), serves by itself to demonstrate scienter.  Second, there is the existence of the adjustment mechanism in the settlement/stipulated judgment.  This mechanism creates a powerful, extra incentive for the manipulative conduct.  Third, there are the dealings between the parties in the formation and performance of their agreement.  IRONRIDGE never told the Plaintiff that it was going to exploit its rights under the agreement to put downward pressure on the share price so as to yield greater share issuances.   While Ironridge did disclose the dilutive effect of share issuance itself, it never disclosed an intent to subsequently use the issued shares to manipulate the market.  It also employed a bait-and-switch tactic, as discussed above, substituting a mechanism of multiple adjustments for the initially proposed single adjustment.

17

And when Bob Schneiderman sought information from IRONRIDGE about its trading activity, such information was denied.  All of that conduct evinces a consciousness of something wrongful to hide or at last obfuscate.  Finally, it appears that the dramatic downward impact of IRONRIDGE's trading on Scrips' share price is not an isolated event.  Indeed, there is real reason to believe that IRONRIDGE has engaged in essentially the same or similar wrongful conduct in connection with the stock of many other companies.  The watchdog website "Scam Informer" recently observed that "[t]he destruction in stocks [IRONRIDGE] has completed transactions with makes the devastation from Hurricane Irene seem tame by comparison."   While the Plaintiff is not yet in a position to allege the depredations that IRONRIDGE has wrought with the stock of other companies with the same degree of particularity that it has been able to muster for its own stock, the fact that there are widespread reports of such conduct should play some role—at least at the pleading stage—in bolstering the inference of scienter.  For example, StreetInsider.co, has reported that NewLead Holdings initiated an arbitration against IRONRIDGE in the same timeframe as this suit, with nearly the same causes of action asserted here, including allegations of share price manipulation under the same kind of funding vehicle.  It has been reported that Ironridge has already requested and/or received an aggregate of approximately 62 million common shares (through July 6, 2014) and received approximately $22.8 million of proceeds (based upon information received from Ironridge) on the sale, in NewLead Holdings' belief, of approximately 44 million of common shares through June 30, 2014.

     39.   And it is not just media reporting and hearsay.   A review of the SEC's EDGAR public filing database reveals that of the 32 United States companies in which IRONRIDGE invested, virtually all suffered a dramatic decline in their stock price following the toxic investment.  Also, there are actual court cases, including right here in Los Angeles.  Among the companies that have been victims of

18

IRONRIDGE's schemes is Green Automotive Company, Inc., which is the subject of a similar stipulation/order in an Los Angeles Superior Court action, under the Section 3(a)(10) exemption.  Incredibly,  IRONRIDGE actually seeks 6 **billion** shares in Green Automotive, which is six times the company's total capitalization. That is a vivid illustration of the absurdly deceptive, abusive and bad faith manner in which IRONRIDGE has been obtaining and implementing the type of stipulation/order at issue here.  In fact, as noted above, the court declined to enforce the same stipulation language at issue here against Green Automotive.  As another, even more vivid example of IRONRIGE's predatory conduct, IRONRIDGE has recently asserted that it is entitled to 27 **billion** shares of another company, Green Innovations, Ltd.  Plaintiff's counsel, who also represents Green Innovations, can aver that the leadership of that company believes that IRONRIDGE has wronged it in the very same way that IRONRIDGE has wronged the Plaintiff in this action. *See* the attached Declaration of Carlos Needham, Exhibit 6 hereto, which is fully incorporated herein.

40.     Proof at trial will reveal that IRONRIDGE's pattern of corporate destruction is part of an even larger pattern orchestrated by a person named David Sims.[1]  Plaintiff is informed (from various published reports of manipulative schemes involving securities issued by persons other than SCRIPS) and believes that Sims is a citizen of South Africa and a resident of Tortola in the British Virgin Islands.  Sims has been implicated in a variety of schemes involving fraud and market manipulation related to at least 32 publicly traded companies, all revealing a similar scheme involving convertible instruments and/or the issuance of shares based upon the trading price of the respective issuer's common shares and subsequent manipulation of the issuer's stock price for the purpose of receiving additional shares.  *See, e.g., Hyperdynamics Corporation v. Southridge Capital Management, LLC,* No. A10A0362, 699 S.E.2d 456, 461 (Ga. Ct. App. July 16,

---

[1] Plaintiff intends to seek to add Mr. Sims as a defendant in this action by appropriate procedure.

