1   CARLOS E. NEEDHAM (SBN 202777)
    Needham Law Firm, A.P.C.
2   28494 Westinghouse Place, Suite 213
    Valencia, CA 91355
    Telephone: (661) 843-6175
3   Facsimile: (661) 430-5595
    cneedham@needhamlegal.com
4   Attorney for Plaintiff
    SCRIPSAMERICA, INC.
5

6                    UNITED STATES DISTRICT COURT

7                   CENTRAL DISTRICT OF CALIFORNIA

8

9   SCRIPSAMERICA, INC.,                Case No. 14-03962-MMM (AGRx)

10          Plaintiff,                  **PLAINTIFF'S OPPOSITION TO
                                        DEFENDANT'S MOTION TO
11          vs.                         DISMISS PLAINTIFF'S SECOND
                                        AMENDED COMPLAINT**
12  IRONRIDGE GLOBAL LLC d/b/a          **[Filed concurrently with Declaration
    IRONRIDGE GLOBAL IV, LTD.           of Carlos Needham and Request for
    JOHN KIRKLAND,                      Judicial Notice]**
13  BRENDAN O'NEILL
    and DOES NOS. 1-5,
14                                      Hearing Date: July 27, 2015
15          Defendants.                 Time: 10:00 a.m.

16                                      Hearing Location: Courtroom 780

17                                      Judge: Hon. Margaret M. Morrow

18                                      Action Filed: May 22, 2014

19

20

21

─────────────────────────────────────────────────────────
    OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................. 1

III.   ARGUMENT AND AUTHORITIES .............................................. 4

   A.   The Second Amended Complaint Supplies Sufficient Particularity in Its Allegations of Open Market Manipulation. ....................................... 4

   B.   If Efficiency Is Required for an Open Market Manipulation Claim, the Second Amended Complaint Sufficiently Alleges Efficiency.......... 6

   C.   To the Extent that Particularized Allegations of Manipulative Trading Activity Are Not Enough to Create a Strong Interfence of Scienter at the Pleading Stage, the Second Amended Complaint Also Contains Allegations of a Pattern of Conduct that Help to State a Plausible Case of Intent to Manipulate................................................. 13

IV.   CONCLUSION.............................................................................. 13

i

**TABLE OF AUTHORITIES**

**CASES**

*Anschultz Corp. v Merrill Lynch & Co., Inc. 785 F.Supp.2d 799, 811 (N.D.Cal. 2011)* ..................................................................... 4

*ATSI Communications, Inc. v Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007)* ................................................................................ 4

*Bank of America Corp., 2011 SL 740902 at \*6 (N.D.Cal.2011).* ......................... 5

*Cammer v Bloom, 711 F.Supp. 1264 (1989)* ......................................................... 8

*Desai v Deutsche Bank Securityies, Ltd., 573 F.3d 931, 945 (9th Cir. 2009)* .......................................................................................... 7

*Initial Pub. Offering Sec. Litig., 54 F.Supp.2d 277, 297 (S.D.N.Y. 2008)* ................................................................................................ 12

*Korsmo, Mismatch: The Misuse of Market Efficiency in Market Maniuplation Class Actions, 52 William and Mary L.R. 1111 (2011)* ................................................................................................. 7

*Laser Arms Corp. Se. Litig., 794 F.Supp 475, 490 (S.D.N.Y. 1989)* ................. 13

*Louisiana Pac. Corp. v Money Mkt.1 Instiutional Inv. Dealer, No. CV 09-03529 JSW, 2011 WL 1142568, \*5 (N.D.Cal.Mar. 28, 2011).* ............................................................................................. 5

*Salvani v ADVFN PLC, No 13 Civ 7082(ER), 2014 WL 4828101* ..................... 12

*SEC v Masri, 523 F.Supp.2d 361. 369 (S.D.N.Y.2007* .......................................... 5

*Scone Invs., L.P. v Am. Third Market Corp., No 97 bCIV. 3802, 1998 WL 205338, \*5 (S.D.N.Y. 1998)* ......................................... 7

ii

1 **I. INTRODUCTION**

2  The Second Amended Complaint states a plausible claim for open-market

3 manipulation.   Both of the deficiencies that the Court identified in allegations in

4 support of the open-market manipulation theory—the lack of particularity in

5 allegations regarding transactions and the lack of particularity in allegations

6 regarding market efficiency—have been corrected in the Second Amended

7 Complaint.

8  In its order granting the motion to dismiss the First Amended Complaint

9 (the "Order"), the Court noted the existence of authority for the application of a

10 relaxed pleading standard for market manipulation claims. (Order, at 23.)   The

11 Court ruled, however, that Scrips' allegations of market manipulation were not

12 sufficiently particular, even under the relaxed standard. (Order, at 24 and 43.)

