DEAN J. KITCHENS, SBN 82096
CHELSEA V. NORELL, SBN 280831
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone:  (213) 229-7000
Facsimile:   (213) 229-6296
Email: DKitchens@gibsondunn.com
Email: CNorell@gibsondunn.com

SHANNON E. MADER, SBN 235271
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, California 90067
Telephone:  (310) 552-8500
Facsimile:   (310) 552-7041
Email: SMader@gibsondunn.com

*Attorneys for Defendants*
*Ironridge Global Partners, LLC, John Kirkland,*
*and Brendan O'Neil*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SCRIPSAMERICA, INC.,<br><br>                  Plaintiff,<br><br>     v.<br><br>IRONRIDGE GLOBAL, LLC d/b/a IRONRIDGE GLOBAL IV, LTD., JOHN KIRKLAND, BRENDAN O'NEIL, and DOES NOS. 1-5,<br><br>                  Defendants. | Case No. 14-03962-MMM (AGRx)<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>[Fed. R. Civ. P. 9(b), 12(b)(6)]<br><br>Hearing Date:       July 27, 2015<br>Hearing Time:       10:00 a.m.<br>Hearing Location:  Courtroom 780<br><br>Judge: Hon. Margaret M. Morrow<br>Action Filed: May 22, 2014 |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. ARGUMENT ...........................................................................................................4

    A. The SAC Does Not Plead Manipulative Conduct........................................4

    B. The SAC Does Not Plead Reliance...............................................................6

    C. The SAC Does Not Plead Facts Giving Rise To A Strong Inference Of Scienter......................................................................................................9

    D. The 10b-5 Claim Should Be Dismissed With Prejudice............................11

    E. The FAC Should Be Dismissed In Its Entirety ..........................................11

III. CONCLUSION ......................................................................................................11

# TABLE OF AUTHORITIES

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................. 1, 2, 5

*Barrie v. Intervoice-Brite, Inc.*,
  2009 WL 3424614 (N.D. Tex. Oct. 26, 2009) ............................................................ 7

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988) ................................................................................................. 11

*Desai v. Deutsche Bank Sec. Ltd.*,
  573 F.3d 931 (9th Cir. 2009) ..................................................................................... 6

*In re Apollo Group, Inc. Sec. Litig.*,
  2011 WL 5101787 (D. Ariz. Oct. 27, 2011) ............................................................ 10

*In re Autodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) ....................................................................... 2

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) ..................................................................................... 2

*Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.*,
  ___ Cal. App. 4th ___, 2015 WL 3958296 (Cal. App. Ct. June 30, 2015) ............... 4

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................... 10

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977) ................................................................................................... 4

*Schmidt v. Herrmann*,
  614 F.2d 1221 (9th Cir. 1980) ................................................................................... 2

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) ..................................................................................... 9

## I. INTRODUCTION

Plaintiff ScripsAmerica, Inc.'s ("Scrips") Opposition to Defendants' Motion to Dismiss (the "Motion") confirms that Scrips cannot state a securities fraud claim against Defendants. As demonstrated in Defendants' Motion, the Second Amended Complaint ("SAC") does not state a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5. It does not adequately plead manipulation, reliance, or facts sufficient to give rise to a strong inference of scienter. Any one of these defects is fatal to Scrips's 10b-5 claim.

Scrips's Opposition does not meaningfully engage Defendants' arguments, responding to some in cursory fashion while ignoring others entirely. First, Scrips fails to address Defendants' argument that it cannot plead reliance based on the fraud-on-the-market presumption, because, as the Court has now twice held, Scrips "alleges that it relied on Ironridge's 'statements and assurances,' not on publicly available information concerning its stock price or its business in general." Second Order at 36 (citing First Amended Complaint ("FAC") ¶ 67); *see also* First Order at 50 n.90. In the SAC, Scrips once again alleges that it relied on Ironridge's "statements and assurances" to Scrips; not that it relied on public disclosures absorbed into its own stock price through the operation of an efficient market. *See* SAC ¶ 72.