2010) (holding that a court has personal jurisdiction over David Sims and his confederates in a lawsuit arising from conspiracy to engage in fraud and market manipulation involving toxic financings provided by offshore entities controlled by Sims).

41.    Sims is the global director of Caledonian Global Financial Services ("Caledonian"), a Cayman Islands bank and brokerage firm which held accounts and laundered funds for Belizean broker-dealers Unicorn International Securities, Legacy Global Markets and Titan International Securities, and their principals who in September of 2014, were the subject of indictments by the U.S. Department of Justice and civil actions by the Securities & Exchange Commission in connection with what regulators described as a $500,000,000 stock manipulation and money laundering ring.

42.    Upon information and belief, IRONRIDGE is a conduit for Caledonian's money laundering activities, which is the source of the funds used for IRONRIDGE's investments in public companies, including SCRIPS.

43.    The investment decisions of IRONRIDGE are controlled by David Sims, and the decisions were carried out through O'NEILL, KIRKLAND (and others) who, upon information and belief, took directions from Sims.

44.    Sims carried out the scheme against SCRIPS through IRONRIDGE, an entity that was designed to implement investment and trading activities that would likely violate securities laws and harm the targets of the planned toxic financing scheme by lowering the companies' stock price.  As stated before, a review of the SEC's EDGAR public filing database reveals that of the 32 United States companies in which IRONRIDGE invested, virtually all suffered a dramatic decline in their stock price following the toxic investment.  As discussed below, this dramatic decline in stock price cannot be explained by market forces and is the result of an illegal trading strategy (the "Trading Strategy") employed by IRONRIDGE in the manipulation of otherwise efficient trading markets.

45.     As part of the Trading Strategy, the Defendants omitted material information which made other statements under the circumstances in which they were made misleading, including the following:

a)     The convoluted and virtually unintelligible "adjustment" language in the Stipulation would produce not merely an "adjustment" to protect against normal market price fluctuation, but would instead  produce extreme levels of stock issuance to Defendants (and in a matter of weeks);

b)     Under the Stipulation, IRONRIDGE had an egregious conflict of interest because the common number of shares it received would be determined by a discount to the current market value of SCRIPS' common stock, and by depressing the price of the common stock, IRONRIDGE was able to obtain a greater number of shares upon conversion;

c)     The Trading Strategy employed by IRONRIDGE would cause a reduced demand for SCRIPS' shares because it created the false appearance that there were multiple sellers at three (3) brokerage firms when, in fact, the only seller was the Defendant;

d)     David Sims controlled IRONRIDGE and had been a control person of at least ten (10) offshore entities that were the subject of SEC enforcement actions in financings mirroring those presented to Plaintiff;

e)     Sims and his affiliated entities had been the subject of at least twenty (20) private actions by issuers alleging illegal and manipulative trading in connection with funding mirroring those offered to Plaintiff; and

21

f)      Sims controlled Caledonian, which became a third party beneficiary of the Stipulation upon its receipt of 1,615,000 shares issuable to IRONRIDGE.

46.     In order to conceal the scheme, it was absolutely critical that SCRIPS not learn of the overwhelming number of actions involving Sims and his offshore corporate egos which would have revealed the devastating effect of the Trading Strategy and Sims' illegal schemes mirroring the SCRIPS investment.

47.     At no time did any of the Defendants advise SCRIPS of the suits and proceedings involving Sims and the associated history of losses suffered by others among his prey.  Because of the astounding number of lawsuits involving Sims and companies under his control, the Defendants knew that SCRIPS would reject its financing if Sims' interest and the actions against his related entities were disclosed. The situation was akin to failing to disclose that one is actually going into business with Bernie Madoff.

48.     In addition to the material omissions set forth above, the Defendants failed to disclose to the Plaintiff the fact that they had established a multi-leveled offshore structure through which they were going to make the SCRIPS investment; that they intended to use that structure to engage in the Trading Strategy designed to drive down the price of Plaintiff's stock by deceiving investors in an otherwise efficient market; and that they were using the structure so that the beneficial owners, IRONRIDGE, the principal actor Sims and his confederates, including KIRKLAND and O'NEILL, could avoid liability for expected violations of law. These were all then-present facts that were known to the Defendants.  Likewise, Defendants failed to disclose that they intended to trade SCRIPS stock through multiple brokerage firms and accounts in a deceptive and manipulative manner, also a then-present fact known to Defendants.