13  That Second Amended Complaint fixes that deficiency.  It contains highly

14 granular transactional details supporting the market manipulation claim.  It

15 incorporates a voluminous set of data analysis that was prepared by an expert

16 and presents the data on a transaction-by-transaction basis.  The data show the

17 exact timing, volume, and participants in each transaction over the relevant

18 period.

19  It is hard to imagine a greater level of particularity in the allegations

20 regarding the transactions at issue.  The degree of particularity is more than

1

1  adequate for the pleading stage, especially under the relaxed standard.  There is

2  no support for the Defendants' assertion that expert analysis finding marker

3  manipulation is insufficient to support a complaint, or for their claim that the

4  Court at the pleading stage may disregard the conclusions of such an analysis

5  based on the Defendants' cavils.

6       The Court also found insufficient particularity in the First Amended

7  Complaint's allegations regarding market efficiency.  (Order, at 30.)   The Court

8  ruled that the First Amended Complaint's allegation of the efficiency of the

9  market for Scrips stock was merely conclusory because it lacked allegations

10  regarding the specific factors that inform an analysis regarding efficiency.  (*Id.*)

11       As discussed more fully below, the applicability of the "efficient market"

12  requirement to an open- market manipulation claim is far from clear.

13  Nevertheless, the Second Amended Complaint contains specific allegations

14  addressed to the criteria used for evaluation of market efficiency.  Moreover, the

15  determination of market efficiency is a fact question involving expert analysis of

16  highly individualized factors for a given company's stock.  There is no blanket,

17  *per se* rule as to the efficiency determination for any particular trading forum.

18  The Second Amended Complaint's specific allegations regarding market

19  efficiency factors are sufficient to preclude the granting of the motion to

20  dismiss, even assuming, in the first instance, that the efficiency requirement

2

OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    actually does apply in an open-market manipulation case.

2          Also, just several days ago, on June 25, 2014, the Securities and Exchange

3    Commission ("SEC") issued an order in a proceeding styled "In the Matter of

4    Ironridge Global Partners, LLC, Ironridge Global IV. Ltd., Respondents" (the

5    "SEC Order").  (A true and correct copy of the SEC Order is attached as Exhibit

6    A to the accompanying Declaration of Carlos Needham.)  The SEC Order

7    institutes cease and desist proceedings against Ironridge.  Based on an

8    investigation by its Division of Enforcement, the SEC alleges that Ironridge has

9    engaged in a pattern of at least 33 Section 3(a)(10) transactions in which it

10   "typically drove down the share price and increased the number of shares that

11   [Ironridge GLOBAL IV, Ltd.] received under the applicable price protection

12   formulas." (¶ 35, p. 5 of the SEC Order.)  The SEC alleges that through share

13   requests under the Section 3(a)(10) settlements, Ironridge's principals

14   "controlled or directed the issuer's (sic) issuance of new shares to [Ironridge

15   Global IV, Ltd.]." (¶ 38, p. 5 of the SEC Order.)

16         The factual allegations in the SEC Order regarding an extensive and

17   ongoing pattern of abuse of the Section 3(a)(10) mechanism to take control of

18   issuers' stock (thereby operating as an unregistered dealer) and to drive share

19   price down virtually mirror Scrips' allegations in this action.  Of course, mere

20   allegations do not serve to prove anything.  But, at the pleading stage, they serve

3

1    to bolster a strong inference of scienter.  After all, the allegations arise from an

2    investigation by a U.S. government agency.  As such, they present sufficient

3    indicia of reliability to be considered in the evaluation of a motion to dismiss.

4           Accordingly, Scrips requests that the Court take judicial notice of the SEC

5    Order, which could not have been included in the Second Amended Complaint

6    because it did not yet exist,[1] or that the Court allow Scrips to amend to include

7    the SEC Order.