Second, Scrips does not and cannot defend its deficient "bid whacking" allegations. Instead, Scrips appears to believe that attaching 200 pages of raw trading data and vaguely referencing conclusory "opinions" by an undisclosed "expert" somehow satisfies its burden of pleading manipulative conduct with particularity. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007) ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b)."). It does not. Ambiguous raw data by itself does not mean anything. It was Scrips's burden to identify, out of the 200 pages, *what* trades were purportedly manipulative, *which* Defendants performed them, *when* they were performed, *why* they were manipulative, *how* the market was misled by them, and *what*

effect the trades had on the market. *Id.* at 102. Scrips does not even make a good faith attempt to meet its burden. Instead, it simply dumped 200 pages of raw trading data into the record, leaving it to Defendants and the Court to try to unpack the data. Rule 9(b) requires more.[1]

Third, even if the fraud-on-the-market presumption applied—it does not—Scrips's allegations of an efficient market are implausible. As set forth in Defendants' Motion, Scrips itself has represented and its own trading data confirms that Scrips's stock price is highly volatile and the stock is very thinly traded. Scrips's only response to these arguments is to cut and paste the inadequate allegations from the SAC into nearly a third of its Opposition.

Finally, even though the Court already has held that "allegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter," *see* Second Order at 41–42 (internal quotations omitted), Scrips once again attempts to "bolster" its deficient scienter allegations by referencing third-party complaints—this time an order instituting administrative proceedings against Ironridge by the SEC (which was coincidentally filed just two days before Scrips's opposition brief was due). But the mere initiation of proceedings does not prove anything. Importantly, the SEC is *not* alleging securities fraud.

---

[1] *See, e.g.*, *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1554 (9th Cir. 1994) ("A complaint is not a puzzle . . . and we are loathe to allow plaintiffs to tax defendants, against whom they have levelled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint."); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) ("[P]laintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading. . . . The court is unwilling, however, to search through the 51–page CAC . . . and also finds that it would be unfair to compel defendants to do so."). *Cf. Schmidt v. Herrmann*, 614 F.2d 1221, 1224 (9th Cir. 1980) ("Our examination of the confusing, distracting, ambiguous, and unintelligible pleadings presented by appellants convinces us that the district court was well within its discretion when it twice struck the appellants' pleadings. . . . Clearly . . . the appellees were prejudiced by the appellants' failure to file understandable pleadings. A recital of the convoluted statements as made in the pleadings would be of absolutely no help to the profession or to the judiciary. Simply stated, such pleadings should not be permitted to stand in the face of the positive language of our Federal Rules of Civil Procedure.").

Instead, based on assumed facts similar to those alleged by Scrips, the SEC asserts only that Ironridge should be required to register as a broker-dealer, a pure administrative claim and one which does not include any allegations of fraud or manipulative conduct.  By definition, a complaint that does *not* allege securities fraud cannot "bolster" an inference of an intent to commit such fraud.  Regardless, as even Scrips concedes, the SEC proceeding is in its nascent stages and its allegations are just that—"mere allegations."  *See* Opp'n at 3.  As such, they do not prove anything and cannot cure Plaintiff's deficient allegations.

Scrips's Rule 10b-5 claim should therefore be dismissed—this time with prejudice.  Moreover, because the 10b-5 claim is the sole basis for federal jurisdiction, the Court should decline supplemental jurisdiction over Scrips's remaining state law claims and dismiss the SAC in its entirety.  Fundamentally, this is an action for breach of contract and common-law fraud, which are state law claims that belong in state court.  Indeed, as the Court may recall, Scrips first raised its state law claims for fraud and breach of contract in the state court action and lost.  It then filed this duplicative action, seeking to be relieved of its obligations under the stipulated judgment and enforcement order.  *See* Complaint ¶¶ 11-17, 46.  Rightly, the Court dismissed Scrips's claims for such "relief" under the *Rooker-Feldman* doctrine.  *See* First Order at 19–20.  Undeterred, Scrips continued to pursue this meritless action—even as it pursued an improper and dilatory appeal of the enforcement order.  But for the pendency of that appeal, Scrips's state law claims would have been barred as *res judicata* here.  The California Court of Appeal, however, has now spoken, issuing a published opinion on June 30, 2015, dismissing Scrips's appeal of the state court judgment.  The Court of Appeal saw right through Scrips's bad faith litigation tactics, dismissing the appeal under the "disentitlement doctrine," holding that "dismissal is the appropriate remedy for [Scrips's] flagrant disregard for the order which is the subject of this appeal," and further finding that "in any event, [Scrips's] claims are plainly without merit." *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.*, ___ Cal. App. 4th ___, 2015 WL