49.     A review of SEC filings and reports of the history of the investments made by IRONRIDGE and Sims reflects that from the inception of the Trading

Strategy, the goal was to aggressively drive down the stock price of the companies targeted in execution of the Strategy.  This Strategy was not disclosed to SCRIPS or to the many other companies targeted by Defendants.

50.   The scheme by which IRONRIDGE invested in SCRIPS was not an isolated and separate investment decision having no connection with their investments in other similarly-situated companies.  Rather, it was a part of the overall scheme that, from the outset, targeted hundreds of United States companies and was expected to harm those companies while earning unconscionable profits for the Defendants.

51.   Defendants' actions with respect to the selling of SCRIPS shares mirror a pattern of fraudulent transactions with at least 32 other companies, which demonstrates that they acted with the requisite scienter.

52.   As of November 26, 2014, an analysis of the SEC's EDGAR database for 32 companies in which IRONRIDGE appears to have conducted similar financings reveals that the vast majority of the companies' stock prices declined sharply over the six month period following the IRONRIDGE investment, and in fact the issuers were crippled by IRONRIDGE.

53.   In order to create and sustain the initial decline in the stock price to start the toxic funding, the Defendant conducted manipulative trading in the stock of SCRIPS through multiple accounts under the Defendant's control at three (3) brokerage firms, aimed at creating the false appearance that multiple sellers were liquidating at the lowest possible prices, when in fact, IRONRIDGE was the only seller at such prices.  Transfer Agent records reflect that:

a)   On November 11, 2013, IRONRIDGE caused SCRIPS' transfer agent to deliver 4,690,000 shares to a brokerage firm account in the name of IRONRIDGE at U.S. Bank Corp.

b)      On November 11,2013, IRONRIDGE caused SCRIPS' transfer agent to deliver 4,000,000 shares to a brokerage firm account in the name of IRONRIDGE at Albert Fried & Company, LLC, and

c)      On February 21, 2014, IRONRIDGE caused SCRIPS' transfer agent to deliver 1,615,000 common shares into the account of Caledonian Bank Limited at Scottsdale Securities.

54.      IRONRIDGE was selling SCRIPS' common stock at the bid price through the three (3) firms shortly after the Stipulation was executed.

55.      Because the stock had been sold at the bid price, it appeared that the demand for SCRIPS shares was decreasing, when in fact, the decline was due to the Trading Strategy, and thus IRONRIDGE was able to reap immense profits at the expense of SCRIPS so long as the price of SCRIPS securities continued to drop. The Defendants received proceeds of at least $1,200,000 from the sale of the 10,305,550 shares.

56.      The actions taken by Defendants in depositing shares in three (3) firms and selling at the bid price immediately prior to the close of the market, were not undertaken for any legitimate corporate or business purposes but with the sole design of distorting an otherwise efficient market for the shares of SCRIPS common stock and to enable Defendants to receive additional common shares as a result of the declining stock price.

57.      Because there is no legitimate explanation for the acts and omissions described above, Plaintiff is informed and believes that Defendants each knew and intended that these actions would distort an otherwise efficient market for the shares of SCRIPS stock and artificially decrease its share price, enabling Defendants to receive additional shares.

58.      The Defendants' illegal manipulation was also accomplished through

24

fraudulent statements and omissions in insider reports.  These actions also further demonstrate the Defendant's scienter.  Pursuant to Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m, and regulations promulgated pursuant thereto (17 C.F.R. § 240.13d-1) persons acquiring more than 5% of the issued and outstanding shares of a class of a publicly traded issuer's equity securities are required to report their holdings and subsequent changes thereto on Schedule 13-G. The most critical disclosure required by Section 13(d), is that holders obligated to file such reports, file subsequent schedules which disclose their sales of the issuer.