8

9    **II.    ARGUMENT AND AUTHORITIES**

10

11          **A.    The Second Amended Complaint Supplies Sufficient
                    Particularity in Its Allegations of Open Market Manipulation.**

12

13          The Court has noted that the Second Circuit has held that "a plaintiff need

14   not plead manipulation to the same degree of specificity as a plain

15   misrepresentation claim."  (Order, at 23, quoting *ATSI Communications, Inc. v.*

16   *Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  The Court has also noted

17   that, while the Ninth Circuit has neither rejected nor adopted this "somewhat

18   relaxed" standard, a number of California district courts have applied it.

19   (Order, at 23, quoting *Anschutz Corp. v. Merrill Lynch & Co., Inc.* 785

20   _____

[1] Indeed, in its Order granting dismissal of the First Amended Complaint, the Court took judicial notice of SEC filings, at Ironridge's urging.  The Court should take judicial notice of the SEC Order for the same reason.

4

1    F.Supp.2d 799, 811 (N.D.Cal. 2011) and citing *Louisiana Pac. Corp. v. Money*

2    *Mkt. 1 Institutional Inv. Dealer,* No. CV 09-03529 JSW, 2011 WL 1142568, *5

3    (N.D. Cal. Mar. 28, 2011) and *In re Bank of America Corp.*, 2011 WL 740902

4    at *6 (N.D.Cal. 2011).  (Order, at 23.)

5         The Court ruled that the First Amended Complaint did not meet even the

6    relaxed standard because it did not allege specific facts as to the timing of

7    transactions and transaction participants.  (*Id.*, at 23-24.)

8         The Court articulated a similar analysis in the scienter portion of the

9    Order.  The Court observed that "the features of open-market transactions" can

10   give rise to "an inference of manipulative intent."  (Order, at 43, quoting *SEC v.*

11   *Masri*, 523 F.Supp.2d 361, 369 (S.D.N.Y. 2007).  The Court, however, also

12   stated that "There are no allegations regarding the size, timing, or repetition of

13   Ironridge's trades in the first amended complaint."  (*Id.*)  The court reasoned:

14   "Absent particularized allegations of manipulation, therefore, the stock sales

15   themselves do not evidence scienter."  (*Id.*)

16        In contrast to the First Amended Complaint, the Second Amended

17   Complaint contains extensive, voluminous, detailed allegations regarding the

18   size, timing, and repetition of transactions and transaction participants.  (Second

19   Amended Complaint, at ¶¶ 22-26.)  The Second Amended Complaint

20   incorporates Exhibit 5 attached thereto, which presents the detailed

5

1   transactional data in various ways.  First, the data are organized on trade-by-

2   trade basis, with sales indicated in red, and Ironridge sales identified in yellow.

3   Second, the data are organized to show the "position" of participants in the

4   stock on a weekly basis.  Third, the data are organized to show trading volume

5   on a daily basis, with daily opening, closing, high, and low prices.  Fourth, the

6   data are organized to show a summary of Ironridge trading on a monthly basis.

7        The transactional data supporting the expert conclusion of open-market

8   manipulation, which the Court found fatally lacking in the First Amended

9   Complaint's allegations, has now been prodigiously supplied in the Second

10   Amended Complaint.   The allegations are more than sufficiently particular

11   under any standard, but all the more so under the relaxed standard that has been

12   applied to open-market manipulation claims.

13

14        **B.    If Efficiency Is Required for an Open Market Manipulation
                   Claim, the Second Amended Complaint Sufficiently Alleges**
15        **Efficiency.**

16

17        Various jurists and scholars have noted that the market efficiency analysis

18   typically required in traditional "fraud on the market" cases based on classic

19   misrepresentation theories should not logically be required in market

20   manipulation cases—or at least should be a very different kind of analysis.  *See,*

6

1   *e.g.*, Korsmo, *Mismatch: The Misuse of Market Efficiency in Market*

2   *Manipulation Class Actions*, 52 William and Mary L.R. 1111 (2011).  After all,

3   the "fraud on the market" serves to establish the causation/reliance element, and

4   in a market manipulation case the impact on price (loss causation), due to the