3958296, at *1 (Cal. App. Ct. June 30, 2015) (attached hereto as "Exhibit A"); *see also id.* at *5 ("[Scrips] had no cause to disobey the court's order, but did so, repeatedly.").[2] As such, Scrips has no good faith basis for continuing to pursue its meritless state law claims here.  In the event that Scrips does not voluntarily dismiss its state claim laws prior to the hearing on Defendants' motion to dismiss (which it should), the Court should dismiss them—along with the 10b-5 claim— with prejudice.

## II.   ARGUMENT

### A.   The SAC Does Not Plead Manipulative Conduct

Scrips pleads three bases for its market manipulation claim:  (1) that Ironridge sold shares through different brokerage firms, (2) that Ironridge allegedly failed to comply with its § 13(d) obligations, and (3) that Ironridge allegedly engaged in "bid whacking."  In its prior Order, the Court rejected the first two bases, and Scrips's Opposition makes no attempt to defend those failed allegations, which are recycled verbatim in the SAC.  *See* Second Order at 19–22; *compare* FAC ¶¶ 40, 43, 48, 53-59 *with* SAC ¶¶ 45, 48, 53, 58-64.

Scrips also makes no substantive attempt to defend the sole remaining basis for its manipulation claim—"bid whacking."  Scrips's Opposition brief does not even use the term it coined in the first complaint and then recycled in the next two.  Nor does it explain how selling stock at the offered bid price, the only way that shares can be sold in the public markets, constitutes unlawful manipulation.  Instead, Scrips appears to suggest that attaching 200 pages of ambiguous raw trading data somehow suffices to state a manipulation claim.  It does not.  To support its allegation that "bid whacking" constitutes market manipulation, Scrips had to show that Ironridge's alleged trades, "mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  It further had to allege *which* trades were

---

[2] The very same day, Robert Schneiderman, Scrips's CEO and President, resigned. *See* ScripsAmerica, Inc.'s Form 8-K SEC Filing, June 30, 2015, *available at* https://www.sec.gov/Archives/edgar/data/1521476/000101968715002621/scripps_8k.htm.

manipulative and *why*.  *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 102 (complaint must set forth, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue").  Scrips does none of this.  Instead, Scrips leaves it to the reader to ferret purportedly manipulative trades out of 200 pages of trading data.

The trading data, moreover, does not support Scrips's assertion that Ironridge traded Scrips's stock at an artificially deflated price.  Rather, the data confirms that Scrips's stock price fluctuated significantly and that Ironridge consistently traded within the price range in which all Scrips's shares were traded.  For instance, in addition to the examples set forth in Ironridge's Motion, on January 28, 2014, the price range for all Scrips stock traded was $0.156 – $0.1684, and the price range in which Ironridge allegedly traded was $0.159 – $0.165.  *See* SAC, Ex. 5 at 125–128.  And on January 31, 2014, the price range for all Scrips stock traded was $0.177 – $0.202, and the price range in which Ironridge allegedly traded was toward the upper end of that range at $0.19 – $0.195.  *Id.* at 135–141.  Indeed, Scrips does not point to a single date on which Ironridge traded in a price range below the range of all other trades made on the same day—let alone that it had the opportunity to sell at a higher price but declined to do so.

Scrips does not (and cannot) respond to Defendants' arguments.  Nor does it explain how such trades – even if true – can constitute market manipulation.  Ironridge was entitled to sell as many shares as it wanted, any time it wanted, at any price it wanted, regardless of whether or how Scrips's share price was impacted.  That is not manipulation – that is the agreement the parties reached when they settled the underlying action, which was fully disclosed to both Scrips and the public.  As this Court observed in its order dismissing Ironridge's original complaint:  "Under the plain terms of the agreement, Ironridge was permitted to sell the shares however it pleased; it was not illegal to sell freely transferrable shares in a publicly traded company." *See* First Order at 53.