59.     IRONRIDGE directly, and Sims indirectly, each control in excess of 5% of the issued and outstanding common shares of SCRIPS following the issuance of 8,690,000 common shares on November 11, 2013.  In connection with the acquisition of the foregoing shares, on or about November 8, 2013, IRONRIDGE filed a Schedule 13-G with the Securities & Exchange commission that contained false and misleading information designed to artificially manipulate SCRIP's shares.  The Schedule 13-G discloses that IRONRIDGE was entitled to 5,650,000 shares, despite receiving 8,690,000 shares.  As such, IRORIDGE received 3,040,000 shares more than it was entitled to sell at such time.  Further, the Schedule 13-G failed to disclose that Caledonian was a third party beneficiary of the shares.

60.     IRONRIDGE'S 13-G provides: "IV [referring to IRONRIDGE] received an initial issuance of 8,690,000 common shares, and may be required to return or be entitled to receive shares, based on the calculation summarized in the prior paragraph. Based on the $0.1820 per share closing price on November 7, 2013, IV would be entitled to 5,650,000 shares. For purposes of calculating the percent of class, the reporting persons have assumed that there were 78,238,653 shares of common stock outstanding immediately prior to the issuance of shares to IV, such that 5,650,000 shares issued to IV would represent approximately 6.8% of the outstanding common stock after such issuance."

25

61.     Despite such statements, in order to mislead the investing public and SCRIPS, IRONRIDGE failed to disclose that it did not return the 3,040,000 shares to SCRIPS and in fact had sold such shares without providing the disclosures required under federal securities laws, for the purpose of manipulating the price of SCRIPS' common shares downward.  Because no sales were reported, Defendants created the illusion that the 10,305,000 free trading shares held by IRONRIDGE could be sold in the future when, in fact, IRONRIDGE had already sold such shares.

62.     On February 10, 2014, Caledonian received an additional 1,615,550, shares issuable to IRONRIDGE. Despite its obligation to amend its earlier filed Schedule 13-G, the Defendants failed to provide disclosures on Schedule 13-G that included the issuance of IRONRIDGE's 1,615,550 shares to Caledonian.

63.     Upon information and belief, IRONRIDGE sold all 10,305,000 shares of SCRIPS shares it received in approximately 20 transactions.  Despite this, IRONRIDGE failed to report its sales as required under the securities laws, which require that IRONRIDGE file reports on Schedule 13-G reporting each of its sales.

64.     The failure to file the requisite reports on SEC Schedule 13-D to properly reflect holdings, control, or beneficial ownership of SCRIPS shares, and changes thereto, was calculated to manipulate the market price of SCRIPS common shares downward because investors were not advised that the aggressive selling activity was the result of IRONRIDGE, and investors believed IRONRIDGE would still be able to sell its 10,305,000 shares, when in fact, the shares were already sold. This deception caused the market price of SCRIPS common shares to become artificial – *i.e.,* divorced from any connection to the assets, liabilities, earnings or reasonable prospects for earnings that would have determined price in what was otherwise an efficient market.  SCRIPS' revenues increased from $150,499 to 16,768,055 for the period ending September 30, 2013 and 2014 respectively, yet its stock price declined by 33%.

26

1

2

3

## FIRST CAUSE OF ACTION (10b-5 VIOLATIONS)

65.    Plaintiff incorporates, by reference, the allegations of paragraphs 1 through 64 of this Complaint.

66.    The conduct of Defendants IRONRIDGE, KIRKLAND and O'NEILL violates SEC Rule 10b-5 (promulgated under the Securities Exchange Act of 1934).

67.    Defendants individually and in concert used directly and indirectly the means and instrumentalities of interest commerce, the mails and/or interstate wires in connection with their scheme to defraud and manipulate as set forth above.

68.    The Defendants each employed devices, schemes and artifices to defraud and to manipulate Plaintiff's stock price, made untrue statements of material fact, and omitted to state material facts necessary to make their statements not misleading, and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Plaintiff.

69.    Each of the Defendants was a primary participant in the wrongful and illegal conduct.

70.    Each of the Defendants acted with intent to deceive, manipulate and defraud the Plaintiff.  Defendants acted with actual knowledge, or at a minimum severe recklessness, that the omissions and statements referenced herein were false and misleading, and that the failure to disclose material facts and make accurate representations as to their actual and intended plans and trading induced Plaintiff to do business with IRONRIDGE and to issue stock to IRONRIDGE.