5   manipulation, by itself establishes the causation.  *Id.*, at 1113-1119, 1151-57; *see*

6   *also Scone Invs., L.P. v. Am. Third Market Corp.*, No. 97 CIV. 3802, 1998 WL

7   205338, *5 (S.D.N.Y. 1998) ("The fraud on the market theory is especially

8   applicable in the market manipulation context.  Market manipulation schemes

9   which are intended to distort the price of a security, if successful, *necessarily*

10   defraud investors who purchase the security in reliance on the market's

11   integrity.")  (emphasis added), cited in *Desai v. Deutsche Bank Securities Ltd.*,

12   573 F.3d 931, 945 (9th Cir. 2009)

13       Indeed, it has been observed, an "inefficient" market for a thinly traded

14   stock is much more at risk of manipulation than the "efficient" market for a very

15   widely traded, marquis, blue chip stock, and consequently is even more in need

16   of the protection of federal securities laws.  Korsmo, *supra*, at 1113-1119.

17       In *Desai*, Circuit Judge O'Scannlain noted that it is questionable whether

18   the efficiency requirement applies in the usual way in a manipulation case.  He

19   wrote:

20           I recognize the possibility that certain allegations of
        manipulative conduct might change the application of the fraud

7

1    on the market theory.  This is because the plaintiff in
     manipulation cases often alleges that a defendant directly
2    manipulated the price.  Certainly, a plaintiff must still show that
     the market in question could absorb into the price the
3    misinformation communicated by the alleged manipulation.
     But need a plaintiff show the same type of proof of an efficient
4    market in a manipulation case as is required in a
     misrepresentation case?  Although I note the doctrinal wrinkle,
5    this is a question I would agree we actually do not need to
     reach, because Investors forsook the fraud on the market theory.

6

7    573 F.3d at 945 n.1.

8         In any event, assuming the efficiency requirement applies, the Second

9    Amended Complaint fixes the problem the Court had with the First Amended

10   Complaint's allegations regarding efficiency.  The Court stated: "The first

11   amended complaint does not plead facts concerning any of the *Cammer* factors.

12   It alleges only that Ironridge deceived investors in an 'otherwise efficient

13   market.'  This type of conclusory allegation does not suffice.  [citations

14   omitted.]"   (Order, at 38.)

15        The Second Amended Complaint does not merely allege in conclusory

16   fashion that the market for Scrips stock is efficient.  It contains allegations

17   specifically addressed to the criteria for market efficiency set forth in *Cammer v.*

18   *Bloom*, 711 F.Supp. 1264 (1989).

19        The Second Amended Complaint alleges:

20        "As the trading data (in Exhibit 5) show, the weekly trading volume in

8

1  Scrips stock is large enough to at least establish a substantial presumption of

2  efficiency (at well over 1% of the total amount of shares)." (Second Amended

3  Complaint, at ¶ 29.)

4         "Scrips stock had numerous market makers and arbitrageurs, including

5  Knight Capital Americas LLC, Stockcross Financial Services, Inc, BMA

6  Securities, Cantor Fitzgerald & Co., BNY Mellon Capital Markets, LLC,

7  Biltmore International Corp., Wilson-Davis & Co., Inc., Vfinance Investments,

8  Inc. and Guggenheim Investor Services, LLC." (Second Amended Complaint,

9  at ¶ 30.)

10        "Also, there are considerable empirical facts showing a cause and effect

11  relationship between financial releases and an immediate response in stock

12  price—which is the hallmark of an efficient market.  On October 21, 2013,

13  ScripsAmerica, Inc. announced that the Company had signed an agreement to

14  acquire PIMD International, LLC, a wholesale distributor of prescription drugs

15  as well as medical supplies and devices. Immediately after this press release

16  share price went from nineteen cents to twenty-six cents.  On October 28, 2013,

17  ScripsAmerica, Inc. announced that the Company's due diligence team would

18  travel to China in November to begin formal RapiMed® distribution

19  negotiations in preparation for a product launch into the Chinese OTC market,

20  valued at over $32 billion. Immediately after this press release share price went

1   from twenty-three cents to twenty-eight cents.  On October 30, 2013, it was

2   announced that PIMD International, LLC had shipped its first order since

3   entering into an agreement to be acquired by ScripsAmerica.   PIMD

4   International also announced that it expected overall revenue to continue

5   growing with the recent launch of its new medical supply product website.