### B. The SAC Does Not Plead Reliance

Scrips pleads three bases for its reliance allegations: (1) Defendants' purported pre-stipulation statements, (2) Defendants' purported pre-stipulation omissions, and (3) fraud on the market. In its prior Order, the Court rejected the first two bases, and Scrips's Opposition does not defend those failed allegations, which are repeated almost verbatim in the SAC. *See* Second Order at 31–33; *compare* FAC ¶¶ 15-16 *with* SAC ¶¶ 15-16.

As to the third basis, Scrips argues only that it has adequately pleaded an efficient market.[3] But Scrips completely ignores the Court's holding that Scrips cannot invoke the fraud-on-the-market presumption because it "alleges that it relied on Ironridge's 'statements and assurances,' not on publicly available information concerning its stock price or its business in general." Second Order at 36 (citing FAC ¶ 67); *see also* First Order at 50 n.90. As the Court explained: "[B]ecause Scrips has pled facts establishing that it did not rely on the efficiency of the market, it cannot invoke the fraud-on-the-market presumption of reliance in connection with its manipulation claim." Second Order at 37. Because the SAC continues to plead reliance on Defendants' alleged "statements and assurances" (SAC ¶ 72), Scrips's attempted reliance on the fraud-on-the-market presumption fails as a matter of law.

Regardless, Scrips's reliance on the fraud-on-the-market presumption also fails because, as Defendants showed, its allegations of market efficiency are not plausible in

---

[3] Scrips suggests that market efficiency does not need to be pled in manipulation cases because "the impact on price (loss causation), due to the alleged manipulation, by itself establishes the causation." Opp'n at 7. But Scrips's reliance on *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009) is highly misleading. There, the Ninth Circuit *affirmed* the trial court's rejection, at the class certification stage, of a presumption of reliance in manipulation cases. *Id.* at 942. Writing separately, Judge O'Scannlain argued that the panel should have *rejected* the plaintiffs' proposed "integrity of-the-market" presumption *as a matter of law* (as opposed to affirming the district court under an abuse of discretion standard), explaining "it would swallow the reliance requirement." *Id.* at 943–44; *see also id.* at 945 ("[t]he artificial market activity that constitutes manipulative conduct, no less than misrepresentations of, or misleadingly incomplete statements about, a company's earnings, is also information that the market price either does or does not reflect.").

light of its own admissions and the 200 pages of trading data attached to the SAC. First, Scrips's own trading data shows daily, dramatic swings in Scrips's share price. For instance, on October 28, 2013, Scrips's stock fluctuated between $0.42 and $0.25. *See* SAC, Ex. 4 at 56.  Likewise, on October 25, 2013, Scrips's stock bounced between $0.26 and $0.17.  *Id.*  And on September 12, 2013, Scrips's stock veered from a high $0.23 to a low of $0.14.  *Id.* at 57.  This data is consistent with Scrips's own admissions in its SEC filings.  *See, e.g.*, Mader Decl., Ex. V at 10 ("our common stock, which historically has a high volatility"), 11 ("the expected volatility of our common stock"); Ex. W at 3 ("our common stock, which has a high-historical volatility"), 10 ("the expected volatility of our common stock"); Ex. X at 7 ("our common stock, which has a high-historical volatility"), 8 ("the expected volatility of our common stock").  Indeed, in valuing its executives' stock options, Scrips assumed a staggering volatility of 181.27%.  *Id.*, Ex. V at 23.

Second, the trading data confirms that Scrips's stock is thinly traded.  For example, the trading volume for the week of April 7, 2014 through April 11, 2014 was only approximately .6% of Scrips's total outstanding shares of common stock (*see* Mader Decl., Ex. Y (showing that as of April 8, 2014, Scrips had 125,610,436 outstanding shares of common stock); SAC Ex. 4 at 51(trading volume for week of April 7, 2014)), which is far less than the "1-2% minimum trading volume courts have found to support a finding of market efficiency." *Barrie v. Intervoice-Brite, Inc.*, 2009 WL 3424614, at *10 (N.D. Tex. Oct. 26, 2009).