71.    KIRKLAND and O'NEILL are also persons in control of Defendant IRONRIDGE under Section 20(a) of the Securities and Exchange Act.  Each has been a high level Managing Director and executive of Defendant IRONRIDGE at all relevant times.  Indeed, they represent two of the three total Managing Directors identified on the IRONRIDGE web site.  Further, each was well aware of and

27

participated intimately in the misrepresentations and wrongful omissions made to Plaintiff in the course of negotiations, and each has participated in and ratified the manipulation of the Plaintiff's stock as alleged herein.

72.    At the time of the misrepresentations and omissions alleged herein, Plaintiff believed all statements and assurances made by Defendants were true and was unaware of any of the omitted facts, such as the Defendants' intent to manipulate Plaintiff's stock as alleged herein.  Had Plaintiff known the true facts, Plaintiff would never have entered into the Section 3(a)(10) arrangement with Defendant IRONRIDGE.

73.    As a direct and proximate result of the wrongful conduct of the Defendants, Plaintiff suffered damages and is consequently entitled to all relief available under the Securities Exchange Act, including compensatory damages against each of the Defendants IRONRIDGE, KIRKLAND and O'NEILL, jointly and severally, for all damages suffered as a result of the Defendants' wrongdoing, in an amount to be proven at trial, with interest thereon; the costs and expenses of this action; and other relief which the Court may find just, appropriate or legally warranted.

## SECOND CAUSE OF ACTION (BREACH OF CONTRACT)

74.    Plaintiff incorporates, by reference, the allegations of paragraphs 1 through 73 of this Complaint.

75.    IRONRIDGE's conduct is a breach of the terms of the agreement between SCRIPS and IRONRIDGE, which was premised on the understanding that IRONRIDGE would not engage in conduct designed to depress artificially the price of SCRIPS' stock, as reflected in paragraph 14 of the Stipulation (Exhibit 2) and the "No Shorting" provision on page 2 of the Term Sheet (Exhibit 1). IRONRIDGE's breach has adversely affected SCRIPS' share value and has caused

28

SCRIPS to issue excessive amounts of stock to IRONRIDGE under the

STIPULATION.

### THIRD CAUSE OF ACTION (TORTIOUS BAD FAITH)

76.   Plaintiff incorporates, by reference, the allegations of paragraphs 1

through 75 of this Complaint.

77.   IRONRIDGE's conduct is a tortious breach of the covenant of good

faith and fair dealing implied in every contract in California.  IRONRIDGE

engaged in manipulative trading activity designed to depress artificially the value of

SCRIPS' stock and thereby yield grossly unfair levels of share issuances under the

Stipulation.  This conduct was in violation of past representations that

IRONRIDGE would not engage in such activity, and was at odds with the

understanding, reflected in the Term Sheet and the Stipulation, that IRONRIDGE

would not engage in trading activity designed to depress stock price.  This conduct

was part of a malicious, oppressive, and fraudulent scheme to game the Stipulation

in such a way as to inflict financial harm on SCRIPS to such a degree as to

undermine and frustrate the essential purpose of the Stipulation (from SCRIPS'

perspective), in order to produce grossly excessive and unconscionable levels of

profit for IRONRIDGE.

### FOURTH CAUSE OF ACTION (DECLARATORY RELIEF)

78.   Plaintiff incorporates, by reference, the allegations of paragraphs 1

through 77 of this Complaint.

79.   IRONRIDGE continues to make demand under the Stipulation for

issuance of additional shares to it.  SCRIPS has refused the latest such demand.

SCRIPS requests that the Court declare that it has no obligation to meet such

demands because SCRIPS is excused from performing under the Stipulation due to

29

IRONRIDGE's illegal conduct, breach of the Stipulation, and tortious bad faith.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment as follows:

1. That the Court award compensatory damages according to proof;

2. That the Court award attorney's fees;

3. That the Court award costs of suit;

4. That the Court award punitive damages on account of IRONRIDGE's tortious bad faith, which either constitutes fraud or was accompanied by malice, oppression or fraud;

5. That the Court declare the rights and obligations of the parties as requested in Cause of Action No. 4; and

6. That the Court award such other and further relief as the Court deems just and proper.


Dated:  April 27, 2015


By:  /s/Carlos E. Needham
Carlos E. Needham
*Attorney for Plaintiff*
SCRIPSAMERICA, INC.

30