6   Immediately after this press release share price went from twenty-eight cents to

7   thirty cents.  On November 11, 2013, ScripsAmerica Inc. announced that it had

8   agreed to invest in WholesaleRx  in exchange for an equity position in the

9   company. Immediately after this press release share price went from nineteen

10  cents to twenty-three cents.  On November 25, 2013, ScripsAmerica, Inc.

11  announced that the Company's recent business development trip to China had

12  generated strong interest from multiple large entities for the distribution of its

13  RapiMed® children's pain reliever throughout Asia.  Immediately after this

14  press release share price went from sixteen cents to eighteen cents.  On

15  December 19, 2013, ScripsAmerica Inc. announced that the Company had

16  received and processed a record high $51,920 in orders during the week ending

17  December 13, 2013 and $84,821 in orders for the first two weeks of the month

18  from its recent pharmaceutical distribution joint venture.  Immediately after this

19  press release share prices went from twelve cents to fourteen cents.  On January

20  31, 2014, ScripsAmerica, Inc. announced that the Company had entered into a

10

1    business management agreement for a New Jersey compounding pharmacy.

2    Immediately after this press release share prices went from nineteen cents to

3    twenty cents.  On February 3, 2014, ScripsAmerica, Inc. announced that the

4    Company had entered into a joint venture with Global Pharma Hub, an

5    international pharmaceutical marketing and distribution company, to license,

6    market and distribute its RapiMed® Children's pain reliever and fever reducer.

7    Immediately after this press release share prices went from twenty cents to

8    nineteen cents.  On February 10, 2014, ScripsAmerica, Inc. announced that the

9    Company had received registration approval for its RapiMed® Children's Pain

10   Reliever & Fever Reducer from the Government of Hong Kong.  Immediately

11   after this press release share prices went from thirteen cents to fourteen cents.

12   On February 12, 2014, ScripsAmerica Inc. announced that during the month of

13   January, the Company's equity venture, Wholesale Rx, received and processed

14   $268,696 in orders, setting a second consecutive monthly revenue record.

15   Immediately after this press release share prices went from fourteen cents to

16   sixteen cents.  On February 18, 2014, ScripsAmerica Inc., announced that the

17   Company had commenced the prepayment of its outstanding convertible debt by

18   issuing the first payment on its convertible note with the largest principal and

19   closest conversion date.  Immediately after this press release share prices went

20   from twelve cents to thirteen cents.  On March 5, 2014, ScripsAmerica, Inc.

1    announced that the specialty pharmacy it had recently entered into a

2    management agreement with recorded $494,643 in prescription sales for the

3    month of March.  Immediately after this press release share prices went from ten

4    cents to eleven cents.  On June 2, 2014, ScripsAmerica, Inc. announced that its

5    managed specialty pharmacy had reported $1.6 million in prescription sales

6    during the month of May.  Immediately after this press release share prices went

7    from eleven cents to twelve cents." (Second Amended Complaint, at ¶ 31.)

8         "As the various above factors demonstrate, Plaintiff's stock was in an

9    open and developed market in which Plaintiff's stock was actively traded, and in

10   which information about the company was reflected in volume and prices over a

11   long period of time."  (Second Amended Complaint, at ¶ 32.)

12        The Court should also bear in mind that the *Cammer* analysis presents a

13   fact question as to the efficiency of the market <u>for a particular stock</u>, and does

14   not include any *per se*, blanket rules for particular trading fora.  *Cammer*, *supra*,

15   711 F.Supp. at 1287.

16        In *Salvani v. ADVFN PLC*, No. 13 Civ. 7082(ER), 2014 WL 4828101,

17   *10 n.9 (2014), the court stated:

18        [C]ourts in this Circuit have often found the question of
         whether a market is efficient to be a question of fact and
19       therefore not meant to be answered on a motion to dismiss.
         *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 544 F.Supp.2d
20       277, 297 (S.D.N.Y. 2008) (stating that the question of whether
         relevant markets were efficient is a question of fact to be

                                          12

---

1    resolved at trial); *In re Laser Arms Corp. Se. Litig.*, 794 F.Supp.
     475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir.1992) (per
2    curiam) ("Whether in fact Laser Arms *(whose stock was traded
     in the over-the-counter market)* traded in an efficient market is
3    a question of fact.  Therefore, resolution of that issue must
     await presentation of further proof at trial").  Accordingly, the
4    Court will not grant Defendant's motion to dismiss on the basis
     that the OTCBB cannot meet the standard for an efficient
5    market as a matter of law.