Third, the trading data belies any claimed causal link between Scrips's share price and market events.  In the SAC, Scrips cherry picks 13 dates on which there was a press release or other event that supposedly affected its stock price.  But Scrips presents no evidence that those press releases or events *caused* the price movement, and the normal volatility of Scrips's stock prices readily explains the fluctuations.  For instance, Scrips alleges that a press release on October 28, 2013 caused its stock price to increase seven cents—the largest increase of any of the 13 days Scrips discusses.

SAC ¶ 31. But Exhibit 4 shows that Scrips's stock price fluctuated wildly that day, with a high-low differential of 17 cents, and that it ultimately closed at only one cent higher than it opened, belying the claim that the press release caused the stock to increase in value. SAC, Ex. 4 at 56. Moreover, the fluctuations on all 13 dates Scrips identifies are each well within the average daily fluctuations in Scrips's stock price without any purported market impetus. Specifically, of the 13 days on which Scrips's stock price supposedly changed following the release of certain information, in 10 of those instances, the stock prices moved only 1 or 2 cents. *See* Opp'n at 9–11. The largest jump was 7 cents. *Id.* at 9. But even a cursory review of the trading data shows that a 7-cent fluctuation is not unusual. *See, e.g.*, SAC, Ex. 4 at 6–8 (August 12, 2013 (.35-.28), August 14, 2013 (.38-.31), September 12, 2013 (.23-.14), October 23, 2013 (.33-.25)). Thus, the random spikes in price that Scrips identifies cannot plausibly be attributed to the purported market events identified by Scrips.

Fourth, Scrips cannot plead market efficiency because it is not eligible to file SEC registration statements on Form S-3. *See O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996) ("Eligibility to file the S–3 form is predicated upon the SEC's belief that the market for the company's stock already operates efficiently and that further disclosure is unnecessary, as the market price has already accounted for relevant information. For companies ineligible to file Form S–3, no such assumption can be made. Although ineligibility does not automatically disqualify a company from a finding of an efficient market, this factor weighs heavily against a finding of efficiency." (internal citations omitted)). "Form S–3 is reserved for companies whose stock is actively traded and widely followed. To file a Form S–3, a company must have filed SEC reports for twelve consecutive months and possess a seventy-five million dollar market capitalization level. By contrast, there is no minimum capitalization requirement to file either Form S–1 or S–2. Further, a company need not even meet the reporting requirements spelled out in § 239.13 to file a Form S–1." *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.5 (5th Cir. 2005) (internal citations

omitted). Scrips cannot remotely satisfy the requirements in § 239.13 and therefore files a Form S-1. *See* Mader Decl., Ex. EE. Accordingly, this "extremely important" factor tips "heavily" against market efficiency. *O'Neil*, 165 F.R.D. at 502.

Finally, Scrips cannot properly allege an efficient market because it repeatedly has failed to timely disclose its financials. *See* Mader Decl., Ex. BB; *see also id.* at Exs. Z, AA. Scrips is over three months late in filing its annual report, and has been thrown off even the OTC Bulletin Board and relegated to trading on the limited information "pink sheets." Market efficiency assumes "that information is regularly being furnished to the market through periodic reports under the Exchange Act," and that such information "is available to the financial press and is obtainable by any other person who seeks it for free or at nominal cost." *Cammer v. Bloom*, 711 F. Supp. 1264, 1284 (D.N.J. 1989) (internal quotations omitted). Where, as here, a company repeatedly fails to timely comply with its disclosure obligations under the Exchange Act, it has forfeited any claim to market efficiency.

Scrips responds to none of these arguments, conceding their force.

## C. The SAC Does Not Plead Facts Giving Rise To A Strong Inference Of Scienter

In the SAC, Scrips claims that the following allegations give rise to a strong inference of scienter: (1) the "manipulative trading activity itself"; (2) the adjustment mechanism in the stipulated judgment; (3) Ironridge's alleged failure to disclose its purportedly manipulative intent and its alleged "bait-and-switch tactic"; (4) Ironridge's alleged refusal to give Scrips's then-CFO, Robert Schneiderman, "information" about its "trading activity"; and (5) Ironridge's alleged pattern of fraud. *See* SAC ¶ 38. But as Defendants' Motion showed, these conclusory allegations – almost all of which are bootstrapped on Scrips's inadequate misrepresentation/omission/manipulation allegations – do not plead a "cogent and compelling" inference of scienter that is "'at least as compelling as any opposing inference one could draw from the facts alleged.'"

*Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 324 (2007)).

In its Opposition, unable to defend its conclusory allegations of scienter, Scrips abandons all but the last allegation – the alleged pattern of fraud. As to it, Scrips contends that the allegations by other companies "bolster the inference of scienter in a holistic sense," because it is "reliable evidence that other companies have, in fact, asserted that Ironridge has engaged in precisely the same kind of manipulation alleged here. . . ." Opp'n at 13–14. But the Court already has rejected Scrips's attempt to plead an alleged pattern of fraud based on unproven allegations in complaints by third parties. *See* Second Order at 40–41. As the Court explained, "It is well settled that 'allegations from other complaints or documents, which are unproved and are contested, may not be used to establish facts to demonstrate scienter.'" Second Order at 41–42 (quoting *Kyung Cho*, 890 F. Supp. 2d at 1203); *see also In re Apollo Group, Inc. Sec. Litig.*, 2011 WL 5101787, at *10 n.5, 11 n.7 (D. Ariz. Oct. 27, 2011) ("[B]ecause allegations from other complaints are unproven and contested, they do not amount to 'facts' sufficient to establish a strong inference of scienter. . . . [W]ith regard to anonymous internet postings, it is Plaintiffs' burden to plead reliability and knowledge that are indicative of scienter to at least the same extent as it must when pleading scienter with regard to confidential witness statements."). Scrips provides no basis for reaching a different conclusion here.

Nor does the SEC administrative proceeding change the analysis. The new, fortuitously timed SEC complaint is just that—a complaint. Like the other complaints that Scrips cites, it is unproven and contested. Moreover, despite Scrips's hyperbole, the SEC does not allege violations of § 10(b) or Rule 10b-5, and neither the word "fraud" nor the word "manipulation" appear in the SEC complaint. Instead, the SEC alleges only that Ironridge should be required to register as a broker-dealer under § 15(a) of the Securities Exchange Act, a technical administrative issue. A dispute over whether Ironridge should be required to register as a broker-dealer does not give

rise to a compelling inference of scienter with respect to securities fraud, particularly where the SEC itself elected not to file a fraud claim. The reason for that is simple: Selling a large number of shares of a public company is not fraudulent. As such, the SEC complaint is irrelevant here, and cannot save Scrips's deficient allegations.

### D. The 10b-5 Claim Should Be Dismissed With Prejudice

In granting leave to amend, the Court "cautioned" that "should [Scrips] fail adequately to plead its Rule 10b-5 claim in a second amended complaint, the court will likely find that further amendment would be futile and dismiss its claims with prejudice." Second Order at 45. Because Scrips has again failed to adequately plead its 10b-5 claim, the Court should dismiss that claim with prejudice.

### E. The FAC Should Be Dismissed In Its Entirety

The Court should decline to exercise supplemental jurisdiction over Scrips's remaining state law claims. As the Supreme Court has recognized, "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). This is particularly true here, where, as the Court observed in its initial order, "the state court action will resolve all of the issues raised by Scrips's breach of contract, breach of the covenant/tortious bad faith, and declaratory relief claims." First Order at 28, 40. And, indeed, it now has. As noted above, the California Court of Appeal recently dismissed Scrips's improper appeal, which it found to be utterly meritless. Dismissal at this juncture would therefore be timely and appropriate.

### III.   CONCLUSION

For the foregoing reasons, Defendants request that the Court grant the Motion.

//
//
//
//

| | | |
|---|---|---|
| 1 | Dated: July 10, 2015 | GIBSON, DUNN & CRUTCHER LLP |
| 2 | | |
| 3 | | By: _____/s/ Dean J. Kitchens_____ |
| 4 | | Dean J. Kitchens |
| 5 | | *Attorneys for Defendants* |
| 6 | | *Ironridge Global Partners, LLC, John Kirkland, and Brendan O'Neil* |