6    (Emphasis added.)[2]

7

8        **C.   To the Extent that Particularized Allegations of Manipulative
              Trading Activity Are Not Enough to Create a Strong Inference
9             of Scienter at the Pleading Stage, the Second Amended
              Complaint Also Contains Allegations of a Pattern of Conduct
10            that Help to State a Plausible Case of Intent to Manipulate.**

11          As discussed above, the Court has noted that allegations of manipulative

12   trading activity, at least if they are sufficiently particular, are enough to give rise

13   to a strong inference of scienter.  In addition, here, there are also allegations that

14   other companies have asserted precisely the same conduct by Ironridge.  Those

15   allegations bolster the inference of scienter in a holistic sense.

16          In its Order granting the motion to dismiss the First Amended Complaint,

17   the Court declined to credit such allegations, finding that they were based on

18   internet postings that lack sufficient indicia of reliability.  (Order, at 41.)

19          In the Second Amended Complaint, the allegations—while certainly not

20   ─────────────────────
     [2] On page 37 of the Order granting the motion to dismiss the first amended complaint, the Court cited *Salvani* in
     support of the statement that courts have held as a matter of law that the OTC market is not efficient.  In fact, as
     shown above, the *Salvani* court held the opposite.

                                   13

1   sufficient to actually *prove* anything (after all, we are at the pleading stage)—

2   include reliable evidence that other companies have, in fact, asserted that

3   Ironridge has engaged in precisely the same kind of manipulation alleged here:

5       A review of the SEC's EDGAR public filing database reveals that of the
        32 United States companies in which IRONRIDGE invested, virtually all
6       suffered a dramatic decline in their stock price following the toxic
        investment.  Also, there are actual court cases, including right here in Los
7       Angeles.  Among the companies that have been victims of IRONRIDGE's
        schemes is Green Automotive Company, Inc., which is the subject of a
8       similar stipulation/order in an Los Angeles Superior Court action, under
        the Section 3(a)(10) exemption.  Incredibly, IRONRIDGE actually seeks
9       6 billion shares in Green Automotive, which is six times the company's
        total capitalization.  That is a vivid illustration of the absurdly deceptive,
10      abusive and bad faith manner in which IRONRIDGE has been obtaining
        and implementing the type of stipulation/order at issue here.  In fact,
11      as noted above, the court declined to enforce the same stipulation language
        at issue here against Green Automotive.  As another, even more vivid
12      example of IRONRIGE's predatory conduct, IRONRIDGE has recently
        asserted that it is entitled to 27 billion shares of another company, Green
13      Innovations, Ltd.  Plaintiff's counsel, who also represents Green
        Innovations, can aver that the leadership of that company believes that
14      IRONRIDGE has wronged it in the very same way that IRONRIDGE has
        wronged the Plaintiff in this action.  See the attached Declaration of
15      Carlos Needham, Exhibit 6 hereto, which is fully incorporated herein.

16  (Second Amended Complaint, at ¶ 39.)

17       In addition, of course, there is the freshly-issued SEC Order, discussed at

18  the end of the Introduction above (and attached as Exhibit A to the

19  accompanying Declaration of Carlos Needham.)  The fact that the U.S.

20  Government is alleging the very same pattern of abuse of the Section 3(a)(10)

14

1   mechanism (albeit from a registration perspective) should significantly bolster

2   the inference of scienter, at least at the pleading stage.

3

4   **III.   CONCLUSION**

5       Scrips has stated a plausible claim for open-market manipulation.

6   Accordingly, the Court should deny the Defendant's motion.

7

8

9

10  Dated:  June 25, 2015

11                          By:  /s/Carlos E. Needham
                                 Carlos E. Needham
12                               *Attorney for Plaintiff*
                                 SCRIPSAMERICA, INC.
13

14

15

16

17

18

19

20

                                    15