1

2

3

4

5

6

7

8

9  UNITED STATES DISTRICT COURT

10  CENTRAL DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| SCRIPSAMERICA, INC., | CASE NO. CV 14-03962 MMM (AGRx) |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| vs. | |
| IRONRIDGE GLOBAL LLC d/b/a IRONRIDGE GLOBAL IV, LTD., JOHN KIRKLAND, BRENDAN O'NEIL, and DOES 1-5, | |
| Defendants. | |

On May 22, 2014, ScripsAmerica, Inc. ("Scrips") filed this action against Ironridge Global LLC d/b/a Ironridge Global IV, Ltd., John Kirkland, and Brendan O'Neil (collectively "Ironridge"), as well as certain fictitious defendants.[1]  The complaint alleges claims for securities fraud, breach of contract, tortious bad faith, and declaratory relief.  The claims concern defendants' allegedly fraudulent scheme to increase the shares of Scrips' stock to which they were entitled by manipulating Scrips' stock price.  The parties had earlier entered into an agreement

---

[1]Complaint, Docket No. 1 (May 22, 2014).

1  that obligated Ironridge to pay off certain of Scrips' accounts payable in exchange for the issuance

2  of stock on an agreed formula.[2]

3      On June 25, 2014, defendants filed a motion to dismiss Scrips' breach of contract, tortious

4  bad faith, and declaratory relief claims under the *Rooker-Feldman* doctrine[3] and *Younger v.*

5  *Harris*, 401 U.S. 37 (1971).  Alternatively, defendants sought to have those claims stayed under

6  *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).  Defendants

7  also to have Scrips' Rule 10b-5 claim dismissed as inadequately pled.[4]  On November 3, 2014,

8  the court granted in part and denied in part defendants' motion to dismiss.  It dismissed Scrips'

9  declaratory relief claim under *Rooker-Feldman* to the extent it sought a declaration that Scrips was

10  excused from performing generally under a stipulated order entered by the state court.  The court

11  denied defendants' motion to dismiss on *Younger* abstention grounds, but stayed Scrips' breach

12  of contract, tortious bad faith, and declaratory relief claims under *Colorado River*. It also granted

13  defendants' motion to dismiss Scrips' Rule 10b-5 claim with leave to amend.[5]

14      On December 3, 2014, Scrips filed a first amended complaint,[6] which defendants moved

15  to dismiss on December 17, 2014.[7]  Scrips opposed the motion.[8]  On March 26, 2015, considering

---

[2]*Id.*, ¶ 11.

[3]*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[4]Motion to Dismiss or Stay Plaintiff's Complaint, Docket No. 9 (Jun. 25, 2014).

[5]Order Granting in Part and Denying in Part Motion to Dismiss and Granting Motion to Stay ("Order"), Docket No. 18 (Nov. 3, 2014).

[6]First Amended Complaint ("FAC"), Docket No. 19 (Dec. 3, 2014).

[7]Motion to Dismiss First Amended Complaint, Docket No. 20 (Dec. 17, 2014). See also Reply in Support of Motion to Dismiss, Docket No. 26 (Mar. 16, 2015).

[8]Opposition to Motion to Dismiss, Docket No. 25 (Mar. 9, 2015).

1   only Scrips' Rule 10b-5 claim (since Scrips' other claims had been stayed under *Colorado River*),

2   the court granted defendants' motion to dismiss with leave to amend.[9]

3       On April 27, 2015, Scrips filed a second amended complaint.[10]  Ironridge filed a motion

4   to dismiss on May 27, 2015,[11] which Scrips opposes.[12]

6   ## I.  FACTUAL BACKGROUND

7       This action concerns an allegedly fraudulent scheme devised by Ironridge.  Scrips is a

8   pharmaceuticals distributor whose stock is publicly traded on the over-the-counter ("OTC")

9   market.  The purported scheme arose from an agreement pursuant to which Scrips agreed to issue

10  shares of its common stock to Ironridge in exchange for Ironridge's undertaking to pay Scrips'

11  outstanding accounts payable.[13]  Scrips alleges that the transaction was first proposed during a

12  telephone call it received from John Kirkland and Brendan O'Neil – directors of Ironridge – on

13  August 28, 2013.[14]  It contends that Kirkland and O'Neil told Scrips' chief executive officer,

14  Robert Schneiderman, that Ironridge could pay Scrips' accounts payable, which totaled

15  approximately $700,000, in exchange for an amount of Scrips stock to be determined by a

16  contractual formula.[15]  Kirkland and O'Neil explained that to effectuate the transaction, Scrips did

19  [9]Dismissal at 1.

20  [10]Second Amended Complaint ("SAC"), Docket No. 30 (Apr. 27, 2015).

22  [11]Motion to Dismiss Second Amended Complaint and Memorandum of Points and
Authorities in Support thereof ("Motion"), Docket No. 32 (May 27, 2015).

23  [12]Opposition to Motion to Dismiss Second Amended Complaint ("Opposition"), Docket

24  No. 36 (June 25, 2015); Reply in Support of Motion to Dismiss ("Reply"), Docket No. 37 (July
10, 2015).

26  [13]SAC, ¶ 4, 11.

27  [14]*Id.*

28  [15]*Id.*

1    not need to register the shares before transferring them to Ironridge.  The parties discussed the

2    transaction further on September 4 and October 2, 2013.[16]

3         During the calls, Ironridge requested that the contract memorializing the transaction include

4    a provision for an adjustment to protect it in the event of a decline in Scrips' stock price.[17]  Scrips

5    allegedly agreed to the inclusion of such a provision, which gave Ironridge the right to receive

6    more stock than the originally agreed amount if Scrips' stock price declined following

7    consummation of the transaction.[18]  The adjustment mechanism was outlined, together with certain

8    other terms, in a term sheet Ironridge prepared and gave to Scrips.[19]  Scrips contends that

9    Ironridge, Kirkland, and O'Neil did not disclose their intention to manipulate the market for Scrips

10   shares in order to reduce the share price and increase the number of shares Ironridge was entitled

11   to receive under the agreement.[20]

12        On October 4, 2013, Schneiderman, Kirkland, and O'Neil purportedly discussed the

13   potential effect Ironridge's sale of the stock it received might have on Scrips' share price.  Unlike

14   other entities that had funded Scrips in exchange for stock, Ironridge allegedly represented that

15   it would not act to manipulate or otherwise affect Scrips' stock price.[21]  Specifically, Ironridge

16   purportedly said that it would "take no action to manipulate or [a]ffect [Scrips'] stock price" and

17   that its sales of Scrips shares would "never be more than ten percent of the volume of sales on any

18

19

20

21

---

22        [16]*Id.*

23        [17]*Id.*, ¶ 12

24        [18]*Id.*

25

26        [19]*Id.*, ¶ 13.  See also *id.*, Exh. 1 (Term Sheet).

27        [20]*Id.*, ¶ 12.

28        [21]*Id.*, ¶ 15.

4

given day."[22]   Scrips contends that Ironridge's representations were knowingly and willfully false.[23]

Because the shares were unregistered, Ironridge and Scrips had to obtain court approval under California and federal securities laws before a transfer of the stock could take place.[24] Thus, on October 11, 2013, Ironridge filed a breach of contract complaint in Los Angeles Superior Court that sought to collect the accounts payable debts; it sued as the successor in interest to Scrips' creditors under receivables purchase agreements into which it had entered with the creditors.[25]   Ironridge and Scrips then submitted a stipulation to the court that was the means by which the exchange transaction was to be effected.  The stipulation provided that Scrips would transfer 8,690,000 shares of stock to Ironridge in satisfaction of $686,962.08 in debt owned by Ironridge.[26]   The shares were to be "unrestricted and freely tradeable exempted shares" of Scrips

---

[22]*Id.*

[23]*Id.*

[24]California Corporation Code § 25017(f)(3) excludes from the definition of offer or sale – and hence from the ambit of California's securities registration laws – "any act incident to a transaction or reorganization approved by a state or federal court in which securities are issued and exchanged for one or more outstanding securities, claims, or property interests, or partly in that exchange and partly for cash."  See CAL. CORP. CODE § 25017 (f)(3).  Section 3(a)(10) of the Securities Act of 1933 exempts from registration "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests . . . where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval."  See 15 U.S.C. § 77c(10).

[25]Declaration of Shannon E. Mader in Support of Defendants' Motion to Dismiss ("Mader Decl."), Docket No. 32-1 (May 27, 2015), Exh. A (Ironridge's State Court Complaint for Breach of Contract Against Scrips) ("State Court Complaint"), ¶¶ 1-6.

[26]See SAC, ¶ 16.   See also *id.*, Exh. 3 (Stipulation for Settlement of Claims) ("Stipulation"), ¶¶ 1-3.

common stock.[27]  The stipulation stated the shares had to be capable of being "immediately resold . . . without restriction,"[28] and noted that Ironridge could "sell any of its shares of [Scrips] common stock issued pursuant to the [stipulation] at any time."[29]  The stipulation warned that issuance of the shares could "have a dilutive effect [on Scrips' stock], which [might] be substantial."[30]

The stipulation also memorialized the adjustment mechanism the parties had previously discussed.  It stated that Scrips would immediately issue and deliver to Ironridge 8,690,000 shares of common stock subject to certain "adjustments, issuances, returns, and ownership limitations."[31]  The stipulation indicated that future adjustments would be made based on trading activity in Scrips stock during the "calculation period."[32]  The "final amount" of shares to which Ironridge was entitled was to be calculated by taking (a) the sum of the claim amount [i.e., $686,962.08], 10% of third party agent fees, and Ironridge's reasonable attorneys' fees and expenses, and dividing it by (b) 80% of the following: the closing price of Scrips common stock on the trading day immediately preceding the date the state court entered an order on the stipulation; the resulting number was not to exceed the arithmetic average of the individual volume weighted average price of any five trading days during the calculation period, less $.01 per share (based on data reported by Bloomberg LP).[33]

The stipulation provided that if at any point during the calculation period the shares issued to Ironridge dropped below "any reasonably possible [f]inal [a]mount," or if Scrips shares closed

---

[27]See Stipulation, ¶¶ 1-3.

[28]*Id.*, ¶ 6.

[29]*Id.*

[30]*Id.*, ¶ 11.

[31]*Id.*, ¶ 6.

[32]*Id.*, ¶ 7.

[33]*Id.*

below 80% of the closing price on the trading day prior to entry of an order on the stipulation, Ironridge was entitled to request the issuance of additional shares.[34]   At the conclusion of the calculation period, if the total value of the initial issuance and subsequent issuances was less than the final amount, Scrips was required to issue further shares so that the total number of shares issued equaled the final amount; conversely, if the number of shares issued to Ironridge exceeded the final amount, Ironridge was required to return the excess shares to Scrips.[35]   The stipulation stated, however, that Scrips was not required at any one time to issue a number of shares that, aggregated with all other shares beneficially owned or controlled by Ironridge or its affiliates, exceeded 9.99% of the total number of shares of common stock outstanding.[36]   Despite the fact that Kirkland, O'Neil, and Schneiderman allegedly discussed the issue, there is no provision in the stipulation requiring that Ironridge's sales of Scrips shares not exceed 10% of the daily trading volume on any given day.

On November 8, 2013, the parties filed a joint *ex parte* application in state court for an order approving the stipulation; they argued that *ex parte* relief was necessary because the stipulation addressed the issuance of "shares of [Scrips] stock with a substantially fluctuating market price."[37]   The application recited that over the course of the prior year, the price of Scrips common stock had fluctuated between $1.05 and $.08, and that it would be difficult to reach any negotiated resolution that did not require *ex parte* relief, as the agreement could collapse if Scrips' stock price fluctuated too much.[38]   As support for their request that the court approve the stipulation, both parties filed declarations stating that they believed the terms of agreement were

[34]*Id.*, ¶ 8.

[35]*Id.*, ¶ 10.

[36]*Id.*, ¶ 9.

[37]Mader Decl., Exh. C (Joint *Ex Parte* Application for Order Approving Stipulation for Settlement of Claims) at 2-3.

[38]*Id.*

fair.[39]   The stipulation recited that the agreement was fair to Ironridge and that Scrips' board had resolved that the terms were fair to and in the best interests of its shareholders.[40]

On November 8, 2013, Superior Court Judge Rolf M. Treu entered an order on the parties' stipulation.[41]   Scrips alleges that thereafter, on several trading days, Ironridge sold an amount of Scrips stock that exceeded ten percent of all sales on that day.[42]   Specifically, it contends that Ironridge's sales during the week of January 6, 2014 represented 28.4% of total sales; sales during the week of January 21, 2014 represented 22.6%; and weekly sales throughout February 2014 ranged from 30-50%.[43]   Scrips maintains that Ironridge made these sales with the intent and purpose of manipulating the market to reduce the price of Scrips' stock so that the number of shares to which it was entitled under the agreement would increase.   It contends, moreover, that Ironridge employed manipulative trading devices, including "marking the close" transactions and

---

[39]Brandon O'Neil, Ironridge's Managing Director, stated that the terms of the agreement were fair to Ironridge.  (See Mader Decl., Exh. D (Declaration of Brandon O'Neil in Support of Joint *Ex Parte* Application for Order Approving Settlement of Claims ("O'Neil Decl.")), ¶ 5 ("Based on my analysis, the terms and conditions of the issuance and exchange are fair to Ironridge.  The number of shares to be issued pursuant to the settlement should more than fairly compensate Ironridge for the claims").)  Robert Schneiderman, Scrips' chief executive officer, similarly reported that the terms were fair to Ironridge and to Scrips.  (See *id*., Exh. E (Declaration of Robert Schneiderman in Support of Joint *Ex Parte* Application for Order Approving Settlement of Claims ("Schneiderman Decl."), ¶ 8 ("It is my belief that the terms and conditions of the settlement of the claims, as set forth in the Stipulation, are fair, reasonable and adequate to Ironridge.  Further, the board of directors of [Scrips] has considered the proposed settlement and has resolved that its terms and conditions are fair to, and in the best interests of, SCRC and its stockholders").)

[40]Stipulation, ¶ 4 ("Plaintiff has agreed to the proposed terms and conditions, and believes that they are sufficiently fair such that [Ironridge] is willing to enter into this stipulation.  [Scrips'] board of directors has considered the proposed transaction and has resolved that its terms and conditions are fair to, and in the best interest of, [Scrips] and its stock holders.  Accordingly, both parties request Court approval of the settlement provided for herein as fair, just and reasonable").

[41]*Id*., Exh. F (Order for Approval of Stipulation for Settlement of Claims).

[42]SAC, ¶ 21.

[43]*Id*.

8

"bid whacking," to reduce Scrips' stock price.[44]  It asserts the sales in fact reduced its stock price,[45] and that during the period of alleged manipulation, Ironridge refused to provide any information concerning its trading activity, claiming it was confidential.

Bid whacking is purportedly a technique in which stock is sold at the bid price rather than a higher price as would "ordinarily" occur in trading.[46]  Appended to Scrips' complaint is an allegedly expert analysis of trades by Ironridge occurring between December 2013 and April 2014.[47]  Scrips asserts that the "majority" of shares sold by Ironridge in December 2013 and January 2014 were sold at the low for each trading day, and that this is indicative of bid whacking.[48]  It contends that Ironridge's bid whacking caused Scrips' stock price to fall from seventeen cents to ten cents between December 2013 and April 2014, despite the fact that Scrips' revenue increased from $600,000 in 2013 to $30 million in 2014.[49]

The complaint alleges that Ironridge's manipulative activity occurred in an open, developed, and efficient market.[50]  Scrips asserts that the weekly trading volume in its stock was "large enough to at least establish a substantial presumption of efficiency (at well over 1% of the total amount of shares)."[51]  There were also allegedly market makers and arbitragers in Scrips stock, such as Knight Capital Americas LLC, Stockcross Financial Service, Inc., BMA Securities, Cantor Fitzgerald & Co., BNY Mellon Capital Markets, LLC, Biltmore International Corp., Wilson-Davis & Co., Inc., Vfinance Investments, Inc., and Guggenheim Investor Services,

---

[44]*Id.*, ¶ 22.

[45]*Id.*, ¶ 31.

[46]*Id.*, ¶ 25.

[47]*Id.*, ¶ 22.

[48]*Id.*

[49]*Id.*, ¶ 24.

[50]*Id.*, ¶¶ 28, 32.

[51]*Id.*, ¶ 29; see also *id.*, Exh. 5.

LLC.[52]  Scrips also contends that its stock price was immediately responsive to financial releases from or about the company, including several instances between October 2013 and June 2014 in which the stock rose purportedly in response to the release of favorable information concerning Scrips.[53]

Scrips contends that Ironridge acted with scienter, citing a larger pattern of similar fraud. It contends that the watchdog website "Scam Informer" recently observed that "[t]he destruction in stocks [of companies with which Ironridge] has completed transactions . . . makes the devastation from Hurricane Irene seem tame by comparison."[54]  Scrips alleges, by way of example, that Ironridge seeks an additional six billion shares of Green Automotive Company, Inc.'s stock, as well as 27 billion shares in Green Innovations, Ltd.; these are two other

---

[52]*Id.*, ¶ 30.

[53]*Id.*, ¶ 31.  Scrips asserts that its stock rose following information released on October 21, 2013 (from nineteen cents to twenty-six cents in response to a press release regarding its acquisition of PIMD International, LLC); on October 28, 2013 (from twenty-three cents to twenty-eight cents in response to a press release regarding negotiations to launch drug distribution in the Chinese OTC market); on October 30, 2013 (from twenty-eight to thirty cents in response to a press release regarding PIMD's new medical supply product website); on November 11, 2013 (from nineteen cents to twenty-three cents in response to a press release regarding WholesaleRx's investment in Scrips); on November 25, 2013 (from sixteen cents to eighteen cents in response to a press release regarding business development in China); on December 19, 2013 (from twelve cents to fourteen cents in response to a press release that Scrips processed record high orders); on January 31, 2014 (from nineteen cents to twenty cents in response to a press release regarding Scrips new management agreement with a New Jersey compounding pharmacy); on February 10, 2014 (from thirteen cents to fourteen cents in response to a press release regarding Scrips' registration approval for pain reliever from the government of Hong Kong); on February 12, 2014 (from fourteen to sixteen cents in response to a press release regarding Wholesale Rx); on February 18, 2014 (from twelve cents to thirteen cents in response to a press release regarding the start of Scrips' prepayment of convertible debt); on March 5, 2014 (from ten cents to eleven cents in response to a press release concerning prescription sales by a specialty pharmacy with which Scrips had a management agreement); and on June 2, 2014 (from eleven cents to twelve cents in response to a press release regarding the same specialty pharmacy and the fact that it had $1.6 million in sales for the month of May).  It also asserts that on February 3, 2014, its stock went from twenty cents to nineteen cents in response to a press release regarding Scrips' joint venture with Global Pharma Hub.  (*Id.*)

[54]*Id.*, ¶ 38.

companies that entered into an agreement with Ironridge to pay existing accounts payable in exchange for unregistered issuance of common stock; each case purportedly involved a stipulated settlement that included a similar adjustment provision.[55]

Scrips asserts that Ironridge's "pattern of corporate destruction" is part of a larger pattern orchestrated by David Sims.[56]  It alleges, on information and belief, that Sims is a citizen of South Africa and a resident of Tortola in the British Virgin Islands.  He has purportedly been implicated in a variety of schemes involving fraud and market manipulation related to at least thirty-two publicly traded companies.  All of the schemes allegedly involve similar manipulation of stock prices and issuance of additional shares under debt purchase agreements.[57]  Scrips contends that Sims is the global director of Caledonian Global Financial Services, a Cayman Islands bank and brokerage firm that held accounts and laundered money for Belizean broker-dealers Unicorn International Securities, Legacy Global Markets, and Titan International Securities, as well as their principals.  It asserts these entities and individuals were the subject of indictments filed by the U.S. Department of Justice and civil suits filed by the Securities and Exchange Commission related to what regulators described as a $500,000,000 stock manipulation and money laundering ring.[58]  On information and belief, it contends that Ironridge is a conduit for Caledonian's money laundering activities, and that its investment decisions – including the decision to manipulate Scrips' stock price – are made by Sims.[59]

Based on the decline in Scrips' share price, Ironridge filed an *ex parte* application in state court for an order compelling the issuance of additional shares under the May 6, 2014

---

[55]*Id.*, ¶ 39.

[56]*Id.*, ¶ 40.

[57]*Id.*

[58]*Id.*, ¶ 41.

[59]*Id.*, ¶¶ 42-44.

1  stipulation.[60]  Scrips opposed the application.[61]  It argued that the court should deny relief because

2  Ironridge had engaged in "wrongful conduct" in "bad faith" and had "unclean hands."[62]

3  Specifically, it asserted that Ironridge had fraudulently manipulated the market for Scrips stock,

4  i.e., engaged in "open market manipulation," by "short selling" Scrips' shares during the

5  calculation period in an effort to drive the share price down artificially and require Scrips to issue

6  more shares to Ironridge under the parties' agreement.[63]  Scrips also alleged that Ironridge's

7  conduct was a breach of the parties' agreement, as well as a breach of the covenant of good faith

8  and fair dealing implied in it.[64]  Finally, it asserted that the additional issuance of shares "could

9  be in violation of [federal] securities laws."[65]

10     On May 6, 2014, Judge Treu implicitly rejected each of Scrips' arguments.  He entered

11  an order enforcing the order that had approved the stipulation ("enforcement order"), and

12  directing that Scrips issue an additional 1,646,008 shares of common stock to Ironridge pursuant

13  to the adjustment mechanism set forth in the stipulation.[66]  Scrips appealed the order on May 14,

14  2014.[67]

15     On May 22, 2014, eight days after appealing the enforcement order, Scrips filed this

16  action, alleging claims for breach of contract, tortious bad faith, violation of Rule 10b-5, and

17

18     [60]See Mader Decl., Exh. G (Plaintiff's *Ex Parte* Motion for an Order Compelling Issuance

19  of Shares) ("Order to Compel").

20     [61]*Id.*, Exh. H (Defendant's Opposition to Plaintiff's Ex Parte Motion for an Order

21  Compelling Issuance of Shares) ("Order to Compel Opp.").

22     [62]*Id.* at 1.

23     [63]*Id.* at 3.

24     [64]*Id.* at 4-5.

25     [65]*Id.* at 4.

26     [66]Mader Decl., Exh. I (Order Enforcing Prior Order for Approval of Stipulation for

27  Settlement of Claims) ("Enforcement Order") at 1-2.

28     [67]*Id.*, Exh. J (Notice of Appeal).

declaratory relief.  Scrips sought compensatory and punitive damages, and a declaration that it need not issue the additional 1,646,008 shares that the Superior Court has ordered it to issue.[68] Scrips maintains that Ironridge intentionally engaged in post-stipulation trading activity to manipulate the market and reduce the price of Scrips' stock in order to increase the number of shares it was to receive under the adjustment formula in the stipulation.[69]  Scrips asserts that Ironridge manipulated the stock to send false information regarding the supply of and demand for its stock to the market, inducing others to sell Scrips stock and creating further market distortion.[70] It contends that absent illegal manipulation by Ironridge, its stock would be trading at $0.15 per share instead of the current price of approximately $0.10.  It also asserts that Ironridge's manipulative actions have caused it to issue 10.3 million shares, instead of the 8.7 million initially required by the agreement, and that Ironridge is seeking issuance of a further 1.6 million shares in state court.[71]  As a result, Scrips contends, it has been injured by issuing more than $1.4 million of stock to Ironridge in satisfaction of a less than $770,000 debt.[72]

On June 30, 2015, the California Court of Appeal dismissed Scrips' appeal of the state court enforcement order under the disentitlement doctrine.[73]  It concluded that Scrips had

---

[68]As noted, the court's November 3, 2014 order dismissed Scrips' declaratory relief claim under *Rooker-Feldman* to the extent it sought a declaration that Scrips was excused from performing under the stipulation.

[69]*Id.*, ¶ 26.

[70]*Id.*, ¶ 33. It is unclear from the complaint and judicially noticeable documents why Scrips asserts, on the one hand, that it has *already* issued 10.3 million shares to Ironridge (i.e., the approximately 8.7 million shares initially issued plus the additional 1.6 million that are the subject of the enforcement order), and on the other, that Ironridge seeks "a further 1.6 million shares through the California courts." (*Id.*, ¶ 34.)  The complaint does not allege that Scrips has issued any stock to Ironridge beyond the initial 8.69 million shares.

[71]*Id.*, ¶ 34.

[72]*Id.*, ¶ 36.

[73]"Under the disentitlement doctrine, a reviewing court has inherent power to dismiss an appeal when the appealing party has refused to comply with the orders of the trial court.

1  repeatedly violated the state court's enforcement order despite the fact that it was legally bound

2  by it.  See *Ironridge Global IV, Ltd. v. ScripsAmerica, Inc.*, 2015 WL 3958296 at *5 ("Defendant

3  had no cause to disobey the court's order, but did so, repeatedly.  Defendant could have sought

4  a stay of the order, but failed to do so.  Defendant also could have sought a writ of supersedeas

5  in this court.  Finding that a balance of the equities weighs in favor of dismissal, we grant

6  plaintiff's motion").

7

## II.  DISCUSSION

### A.    Requests for Judicial Notice

#### 1.    Ironridge's Request

11  Ironridge asks that the court take judicial notice of various documents that have been

12  publicly filed with the Securities & Exchange Commission ("SEC").[74]  Because Rule 12(b)(6)

13  review is confined to the complaint, the court typically does not consider material outside the

14  pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) when deciding such

15  a motion.  *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d

16  1524, 1537 (9th Cir. 1996).  It may, however, properly consider exhibits attached to the complaint

17  and documents whose contents are alleged in the complaint but not attached, if their authenticity

18  is not questioned.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

19  In addition, the court can consider matters that are proper subjects of judicial notice under

20  Rule 201 of the Federal Rules of Evidence.  *Id.* at 688-89; *Branch v. Tunnell*, 14 F.3d 449, 454

21  (9th Cir. 1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d

22  1119 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542,

23  _____

24  Appellate disentitlement is not a jurisdictional doctrine, but a discretionary tool that may be
   applied when the balance of the equitable concerns makes it a proper sanction. The rule applies
25  even if there is no formal adjudication of contempt[, and] is particularly likely to be invoked
   where the appeal arises out of the very order (or orders) the party has disobeyed." *Ironridge*
26  *Global IV, Ltd.*, __ Cal.App.4th __, 2015 WL 3958296, *4 (Cal. App. June 30, 2015) (internal
27  citations and quotation marks omitted).

28  [74]Request for Judicial Notice ("RJN"), Docket No. 33 (May 27, 2015) at 2-3.

1555 n. 19 (9th Cir. 1990); see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[75]   The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint" or proper subjects of judicial notice. *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998); see also *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit").

Ironridge asks that the court take judicial notice of Exhibits V through EE to its motion to dismiss the second amended complaint.[76]   Specifically, Ironridge asks that the court judicially notice excerpts from three of Scrips' Schedule 10-Q's with filing dates between March 31, 2013, and September 30, 2014 (Exhibits V through X); an excerpt from and three copies of Scrips' 2012, 2013, and 2014 Schedule 10-K's (Exhibits Y through BB); a press release regarding Scrips dated April 9, 2015 (Exhibit CC); a graph showing Scrips' stock prices between September 2013 and May 2015 obtained from Bloomberg Finance L.P. (Exhibit DD); and excerpts from Scrips' Form  S-1, Amendment No. 4, which was submitted to the SEC on November 9, 2011 (Exhibit EE).[77]

"Courts can consider securities offerings and corporate disclosure documents that are publicly available." See *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, 50 F.Supp.3d 1328, 1349 (C.D. Cal. 2014) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008)  ("Defendants sought judicial notice for Corinthian's reported stock

---

[75]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

[76]RJN at 2-3.  See also Mader Decl., Exhs. V-EE.

[77]*Id.*

price history and other publicly available financial documents, including a number of Corinthian's SEC filings.  In its dismissal order, the court granted Defendants' unopposed requests for judicial notice.  Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper")).  Accordingly, the court will take judicial notice of Exhibits V through BB and Exhibit EE, as they are documents filed with the SEC.[78]

Exhibit CC is a public press release.  Taking judicial notice of news reports and press releases is appropriate to show "that the market was aware of the information contained in news articles." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir.1999); see also *In re White Electronic Designs Corp. Sec. Litig.*, 416 F.Supp.2d 754, 760 (D. Ariz. 2006) ("[J]udicial notice is appropriate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)).  Importantly, however, the court can do so only to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir.2009) (citing *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir.2006)); *In re Disciplinary Proceedings of Yana*, No.2012–SCC–0017–ADA, 2014 WL 309314, *4 (N. M.I. Jan. 28, 2014) ("Newspaper articles generally, and statements during an interview specifically, are not always free of reasonable dispute.  Ordinarily, then, we only take 'judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact

---

[78]"The court takes judicial notice of the SEC filings only for their existence and contents, not for the truth of the information contained in them."  See *Ixia*, 50 F.Supp.3d at 1349 n. 151 (citing *In re Foundry Networks, Inc.*, C 00–4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D. Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents.  Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D. Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed.  To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice")).

true,"'" quoting *Von Saher*); *United States v. Kane*, No. 2:13–cr–250–JAD–VCF, 2013 WL 5797619, *9 (D. Nev. Oct.28, 2013) ("When a court takes judicial notice of publications like websites and newspaper articles, the court merely notices what was in the public realm at the time, not whether the contents of those articles were in fact true" (citations omitted)); *Brodsky v. Yahoo! Inc.*, 630 F.Supp.2d 1104, 1111–12 (N.D. Cal. 2009) ("The Court also grants Defendants' request [for judicial notice] as to Exhibits 31 through 47, Yahoo! Press releases, news articles, analyst reports, and third party press releases to which the [amended complaint] refers, but not for the truth of their contents " (emphasis added)). Because the press release describes a statement by Scrips regarding its trading activity in approximately April 2015, the court takes judicial notice of it.

With regard to Exhibit DD, Ironridge seeks judicial notice of a graph detailing Scrips' stock price fluctuations between September 2013 and May 2015, representing data that was gathered by Bloomberg Finance L.P. "Because publicly traded companies historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them." *IXIA*, 50 F.Supp.3d at 1349 (citing *Patel v. Parnes*, 253 F.R.D. 531, 547–48 (C.D. Cal.2008) (judicially noticing historical stock prices because such information is capable of accurate and ready determination); *In re Homestore.com Inc. Sec. Litig.*, 347 F.Supp.2d 814, 816 (C.D.Cal.2004) ("[A] court may take judicial notice of a company's published stock prices")); see also *Metzler Inv. GMBH*, 540 F.3d at 1064 n. 7 ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"). Consequently, the court takes judicial notice of Exhibit DD.

The parties' state court stipulation and term sheet, which are Exhibits B and K to Ironridge's request for judicial notice, are attached to the complaint and are properly considered in deciding the motion for that reason. See *Lee*, 250 F.3d at 688 ("a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting

1   the motion to dismiss into a motion for summary judgment," quoting *Branch*, 14 F.3d at 453).

2   Finally, as Ironridge notes, the state court order approving the parties' stipulation, which is

3   Exhibit F to the request for judicial notice, is referenced in the complaint, and can be considered

4   under the incorporation by reference doctrine.  See *United States v. Ritchie*, 342 F.3d 903, 908

5   (9th Cir. 2003) (acknowledging that a district court may assume that the contents of a document

6   incorporated by reference "are true for purposes of a motion to dismiss"); *In re Downey Sec.*

7   *Litig.*, No. CV 08–3261 JFW, 2009 WL 2767670, *6 n. 4 (C.D. Cal. Aug. 21, 2009) (same).

8                      **2.      Scrips' Request**

9            Scrips asks the court to take judicial notice of a June 23, 2014, SEC order instituting

10   administrative cease and desist proceedings against Ironridge under Sections 15(b) and 21(c) of

11   the Securities Exchange Act of 1934.[79]  Courts can take judicial notice of SEC orders.  See *In re*

12   *UBS Auction Rate Sec. Litig.*, No. 08 CV 2967 (LMM), 2010 WL 2541166, *13 (S.D.N.Y. June

13   10, 2010) ("On May 31, 2006, the SEC issued an Order Instituting Administrative and Cease-and-

14   –Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist

15   Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities

16   Exchange Act of 1934. The Court takes judicial notice of the SEC Order"); *In re Citigroup*

17   *Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 302 n. 2 (S.D.N.Y. 2009) ("The Court takes

18   judicial notice of the 2006 SEC Order concerning ARS practices and disclosure requirements").

19   The court therefore grants Scrips' request for judicial notice.

20                **B.      Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)**

21            A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

22   A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal

23   theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri*

24   *v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual

25   allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences

26

27   _____

28            [79]Opposition, Declaration of Carlos Needham, Exh. A ("SEC Order").

1   from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38

2   (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

3          The court need not, however, accept as true unreasonable inferences or conclusory legal

4   allegations cast in the form of factual allegations.  See *Bell Atlantic Corp. v. Twombly*, 550 U.S.

5   544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

6   detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment]

7   to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

8   a cause of action will not do").   Thus, a complaint must "contain sufficient factual matter,

9   accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial

10  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

11  inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.

12  662, 678 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise

13  a right to relief above the speculative level, on the assumption that all the allegations in the

14  complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret*

15  *Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss,

16  the non-conclusory 'factual content,' and reasonable inferences from that content, must be

17  plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

18          **C.     Whether the Court Should Dismiss Scrips' Rule 10b-5 Claim**

19          Ironridge argues that Scrips' second amended Rule 10b-5 claim fails to cure the pleading

20  deficiencies that the court identified in its first amended complaint.  First, it contends that Scrips

21  has failed to plead an actionable misrepresentation or omission.  Second, it asserts that Scrips has

22  failed to allege manipulative conduct.  Third, it argues that Scrips cannot plead reliance as a matter

23  of law.  Fourth, it contends that Scrips has failed adequately to allege facts giving rise to a strong

24  inference of scienter.  Ironridge asserts that, given Scrips' multiple, unsuccessful attempts to plead

25  a viable Rule 10b-5 claim, the claim should be dismissed with prejudice.  The court addresses

26  each argument in turn.

27

28

### 1. Legal Standard Governing the Pleading of Securities Fraud Claims

"A securities fraud complaint under § 10(b) and Rule 10b–5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4]." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires that the "circumstances constituting fraud or mistake . . . be stated with particularity." FED.R.CIV.PROC. 9(b). "Generally, a plaintiff must plead 'with particularity' the time and place of the fraud, the statements made and by whom made, an explanation of why or how such statements were false or misleading when made, and the role of each defendant in the alleged fraud." See *Cirulli v. Hyundai Motor Co.*, No. SACV 08-0854 AG (MLGx), 2009 WL 5788762, *4 (C.D. Cal. June 12, 2009) (citing *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1547-49 (9th Cir. 1994) (en banc); *Lancaster County Hospital v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)); see also *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) ("Generally, a plaintiff must plead the 'time, place, and specific content' of allegedly fraudulent conduct to satisfy Rule 9(b)").

Thus, a securities fraud plaintiff cannot survive a motion to dismiss merely by alleging that certain statements were false. *Metzler Inv. GMBH*, 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e Rule 9(b)] standard"); see also *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 390 (9th Cir. 2010) ("Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression,' quoting *In re Convergent Technologies Securities Litigation*, 948 F.2d 507, 512 (9th Cir. 1991)). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made*." *In re Glenfed Inc.*, 42 F.3d at 1549 (emphasis added). It must also provide specifics concerning who made the statement and when it was made.

In 1995, Congress passed the PSLRA, which amended the Securities Exchange Act of 1934. The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason

1   or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15

2   U.S.C. § 78u-4(b)(1); see *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 996 (9th

3   Cir. 1999).   The statute requires that, in pleading that each allegedly misleading statement or

4   omission was made with scienter, the plaintiff must "state with particularity . . . facts giving rise

5   to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.

6   § 78u-4(b)(2).   If the complaint does not contain such allegations, it must be dismissed.   15

7   U.S.C. § 78u- 4(b)(3)(A).[80]

8        In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions

9   brought pursuant to § 10(b) and Rule 10b-5.'" *Tellabs*, 551 U.S. at 320 (citing *Merrill Lynch,*

10  *Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)).   The PSLRA's requirements

11  "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations

12  of deception unaccompanied by a particularized explanation stating why the defendant's alleged

13  statements or omissions are deceitful." *Metzler Inv. GMBH*, 540 F.3d at 1061 (citing *Falkowski*

14  *v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002)).

15        **2.     Legal Standard Governing Liability Under Section 10(b) and Rule 10b-5**

16        Rule 10b-5, promulgated by the Securities and Exchange Commission pursuant to section

17  10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive

18  device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically,

19  one cannot "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue

20  statement of a material fact or omit to state a material fact necessary in order to make the

21  statements made, in the light of the circumstances under which they were made, not misleading;

22

23

24        [80]The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial,
    are limited by "meaningful cautionary statements," or are made without actual knowledge of their

25  falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). Such statements include, but are not limited to,
    statements of future economic performance and management plans and objectives. 15 U.S.C.

26  §§ 77z-2(I), 78u-5(I). This "safe harbor" has much the same effect as the "bespeaks caution"

27  doctrine, which provides that forward-looking representations that contain adequate cautionary
    language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v.*

28  *Haggerty*, 38 F.Supp.2d 816, 830 (C.D. Cal. 1998).

or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

"Regardless of whether a § 10(b) plaintiff alleges a misrepresentation, omission, or manipulation, he must plead and prove the following elements: (1) . . . use or employ[ment of] a[ ] manipulative or deceptive device or contrivance; (2) scienter, i.e.[,] [a] wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . . as transaction causation; (5) economic loss; and (6) loss causation, i.e.[,] a causal connection between the manipulative or deceptive device or contrivance and the loss." *Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009) (internal quotation marks omitted); see also *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006), vacated on other grounds by *Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 552 U.S. 1162 (2008).

In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §§ 78u-4(b)(2).  "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991–92 (9th Cir. 2009)).

The Ninth Circuit has emphasized that, to allege scienter, "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1179 (C.D. Cal. 2007) (quoting *Silicon Graphics*, 183 F.3d at 974); see also *Silicon Graphics*, 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some

degree of intentional or conscious misconduct").   The requisite state of mind must be a

"'departure from the standards of ordinary care [that] presents a danger of misleading buyers that

is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco*

*Partners*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 984).   If plaintiff relies on

allegations of recklessness, the pleading standard requires that it "state specific facts indicating

no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics*, 183

F.3d at 979.   Allegations of negligence are insufficient.   *Glazer Capital Management, LP v.*

*Magistri*, 549 F.3d 736, 748 (9th Cir. 2008) ("At most, it creates the inference that he *should*

*have known* of the violations.   This is not sufficient to meet the stringent scienter pleading

requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.*,

No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D. Cal. Aug. 10, 2011) ("[T]he Ninth

Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving

not merely simple, or even inexcusable negligence, but an extreme departure from the standards

of ordinary care, and which presents a danger of misleading buyers or sellers that is either known

to the defendant or is so obvious that the actor must have been aware of it").

   "To qualify as 'strong' within the intendment of . . . the PSLRA . . . an inference of

scienter must be more than merely plausible or reasonable – it must be cogent and *at least as*

*compelling as any opposing inference of nonfraudulent intent*." *Tellabs*, 551 U.S. at 314

(emphasis added).   "[C]ourts must consider the complaint in its entirety, as well as other sources

courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . .   The inquiry . . .

is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter,

not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23

(emphasis original).

   In determining whether a plaintiff has alleged facts giving rise to a strong inference of

scienter, the court must draw all reasonable inferences from the allegations presented, including

inferences unfavorable to plaintiff.   *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002).

"However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of

the "smoking-gun" genre, or even the "most plausible of competing inferences." . . .   [T]he

1    inference of scienter must be more than merely "reasonable" or "permissible[,]" [however] – it

2    must be cogent and compelling . . . in light of other explanations.'" *Middlesex Retirement System*,

3    527 F.Supp.2d at 1179 (quoting *Tellabs*, 551 U.S. at 314).

4         The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because

5    falsity and scienter are generally inferred from the same set of facts." *In re New Century*, 588

6    F.Supp.2d 1206, 1227 (C.D. Cal. 2008) (citing *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th

7    Cir. 2003), abrogated by *Tellabs* on other grounds  as recognized in *South Ferry LP, No. 2 v.*

8    *Killinger*, 542 F.3d 776 (9th Cir. 2008), and *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.

9    2001)).  The court therefore analyzes Scrips' falsity and scienter allegations in tandem below.

10        **3.    Whether Scrips Has Pled Manipulative Conduct**

11        To state a claim for market manipulation, Scrips must plead that Ironridge engaged in

12   trading practices "intended to mislead investors by artificially affecting market activity." *Santa*

13   *Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).  Thus, "[t]o plead a claim based on market

14   manipulation, a plaintiff must allege, *inter alia,* that the defendant engaged in manipulative acts,

15   that the plaintiff suffered damage, which was caused by his or her reliance on an assumption that

16   the market was free of manipulation, and that the defendant acted with scienter." *In re Bank of*

17   *America Corp.*, No. 09-MD-02014 JSW, 2011 WL 740902, *6 (N.D. Cal. Feb. 24, 2011).  "A

18   market manipulation claim . . . cannot be based solely upon misrepresentations or omissions."

19   *ATSI Communications, Inc. v. Shaar Fund, Ltd.* ("*ATSI II*"), 493 F.3d 87, 101 (2d Cir. 2007)

20   (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005)).  "There must be some

21   market activity, such as 'wash sales, matched orders, or rigged prices.'" *Id.* (citing *Santa Fe*

22   *Indus., Inc.*, 430 U.S. at 476).  Moreover,"nondisclosure is usually essential to the success of a

23   manipulative scheme." *Santa Fe Indus., Inc.*, 430 U.S. at 477; *In re Merrill Lynch Auction Rate*

24   *Securities Litigation*, 704 F.Supp.2d 378, 390 (S.D.N.Y. 2010) (where "a transaction's terms are

25   fully disclosed," there can be no market manipulation claim).

26        In its prior order, the court held that Scrips' first amended complaint did not sufficiently

27   plead manipulative conduct because Scrips failed plausibly to allege any particular course of

28   conduct that would amount to market manipulation.  Scrips attempts to cure this deficiency in the

24

1    second amended complaint by adding additional "bid whacking" allegations and by appending

2    details concerning Scrips' trading patterns to the complaint.  It also makes many of the same

3    arguments that the court previously found unavailing.  The court addresses each in turn.

4                    **a.      Use of Multiple Brokerage Firms**

5            As the court noted in its order dismissing this claim in the first amended complaint, Scrips'

6    allegations that Ironridge's use of multiple brokerage accounts demonstrates market manipulation

7    fail because many traders, especially institutional traders, use multiple accounts to place orders.[81]

8    The mere use of three trading accounts – two in Ironridge's name and one in Caledonian's name

9    – does not evidence market manipulation in and of itself.  Compare *S.E.C. v. McCaskey*, No. CV

10   98-06153 (SWK), 2001 WL 1029053, *5 (S.D.N.Y. Sept. 6, 2001) ("The record reflects that

11   McCaskey acted willingly and knowingly as his stock manipulation scheme involved wash sales

12   and matched orders conducted through 22 accounts held in misleading names or the names of

13   nominees at 14 different firms").

14           More fundamentally, the court noted that Scrips could not argue that the use of multiple

15   brokerage accounts constituted manipulation because it had to have been aware that Ironbridge was

16   using multiple brokerage accounts.  See *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)

17   ("The gravamen of manipulation is deception of investors into believing that prices at which they

18   purchase and sell securities are determined by the natural interplay of supply and demand, not

19   rigged by manipulators. . . .  In consequence, a private plaintiff in such a case must establish that

20   he or she engaged in a securities trade in ignorance of the fact that the price was affected by the

21   alleged manipulation," citing *Ray v. Lehman Brothers Kuhn Loeb, Inc*., 624 F.Supp. 16, 19 (N.D.

22   Ga. 1984)); *In re Bank of America Corp*., 2011 WL 740902 at *7 (manipulation occurs "when

23   an investor is erroneously led to believe that the prices for the security in question are driven by

24   the 'natural interplay of supply and demand, not rigged by manipulators'").  This is because

25

26

27

28   [81]Order at 21.

1   Scrips pleads that its transfer agent delivered the shares to each of the accounts.[82]   Accordingly,

2   it had to have known that Ironridge could sell Scrips shares through these brokerage accounts; as

3   a consequence, it cannot have been deceived.

4   **b.   Ironridge's Section 13(d) Disclosure Statement**

5   Scrips next contends, as it did in the first amended complaint, that Ironridge's November

6   8, 2013 Section 13(d) disclosure statement was false or misleading because it stated that "Ironridge

7   was entitled to 5,650,000 shares despite receiving 8,690,000." [83]   The court previously found this

8   allegation unavailing.   As it noted previously, Scrips' description of the disclosure statement is

9   inaccurate.[84]   The disclosure statement provides:

10   "IV received an initial issuance of 8,690,000 common shares, and may be required

11   to return or be entitled to receive shares, based on the calculation summarized in

12   the prior paragraph.   Based on the $0.1820 per share closing price on November

13   7, 2013, IV would be entitled to 5,650,000 shares.   For purposes of calculating the

14   percent of class, the reporting persons have assumed that there were 78,238,653

15   shares of common stock outstanding immediately prior to the issuance of shares to

16   IV, such that 5,650,000 shares issued to IV would represent approximately 6.8%

17   of the outstanding common stock after such issuance."[85]

18   When the whole statement is considered, it is clear that Ironridge did not represent it had

19   received only 5,650,000 shares; it clearly stated that it had received 8,690,000 shares, but might

20   be required to return some of the shares because, based on the current trading price, it was

21

22

23   [82]SAC, ¶ 53(a)-(c) (listing transfers to brokerage accounts in Ironridge's name at U.S. Bank

24   Corp. and Albert Fried & Company, LLC, and in the name of Caledonian Bank Limited at

25   Scottsdale Securities).

26   [83]*Id.*, ¶ 59.

27   [84]Order at 22.

28   [85]Mader Decl., Exh. M (November 8, 2013 Section 13(d) Disclosure) at 11.

1   entitled to only 5,650,000 shares.  The court can discern nothing false or misleading about the

2   statement; hence it does not support Scrips' market manipulation claim.

3          In addition, "the purpose of section 13(d) is to alert the marketplace to every large, rapid

4   aggregation or accumulation of securities, regardless of [the] technique employed, which might

5   represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d

6   Cir. 1971).  Thus, "Section 13(d)(1)(C) requires the person filing to disclose any intention to

7   acquire control.  If he has such an intention, he must disclose any plans for liquidating the issuer,

8   selling its assets, merging it with another company or changing substantially its business or

9   corporate structure." *Id*.  Ironridge's shares were non-voting.[86]  As a result, there was no

10  potential that it could acquire control of Scrips.  Even assuming, therefore, that Ironridge had

11  misrepresented the number of shares it had received, it is unclear how the statement would be

12  material for purposes of Section 13(d) or Rule 10b-5.

13         Finally, as noted, "a private plaintiff in . . . a case [like this] must establish that he or she

14  engaged in a securities trade in ignorance of the fact that the price was affected by the alleged

15  manipulation." *Gurary*, 190 F.3d at 45.  Scrips knew how many shares it had issued to Ironridge.

16  Because it was not ignorant of the number of shares Ironridge had received, it could not

17  reasonably rely on any alleged misrepresentation in the Section 13(d) disclosure statement

18  concerning the number of shares issued as the basis for a market manipulation claim.  See *id*.

19  (summary judgment was properly granted because, "[b]y plaintiff's own admission, th[e reliance]

20  requirement [wa]s not satisfied," i.e., plaintiff was not ignorant of the alleged manipulation); *Alki*

21  *Partners, L.P. v. Vatas Holding GmbH*, 769 F.Supp.2d 478, 493 (S.D.N.Y. 2011) ("[A]

22  complaint alleging a violation of § 10(b) is required to state that the transactions that caused the

23  loss were made 'in ignorance of the fact that the price was affected by the alleged manipulation.'

24  . . .  Plaintiffs were not ignorant of the manipulation of the price of RMDX stock that they now

25  claim to be victims of, and so cannot establish that they relied on [a] market free of

26

27        [86]*Id*. at 11 (stating that Ironridge is "prohibited from . . . voting any shares of issuer's
    common stock owned or controlled by them"); Stipulation, ¶ 12 ("neither [Ironridge] nor any of
28  its affiliates shall: (a) vote any shares of Common Stock owned or controlled by it").

manipulation"), aff'd sub nom. *Alki Partners, L.P. v. Windhorst*, 472 Fed. Appx. 7 (2d Cir. May 21, 2012) (Unpub. Disp.).

### c.       "Bid Whacking"

In the first amended complaint, Scrips alleged that Ironridge engaged in "marking the close" transactions and "bid whacking." The second amended complaint omits any reference to "marking the close" transactions, and instead includes additional allegations concerning "bid whacking." As the court stated in its order dismissing the first amended complaint, there are no reported decisions discussing"bid whacking," let alone holding that it amounts to manipulative conduct. No secondary legal authority describes bid whacking or suggests that it should be considered manipulative.[87] The court will nonetheless assume, without deciding, that bid whacking could constitute manipulative conduct. The second amended complaint describes bid whacking as follows:

> "'Bid whacking' is accomplished when the selling party offers to sell their shares 'at the bid' instead of a higher price – this has the effect of lowering bids further and if the selling parties continue to reduce their demanded price (agree to sell again at the lower bid price), this will have the effect of lowering the overall share price for the day and often into at least the next trading day. If a selling party continues this day after trading day, the share price will start dropping due to this manipulation as well as panic in what were previously 'long' holding stock holders; who now lose confidence in the stock and sell out their positions. If they are successful, and/or if other 'funders' are in the stock also selling, their model is to consistently 'bid whack' the stock in an effort to 'entice' others to sell, causing the decline in price to the point where they would be able to request more stock."[88]

The Second Circuit has held that manipulation claims, while subject to Rule 9(b), often involve facts solely within the defendant's knowledge; thus, "at the early stages of litigation, the

---

[87]Motion at 12.

[88]SAC, ¶ 22.

plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI II*, 493 F.3d at 102.  The Ninth Circuit has not addressed whether Rule 9(b) should be relaxed for manipulation claims.  Several California district courts have applied the Second Circuit's relaxed pleading standard, however.  *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F.Supp.2d 799, 811 (N.D. Cal. 2011) (citing *ATSI II* and describing the burden as "somewhat relaxed"); *Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, No. CV 09-03529 JSW, 2011 WL 1152568, *5 (N.D. Cal. Mar. 28, 2011) (applying the *ATSI II* standard); *In re Bank of America Corp.*, 2011 WL 740902 at *6 (same).  Because Scrips fails to satisfy even the "somewhat relaxed" burden imposed by the Second Circuit, the court assumes, without deciding, that it is the appropriate standard to apply.[89]

In *ATSI II*, the Second Circuit explained that even under a relaxed Rule 9(b) standard, "[g]eneral allegations not tied to the defendants or resting upon speculation are insufficient." 493 F.3d at 102.  It stated that the complaint must set forth "*what* manipulative acts were performed, which defendants performed them [i.e., '*who*'], *when* the manipulative acts were performed, and *what* effect the scheme had on the market for the securities at issue." *Id.* (emphasis added).  The court's order dismissing the first amended complaint noted that Scrips'"bid whacking" allegations lacked any detail concerning when it occurred or who directed it to occur; it therefore concluded that bid whacking was deficiently pled.[90]  Scrips contends that it has remedied these concerns.

In its second amended complaint, Scrips attempts to bolsters its bid whacking allegations by pleading that Ironridge engaged in bid whacking between December 2013 and January 2014.  Scrips contends this ultimately drove "the price of [its] stock from seventeen cents to ten cents" over this five-month period.[91]  Scrips supports these allegations by attaching as an exhibit to the

---

[89]At the hearing, Scrips stressed that courts have applied a lower pleading standard to stock manipulation claims.  Given that the court applies the lower standard here, and that it did so in its prior order dismissing the first amended complaint, this argument does not affect the outcome.

[90]Order at 24.

[91]*Id.*, ¶¶ 22-24.

second amended complaint an unnamed, and according to Ironridge, undisclosed, expert's analysis of trading data from December 2013 to April 2014.[92]  The expert allegedly asserts that Ironridge sold the majority of its shares at the low for each trading day in December 2013 and January 2014.[93]  In its opposition, Scrips argues that "a greater level of particularity in the allegations regarding the transactions at issue" could not be imagined, given the "highly granular transactional details . . . [of the] voluminous set of data analysis that was prepared by an expert."[94]  Scrips' "highly granular transactional details," however, show nothing more than that Ironridge sold stock at certain times and at certain prices.  To allege a market manipulation claim adequately, it must plead *which* trades were manipulative and *why* they were so.  See *ATSI II*, 493 F.3d at 102 (the complaint must, at a minimum, allege "*what* manipulative acts were performed, which defendants performed them [i.e., '*who*'], *when* the manipulative acts were performed, and *what* effect the scheme had on the market for the securities at issue"); *id.* at 104-05 ("Wholly absent are particular facts giving rise to a strong inference that Trimark acted with scienter in manipulating the market in ATSI's common stock and *any allegations of specific acts by Trimark to manipulate the market, much less how those actions might have affected the market*" (emphasis added)); *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03 CIV 3120 LTS THK, 2009 WL 1492196, *7 (S.D.N.Y. May 27, 2009) ("The mere fact that Frankel effected such a large volume of trades in Sedona's stock is also not indicative of anything manipulative").

Appending 200 pages of trading data, without identifying a single transaction as manipulative, along with vague testimony from an unnamed expert that Ironridge sold shares "at the lows of each trading day" over a two month period does not suffice.  As Ironridge argues in its motion, "[a]mbiguous raw data by itself does not mean anything.  It was Scrips' burden to identify, out of the 200 pages, *what* trades were purportedly manipulative, . . . *why* they were manipulative, *how* the market was misled by them, and *what* effect the trades had on the

---

[92]*Id.*; see *id.*, Exh. 5.

[93]*Id.*, ¶ 23.

[94]Opposition at 1.

market."[95]   To the extent Scrips alleges that *all* Ironridge trades during the five month period covered by the raw data were manipulative, the court cannot agree.  Initially, the court seriously doubts that Scrips can satisfy its burden under Rule 9(b) simply by appending 200 pages of data to its complaint and suggesting that all of the trades reflected in the data were manipulative.  See *ATSI Communications*, *Inc. v. Shaar Fund, Ltd.* ("*ATSI I*"), 357 F.Supp.2d 712, 719 (S.D.N.Y. 2005) ("*Finally,* the Complaint alleges that three charts containing certain trading data for the period December 2002 through January 2003 show manipulation.  Again, the Complaint fails adequately to explain how the data shows manipulation, let alone how it is linked to any of the defendants"), aff'd, *ATSI II*, 493 F.3d at 102-03 ("We agree with the district court that these allegations are inadequate under Rule 9(b).  In sum, ATSI has offered *no specific allegations* that the defendants did anything to manipulate the market; it relies, at best, on speculative inferences" (emphasis added)).

    In any event, the court's review of the transaction data for December 2013 and January 2014, the months Scrips contends are the most indicative of Ironridge's purported misconduct, confirms that Ironridge sold its Scrips shares within the range at which all Scrips' shares were sold.  For example, on December 6, 2013, Scrips stock traded between $0.17 – $0.1956 a share; the price range at which Ironridge allegedly traded was $0.17 – $0.19.[96]  The same is true for December 13, 2013.  Ironridge sold Scrips stock within the overall trading range that day, and in fact sold more shares at $0.155, the highest price point of the day, than at any other price.[97] On December 23, 2013, Ironridge sold Scrips shares in a range between $0.115 and $0.13, while Scrips shares traded as low as $0.1144 and closed at $0.14.[98]  On December 24, 2013, Ironridge sold Scrips stock above the average price for the day; indeed, all its trades on December 24, 2013

---

[95]Reply at 1.

[96]SAC, Exh. 5 at 60–61.

[97]*Id*. at 71.

[98]Id. at 286-87.

were well above the closing price, generally $0.02 higher.[99]  Furthermore, the next trading day, Ironridge allegedly sold 21,000 shares at $0.152, which was the second highest trading price of the day.[100]  On January 13, 2014, Ironridge sold shares between $0.105 and $0.11; that day, the stock opened at $0.115 and closed at $0.11.  Several other sales (of greater volume than Ironridge' sales) were also made at $0.105.[101]  On January 14, 2014, Ironridge sold shares at $0.11 and $0.122, well above the $0.105 opening price.  The following day, it sold a substantial number of shares – nearly 200,000 – at $0.115; Scrips shares opened on January 15, 2014 at $0.12 and other traders sold a substantial quantity of Scrips stock at $0.115, $0.116, and $0.118.[102]  Finally, on January 23, 2014, Ironridge sold shares between $0.125 and $0.1128 on a day when Scrips shares opened and closed at $0.12.

Even on the days where Ironridge sold Scrips' shares at or near intraday lows, the data indicate that other traders were selling Scrips shares at or near the same price.  On December 9, 2013, for example, Scrips shares opened at $0.175 before a series of sales by traders other than Ironridge drove the share price down to $0.16.  Ironridge then sold 7,000 shares at $0.156, 2,000 shares at $0.1494 (the lowest price of the day), and 26,500 shares at $0.1514.  Before Ironridge made its largest sale of 26,500 shares, another trader sold 10,000 Scrips shares at $0.15.  Within 90 minutes of these trades, other entities sold 2,062 shares at $0.154, 18,000 shares at $0.156, and 4000 shares at $0.158.[103]  On December 11, 2013, Ironridge sold shares at $0.145, $0.1455, $0.15, $0.155, and $0.1491.[104]  Before it executed its first trade, another trader sold 9,000 Scrips

---

[99]*Id*. at 87–88.

[100]*Id*. at 88.

[101]*Id*. at 99-100.

[102]*Id*. at 104-05.

[103]*Id*. at 63.

[104]*Id*. at 66-68.

shares at $0.145 – the lowest sale price for any of the Ironridge trades.[105]   Other traders sold Scrips shares at the same prices Ironridge did.   Moreover, Ironridge's final trade of 10,000 shares at $0.155 was executed at 3:38 PM; thereafter, other trades were executed at $0.1475 and at the closing price of $0.15.[106]   It is true that on December 17, 2013, Ironridge sold 1,000 shares at $0.10, the intraday low; it did so within two minutes of others sales in much higher quantities (42,025 and 5,000 shares) at $0.11, however.   Another trader sold 35,000 share at $0.102 four minutes later.   In short, although certain of Ironridge's sales were at or near intraday lows, they are not inherently suspect because they are in line with other sales and overall trading patterns on the days in question.   See *ATSI I*, 357 F.Supp.2d at 719 ("Although a change in stock price or trading volume favorable to the defendants is relevant to whether a manipulation occurred, it does not, without more, give rise to an inference of fraud").

Further eroding Scrips' theory is the fact Ironridge did not sell any shares on December 16, 2013.   Despite that fact, Scrips shares opened at $0.14 and closed at $0.13 following an intraday low of $0.122; this is a trading range that is substantially similar to the range at which the stock traded on days Scrips contends Ironridge was manipulating its stock.[107]   Again on December 18, 2013, Scrips shares fluctated between an opening price of $0.131, an intraday low of $0.1075, and a closing price of $0.124.[108]   Ironridge sold no shares on December 30 and 31, 2013, when Scrips shares traded for as little as $0.1284 and $0.11, respectively.[109]   Thus, even when the unexplained trading data proffered by Scrips is analyzed, the trading activity does not demonstrate manipulation.   Rather, the data attached to the complaint belie Scrips' conclusory allegation that Ironridge continually offered to sell at the lowest bid price, *i.e.*, that Ironridge was

---

[105]*Id*. at 70-71.

[106]*Id*.

[107]*Id*. at 72-75.

[108]*Id*. at 77-79.

[109]*Id*. at 91-95.

bid whacking.  Thus, Scrips' new allegations do not cure the deficiencies the court previously noted.

Because Scrips fails to allege with particularity any specific conduct that constitutes market manipulation, its Rule 10b-5 claim must be dismissed to the extent it is based on such manipulation.

### 4.     Whether Scrips Has Pled a Misrepresentation or Omission

Ironridge next argues that Scrips has again failed adequately to allege a misrepresentation or omission, as it has added no new allegations curing the deficiencies identified in the court's order dismissing the first amended complaint.[110]  In its opposition, Scrips does not argue that it has pled an actionable misrepresentation, omission, or false promise; it focuses instead on its "open-market manipulation theory."[111]  The court nonetheless addresses the misrepresentations, omissions and false promises alleged by Scrips.[112]

---

[110]*Id*. at 3; 11 n. 4.

[111]Opposition at 1.

[112]Scrips no longer alleges, as it did in the first amended complaint, that Irongate did not disclose Sims' involvement in the transaction.  There, Scrips alleges that it "did not learn of Sims' involvement until after transaction documents were executed and it received its funding from [Ironridge]."  It asserted that as a result "of the astounding number of lawsuits involving Sims and companies under his control, [Ironridge] knew that [Scrips] would reject its financing if Sims' interest and the actions against his related entities were disclosed."  (FAC, ¶ 42.)  Ironridge's omission, Scrips argued, "was akin to failing to disclose that one is actually going into business with Bernie Madoff."  (*Id*.)  By omitting these allegations, Scrips has abandoned reliance on this theory.  The allegations fail to state an actionable omission in any event.  As the court explained in its prior order, Scrips knew that Sims was involved in the transaction because the initial term sheet Ironridge gave Scrips was signed by Sims as Ironridge's director; so too was the state court stipulation.  Ironridge had also filed 62 Schedules 13G with the SEC prior to execution of the stipulation; each listed Sims as an Ironridge director.  Thus, Scrips' allegation that it did not learn of Sims' involvement until after the transaction documents were executed and it had received funding from Ironridge was contradicted by documents incorporated by reference in the complaint. See *Sprewell*, 266 F.3d at 988 ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit," citing *Mullis v. United States Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987)).  In addition to Sims' signature on the transaction documents, Scrips was placed on constructive notice of Sims' involvement based on Ironridge's SEC filings.  See *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 700 (5th Cir.

### a.   The Adjustment Mechanism

Scrips alleges that the adjustment mechanism set forth in the parties' agreement and stipulation is "incredibly convoluted and virtually unintelligible."[113]   To the extent it asserts that vagueness or ambiguity in the term setting forth the adjustment mechanism is tantamount to a misrepresentation or omission, the court cannot agree.   First, Scrips fails to allege any specific misrepresentation or omission related to the adjustment mechanism.   For this reason alone, the claim fails under Rule 9(b).   See *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged" (citations omitted)).   Second, the manner in which the adjustment mechanism was to operate was fully disclosed in the parties' agreement and stipulation, which included a merger clause that cut off any right to rely on prior oral representations; Ironridge thus did not conceal the adjustment mechanism from Scrips.   As the court found in its prior order dismissing Scrips' Rule 10b-5 claim – which then was based on an allegation that Ironridge made misrepresentations because there was a discrepancy between the term sheet and the stipulated judgment – "a party who signs a written agreement generally is bound by its terms, even though he neither reads it nor considers the legal consequences of signing it." *Operating Engineers Pension Trust v. Gilliam*, 737 F.2d 1501, 1504 (9th Cir. 1984) (citing *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 20 Cal.App.3d 668, 671(1971)); see also *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012) ("California courts have held that where, as here, the parties to an agreement deal at arm's length, it is not reasonable to fail to read a contract

---

2004) ("SEC filings are generally sufficient to place investors on constructive notice of their contents"); *Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1169 (7th Cir. 1995) ("The presence of that information in the registration statement does not save the prospectus from a charge of incompleteness.   But the presence of the information in the registration statement does give actual notice to professional investors and constructive notice to ordinary investors"); *Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993) (information contained in SEC documents disclosing fraud put investors on constructive notice and started the one-year statute of limitations period).   For this reason, even had Scrips continued to allege that Ironridge failed to disclose Sims' involvement in the transaction, the allegations would not plead a viable omissions claim under Rule 10b-5.

[113]SAC, ¶ 18.

before signing it" (citations omitted)); *Rodriguez v. Shen Zhen New World I LLC*, No. CV 13-02959-RSWL, 2014 WL 908464, *3 (C.D. Cal. Mar. 6, 2014) (same); RESTATEMENT (SECOND) OF CONTRACTS § 23, cmts. b, e (1981).  Because Scrips signed the stipulation, it cannot now assert that it was misled.

In addition to signing the stipulation, moreover, Scrips joined Ironridge in filing an *ex parte* application seeking approval of the stipulated judgment.[114]  Its representatives stated at the time that "the board of directors of [Scrips] ha[d] considered the proposed [agreement] and . . . resolved that its terms and conditions [were] fair to, and in the best interests of, SCRC and its stockholders."[115]  If Scrips felt the adjustment mechanism was unintelligible and convoluted, it should not have made this representation to the state court.  Scrips also explained to its shareholders in its November 7, 2013 Form 8-K how the adjustment mechanism would function.[116]

---

[114]The filing included a declaration by O'Neil that explained the operation of the adjustment mechanism.  (O'Neil Decl., ¶ 5 ("Based on my analysis, the terms and conditions of the issuance and exchange are fair to Ironridge. The number of shares to be issued pursuant to the settlement should more than fairly compensate Ironridge for the claims. The market value of the shares to be issued, based on the public sale prices of the Company's stock on its trading market, should ultimately represent a premium to the dollar amount of the claims. The Stipulation provides for an adjustment mechanism, based on the average of the five lowest daily volume weighted average prices during a defined calculation period, such that the aggregate number of shares issued to Ironridge should represent a premium to the average price of the Company's stock over such time. This adjustment mechanism, combined with Ironridge's ability to sell shares at any time, including during the calculation period, provide a substantial measure of protection to Ironridge for price fluctuations in the Company's stock.  Such fluctuations are likely given the Company's trading history and the terms of the Stipulation").)

[115]Schneiderman Decl., ¶ 8

[116]Mader Decl., Exh. L (November 7, 2013 Form 8-K) at 3 ("On November 18, 2013 the Registrant's transfer agent delivered to Ironridge 8,690,000 shares of the Registrant's common stock.  The shares issued to Ironridge are freely tradable and exempt from registration under the Securities Act of 1933, as amended (the 'Securities Act') pursuant to Section 3(a)(10) of the Securities Act and Section 25017(f)(3) of the California Corporations Code.  The number of shares issued to Ironridge is subject to adjustment based on the trading price of the Registrant's stock such that the value of the shares is sufficient to cover the Claim Amount, a 10% agent fee amount and Ironridge's reasonable legal fees and expenses ( 'Final Amount').  Under the Stipulation Order, Ironridge may not be the beneficial owner of more than 9.99% of the

1    Finally, Scrips failed to argue that the adjustment mechanism was unintelligible in its opposition

2    to Ironridge's *ex parte* application for an order compelling the issuance of shares.[117]   The state

3    court clearly did not find the adjustment mechanism unintelligible as it ordered Scrips to issue the

4    shares required under the mechanism; this was the subject of Scrips' state court appeal.   This

5    court, moreover, does not find the adjustment mechanism unintelligible.   For all these reasons,

6    Scrips fails to allege a misrepresentation or omission premised on the adjustment mechanism.

7                         **b.   Use of Multiple Brokerage Accounts**

8           The court previously dismissed Scrips' omission allegations to the extent they were based

9    on Ironridge's failure to disclose the use of multiple brokerage accounts.   "Under Rule 10b–5(b),

10   a defendant can be liable for the omission of material information if he or she has a duty to

11   disclose that information." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d

12   1039, 1048-49 (9th Cir. 2011) (citing *Chiarella v. United States*, 445 U.S. 222, 235 (1980);

13   *Desai*, 573 F.3d at 938).   A duty to disclose "does not arise from the mere possession of non-

14   public information." *Chiarella*, 445 U.S. at 235.   "[I]n the case of an omission, '[s]ilence, absent

15   a duty to disclose, is not misleading under Rule 10b–5.'"   *McCormick v. Fund American*

16   *Companies*, 26 F.3d 869, 875 (9th Cir. 1994) (quoting *Basic v. Levinson*, 485 U.S. 224, 239 n.

17   17(1988)).   "A number of factors are used to determine whether a party has a duty to disclose:

18   (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the

19   defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying

20   upon the relationship in making his investment decision, and (5) the defendant's activity in

21   initiating the transaction." *WPP Luxembourg Gamma Three Sarl*, 655 F.3d at 1048-49 (citations

22   omitted).   Scrips alleges no facts in its second amended complaint that indicate Ironridge had a

23   duty to disclose the number of brokerage accounts it intended to use, or was using, to trade in

24   Scrips' stock; nor does it address the issue in its opposition.   First, Scrips and Ironridge had an

25   ─────────────

26   Registrant's outstanding shares of common stock until the Final Amount is paid.   Further
     Ironridge has agreed not to exercise any voting rights of the shares issued to it nor influence or

27   cause any change in control of the Registrant").

28   [117]See generally Motion to Compel Opp.

1  arms length relationship in which Scrips agreed to issue stock to Ironridge in exchange for

2  Ironridge's promise that it would pay Scrips' accounts payable.  None of the terms of the parties'

3  agreement indicated that Scrips expected to be told how many brokerage firms Ironridge would

4  use to trade its stock.  Second, both parties had equal access to information that Ironridge used

5  multiple brokerage accounts, as Scrips delivered the shares initially issued to Ironridge to more

6  than one brokerage firm.  Scrips alleges that Ironridge derived benefit from using multiple

7  brokerage accounts because this allowed it to manipulate the market in Scrips' stock.  The court

8  finds *supra*, however, that the allegations of manipulation in the second amended complaint are

9  deficient.  Scrips, moreover, alleges no facts suggesting that Ironridge knew it was relying on

10  Ironridge's use of a single brokerage firm in any way.  While it is true that, as alleged, Ironridge

11  initiated the transaction that led Scrips to issue stock in exchange for Ironridge's payment of

12  Scrips' accounts payable, the fact that this one factor weighs in Scrips' favor is not sufficient to

13  impose a duty on Ironridge to disclose that it used multiple brokerage firms.

14  Furthermore, and perhaps most importantly, as noted, Scrips knew the specific brokerage

15  houses to which it delivered shares under the agreement because its transfer agent delivered the

16  shares.[118]  It does not allege that thereafter, other brokerage houses were used to trade its stock.

17  Thus, it has not adequately pled that it was misled by the purported non-disclosure.

18  For both reasons, therefore, Scrips has not adequately alleged a misrepresentation or

19  omission concerning Ironridge's use of multiple brokerage accounts.

20  ### c.    Promise Not to Engage in Manipulative Conduct

21  Scrips also alleges that Ironridge falsely promised that it would not engage in manipulative

22  conduct with no intention of performing.[119]    "In addition to omission and affirmative

23  misrepresentation cases, courts have long held . . . that promissory fraud [can] support a claim

24  under Section 10(b) and Rule 10b–5."  See *Thompson ex rel. Thorp Family Charitable Remainder*

25  *Unitrust v. Federico*, 324 F.Supp.2d 1152, 1162 (D. Or. 2004) (citing *Ouaknine v. MacFarlane*,

26  _____

27  [118]SAC, ¶ 53(a)-(c).

28  [119]*Id.*, ¶ 12.

1    897 F.2d 75, 80-81 (2d Cir. 1990); *Pross v. Katz*, 784 F.2d 455, 457-58 (2d Cir. 1986); *Burns*

2    *v. Paddock*, 503 F.2d 18, 23 (7th Cir. 1974)); accord *Walling v. Beverly Enterprises Corp.*, 476

3    F.2d 393, 396 (9th Cir.1973) (entry into an agreement of "sale with the secret reservation not to

4    fully perform it is fraud cognizable under § 10(b)").

5          "[A] person's 'state of mind is, of course, a fact' and thus may support a securities fraud

6    claim." *Thompson ex rel. Thorp Family Charitable Remainder Unitrust*, 324 F.Supp.2d at 1162

7    (quoting *Keers & Co. v. American Steel & Pump Corp.*, 234 F.Supp. 201, 203 (S.D.N.Y. 1964)).

8    "A mere failure to perform a promise, however, is not sufficient to state a fraud claim under

9    federal securities law (although such a failure may support a breach of contract or other claim)."

10   *Id.* (citing *Keers & Co.*, 234 F.Supp. at 203).  "Instead, to state a securities fraud claim based

11   on broken promises, there must be 'proof that at the time the promises were made the promisor

12   had no intention of keeping them,' since it is 'the lack of intention to perform' which 'constitutes

13   the fraud.'" *Id.* (citing *Keers & Co.*, 234 F.Supp. at 203).

14         Scrips' promissory fraud claim fails for several reasons.  Most fundamentally, because

15   Scrips fails plausibly to allege that Ironridge engaged in any market manipulation, *a fortiori* it has

16   not adequately pled that Ironridge's purported promise that it would not engage in such

17   manipulation was made with no intention to perform.  Cf. *Saberi v. Shell Oil Products*, 224 Fed.

18   Appx. 694, 695 (9th Cir. Mar. 16, 2007) (Unpub. Disp.) ("Because Defendant performed as

19   allegedly promised when it eventually sold the station to Plaintiff, the promissory fraud claim fails

20   as a matter of law").

21         Moreover, and relatedly, no facts are alleged that plausibly suggest Ironridge had no

22   intention of performing at the time the alleged promise was made.  Intent can be alleged generally.

23   See *Iqbal*, 556 U.S. at 686 ("It is true that Rule 9(b) requires particularity when pleading 'fraud

24   or mistake,' while allowing '[m]alice, intent, knowledge, and other conditions of a person's mind

25   [to] be alleged generally'").  This does not save Scrips' allegations, however.  "'Although intent

26   can be averred generally under Rule 9(b), a plaintiff must point to facts which show that defendant

27   harbored an intention not to be bound by the terms of the [promise at the time it is made].'" *Mat-*

28   *Van, Inc. v. Sheldon Good & Co. Auctions, LLC*, No. 07-CV-912 IEGBLM, 2007 WL 2206946,

1   *6 (S.D. Cal. July 27, 2007) (quoting *Hsu v. OZ Optics Ltd.*, 211 F.R.D. 615, 620 (N.D. Cal.

2   2002), and citing *Richardson v. Reliance Nat'l Indemnity Co.*, No. C 99-2952, 2000 WL 284211,

3   *4 (N.D. Cal. Mar. 9, 2000)).

4          Because it alleges no such facts, Scrips' complaint "does not . . . explain how an inference

5   that [Ironridge] intended to defraud [it] might be drawn. . . ."  See *Shogen v. Global Aggressive

6   *Growth Fund, Ltd.*, No. CIV.A. 04 5695(SRC), 2007 WL 1237829, *13 (D.N.J. Apr. 26, 2007)

7   (granting summary judgment on a Rule 10b-5 claim based on promissory and common law fraud).

8   The only allegation in the complaint that might support an inference that the promise was made

9   with no intention of performing is the fact that Ironridge purportedly engaged in market

10  manipulation.  As noted, however, mere nonperformance of a contractual promise (i.e., not to

11  engage in manipulation) alone is not sufficient to plead or prove promissory fraud.  See *Thompson

12  *ex rel. Thorp Family Charitable Remainder Unitrust*, 324 F.Supp.2d at 1162 ("A mere failure to

13  perform a promise, however, is not sufficient to state a fraud claim under federal securities law

14  (although such a failure may support a breach of contract or other claim)," quoting *Keers & Co.*,

15  234 F.Supp. at 203); see also *Triumph Furniture Processing-Export Joint Stock Co. v. Everest

16  *Furniture Co.*, No. CV 13-01729 NC, 2013 WL 9600372, *2 (N.D. Cal. Aug. 29, 2013)

17  ("Triumph does not allege any facts that would suggest Everest intentionally did not perform or

18  knew they would not perform when they entered into the contract"); *Mat-Van*, 2007 WL 2206946

19  at *6 ("In the instant case, the only allegations in the complaint that could demonstrate defendants'

20  fraudulent intent are claims that defendant ultimately did not perform the material terms of the

21  contract.  Plaintiffs' reliance on nonperformance as circumstantial evidence of defendants'

22  fraudulent intent at the time of contract formation is misplaced"); *Sunnyside Development Co.,

23  *LLC v. Opsys Limited*, No. CV 05-0553 MHP, 2005 WL 1876106, *5-6 (N.D. Cal. Aug. 8,

24  2005) ("[T]he mere fact that a party breaches a promise to perform a condition of contract is as

25  a matter of law insufficient to give rise to an inference that the breaching party acted with

26  fraudulent intent at the time that the promise was made").  Thus, even had Scrips sufficiently

27

28

1  alleged manipulative conduct, its promissory fraud claim based on market manipulation would be

2  deficiently pled.

3       In sum, Scrips has fails to allege any misrepresentation, omission, or false promise

4  adequately.  Accordingly, its Rule 10b-5 claim fails to the extent based on misrepresentations,

5  omissions, or false promises.

6            **5.    Whether Scrips Has Adequately Pled Reliance**

7       Ironridge contends that Scrips has also failed to allege reliance sufficiently.  Specifically,

8  Ironridge argues that its ability to plead reliance is foreclosed by the stipulation's merger clause,

9  that Scrips is not entitled to a presumption of reliance based on omissions or fraudulent statements,

10  and that no presumption of reliance due to fraud on the market arises in this context or is

11  adequately pled.[120]  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential

12  element of the § 10(b) private cause of action.  It ensures that, for liability to arise, the 'requisite

13  causal connection between a defendant's misrepresentation and a plaintiff's injury' exists. . . ."

14  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (quoting *Basic Inc.*

15  *v. Levinson,* 485 U.S. 224, 243 (1988)); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d

16  1151, 1159 (9th Cir. 1996) ("Justifiable reliance 'is a limitation on a rule 10–5 action which

17  insures that there is a causal connection between the misrepresentation and the plaintiff's harm,'"

18  quoting *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992) (internal quotation

19  marks omitted)).

20            **a.    Reliance on Misrepresentations, Omissions, and/or False**

21                 **Promises**

22       The court previously found that Scrips had failed to allege the reliance element of its Rule

23  10b-5 claim because it admitted in the stipulation on which the state court entered judgment that

24  it had been "advised as to the terms and legal effect" of the stipulation, and the stipulation

25  contained a merger clause stating that Ironridge did not "make [and] ha[d] not made any

26

27  _____

28       [120]Motion at 16.

representations or warranties other than those specifically set forth [therein]."[121]  Because none of the provisions the stipulation restricted Ironridge from selling the shares Scrips issued to it, and Scrips had alleged that such sales violated Rule 10b-5, the court found its reliance allegations deficient.  See *Bank of the West v. Valley Nat'l Bank of Arizona*, 41 F.3d 471, 478 (9th Cir. 1994) (concluding that plaintiff had not shown reasonable reliance where plaintiff represented in an agreement that it had "independently and without reliance upon any representations of [the lead bank] . . . relied upon [its] own credit analysis and judgment" because this "implie[d] that, to the extent that it did rely on [the lead bank's conflicting representations], [plaintiff's] reliance was not justifiable," and holding that "*the contract could and did control whether such reliance would be 'justifiable' for purposes of a fraud claim*" (emphasis added));[122] *In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 306-07 (S.D.N.Y. 2009) ("Furthermore, the documents proffered by Defendants, and of which the Court takes judicial notice, negate any inference that reliance by the class on such a view of the ARS pricing mechanism was reasonable.  The 2006 SEC Order, Plaintiff's trade confirmations and language from the Citigroup Smith Barney website incorporated by reference therein, and the official statements issued in connection with ARS specifically enumerated in the Complaint, all disclosed that Defendants could engage in the very conduct of which Plaintiff complains, the advantages that Defendants would have if they did engage in such conduct, the ability of such conduct to affect clearing rates and the possibility that the auctions would fail if Defendants did not intervene in them"); *Briskin v. Ernst & Ernst*, 398 F.Supp. 997, 1009 (C.D. Cal. 1975) ("Furthermore, plaintiffs have not denied that after an extended, arm's-

---

[121]Stipulation, ¶¶ 11, 16.

[122]*Bank of the West* involved common law fraud, but the Ninth Circuit has applied its reasoning to Rule 10b-5 claims.  See *Paracor Fin., Inc.*, 96 F.3d at 1159 ("In *Bank of the West*. . . , in the analogous situation of a common-law fraud cause of action, a lead bank and a participating bank in a loan to a corporation signed a participation agreement.  In the agreement, the participating bank represented that it 'independently and without reliance upon any representations of [the lead bank] made and relied upon [its] own credit analysis and judgment.' This language, we held, 'implies that, to the extent that it did rely on [the lead bank], [the participating bank's] reliance was not justifiable'" (alterations original)).

1   length negotiation period, an agreement was reached with Beck which contained neither references

2   to McDevitt's representations nor references to the type of warranties that Sloane unilaterally

3   extended to Beck. This irrefuted fact alone should have alerted plaintiffs to the inherent risks of

4   the transaction as well as the proper credence to be accorded to McDevitt's representations"); see

5   also *Paracor Fin., Inc.*, 96 F.3d at 1159 (investors could not demonstrate reasonable reliance

6   where the purchase agreement on which they purportedly relied stated that they had been given

7   "access to the information [they had] requested from the Company," and that they "made [their]

8   own investment decision with respect to the purchase of the Debentures").

9        The merger clause in the stipulation forecloses any finding of reliance with respect to the

10   misrepresentations, omissions, and false promise Scrips alleges. The fact that the stipulation states

11   that Ironridge did not "make [and] ha[d] not made any representations or warranties other than

12   those specifically set forth [in the stipulation]"[123] renders deficient allegations that Scrips relied

13   on pre-stipulation oral promises. Given the language of the stipulation, for example, Scrips'

14   allegation that it reasonably relied on Ironridge's purportedly false promise that it would not

15   engage in market manipulation is unavailing. Similarly, the adjustment mechanism was fully

16   disclosed in a document about which Scrips admitted that it had been "advised [concerning its]

17   terms and legal effect."[124] Scrips does not allege that Ironridge explained the operation of the

18   adjustment mechanism in a false or misleading way, but only that the terms of the contract were

19   vague and ambiguous. To the extent it intends to plead that Ironridge's explanation was false or

20   misleading, however, the allegation fails because the stipulation demonstrates that Scrips cannot

21   plead reasonable reliance. Similarly, because David Sims' involvement was disclosed on all of

22   the transaction documents, any allegation that Scrips relied on the concealment of his participation

23   is implausible. The same is true respecting the use of multiple brokerage houses: Scrips alleges

24   that its transfer agent delivered Ironridge's shares to the brokerage houses; it thus cannot have

25   relied on the fact that Ironridge used only a single brokerage.

26

27        [123]Stipulation, ¶¶ 11, 16.

28        [124]*Id.*

43

### b.   Reliance on Market Manipulation

In its prior order dismissing the first amended complaint, the court found unavailing Scrips' assertion that it relied on the fact Ironridge was not manipulating the market in its stock. To plead the reliance element of a market manipulation claim adequately, plaintiff must allege that it relied on "an assumption of an efficient market free of manipulation." See *ATSI Communications*, 493 F.3d at 101; see also *In re Bank of America Corp.*, 2011 WL 740902 at *7 (manipulation "arises when an investor is erroneously led to believe that the prices for the security in question are driven by the 'natural interplay of supply and demand, not rigged by manipulators'" (citations and quotation marks omitted)). Thus, "a complaint alleging a violation of § 10(b) is required to state that the transactions that caused the loss were made 'in ignorance of the fact that the price was affected by the alleged manipulation.'" See *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F.Supp.2d 478, 493 (S.D.N.Y. 2011) (quoting *Gurary*, 190 F.3d at 45).

Scrips alleges, as it did in the first amended complaint, that it entered into the agreement with Ironridge "in ignorance of the fact the price would be affected by [Ironridge's] manipulation."[125] *Gurary,* 190 F.3d at 45. Even assuming Ironridge's conduct was manipulative (which, as noted, Scrips has not adequately pled), its allegation that it entered into the agreement in ignorance of Ironridge's intent to manipulate the market in Scrips' stock, which is unsupported by any facts, does not plausibly allege reliance under Rule 8, *Twombly*, and *Iqbal*. Scrips does not argue otherwise. It thus has failed sufficiently to allege the reliance element of its manipulation claim.

### c.   Presumptions of Reliance

Scrips attempts to avoid the conclusion that it has failed to allege reliance adequately by asserting that it can invoke either of two presumptions of reliance. First, "a presumption [of reliance] is generally available to plaintiffs alleging violations of section 10(b) based on omissions of material fact." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999); *In re Merrill Lynch Auction Rate*, 704 F.Supp.2d at 397 ("Reliance may [ ] be presumed when a plaintiff alleges a

---

[125]SAC, ¶ 26.

44

1  material omission"). "The shortcut of a presumption of reliance . . . applies only in cases

2  primarily involving 'a failure to disclose' – that is, cases based on omissions as opposed to

3  affirmative misrepresentations." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 (9th Cir.

4  2004); *Binder*, 184 F.3d at 1064 (holding, in a case alleging violation of Rule 10b–5, that use of

5  a presumption of reliance "should be confined to cases that primarily allege omissions").

6        Here, Scrips alleges multiple theories on which its Rule 10b-5 claim rests – it asserts that

7  Ironridge made misrepresentations, that it failed to disclose material facts, that it was guilty of

8  promissory fraud, and that it manipulated the market in Scrips' stock.[126]  As a result, the court

9  cannot conclude that the second amended complaint "primarily allege[s] omissions." Accordingly,

10  Scrips cannot invoke a presumption of reliance based on a material omission. See *Poulos*, 379

11  F.3d at 667 ("In *Binder,* we held 'that the *Affiliated Ute* presumption should not be applied to

12  cases that allege both misstatements and omissions unless the case can be characterized as one that

13  primarily alleges omissions.' Because the allegations here cannot be characterized primarily as

14  claims of omission, the Class Representatives are not entitled to *Binder*'s presumption of

15  reliance," citing *Binder*, 184 F.3d at 1064); *Binder*, 184 F.3d at1064 ("presumption [of reliance]

16  should not be applied to cases that allege both misstatements and omissions unless the case can be

17  characterized as one that primarily alleges omissions"); see also *Regents of Univ. of California*

18  *v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007) ("For us to invoke

19  the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case

20  primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him

21  a duty of disclosure. The case at bar does not satisfy this conjunctive test"); *Cavalier Carpets,*

22  *Inc. v. Caylor*, 746 F.2d 749, 756 (11th Cir. 1984) ("This Circuit has recognized the limited reach

23  of the *Ute* presumption, applying it only in primarily omission cases").

24

25

---

26      [126]See, e.g., SAC, ¶ 68 ("The Defendants each employed devices, schemes and artifices

27  to defraud and to manipulate Plaintiff's stock price, made untrue statements of material fact, and
   omitted to state material facts necessary to make their statements not misleading, and engaged in

28  acts, practices and a course of business that operated as a fraud and deceit upon the Plaintiff").

Scrips also contends that it is entitled to a presumption of reliance under the fraud-on-the-market theory. "The fraud-on-the-market presumption is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .   Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]" *Binder*, 184 F.3d at 1064 (quoting *Basic*, 485 U.S. at 241-42 (in turn quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986))); see also *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1113-14 (9th Cir. 1989).

As the court noted in its order dismissing that first amended complaint, Scrips' alleged misrepresentations were part of an arm's length transaction; Scrips does not plausibly allege that the market incorporated the alleged misrepresentations.[127]   Moreover, Scrips' allegations in its second amended complaint, like those in the first amended complaint, clearly establish that Scrips relied on Ironridge's "statements and assurances," not on publicly available information concerning its stock price or its business in general.[128]   See *Alki Partners, L.P.*, 769 F.Supp.2d at 493 (no fraud-on-the-market presumption where "[plaintiffs] did not rely on th[e] market. Instead, they relied on [defendant's] promise"); see also *Basic*, 485 U.S. at 246-47 ("Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all *publicly available* information, and, hence, any material misrepresentations. . . .   An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.   Because most *publicly available* information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action" (emphasis added)); *In re Moody's Corp. Securities Litigation*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011) ("In order to be entitled to the rebuttable reliance presumption, a plaintiff must show that Defendants '(1) *publicly made* (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed

---

[127]Order at 36.

[128]SAC, ¶ 72.

1  (i.e., efficient) market'" quoting *In re Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 481

2  (2d Cir. 2008), abrogated on other grounds in *Amgen Inc. v. Connecticut Retirement Plans and*

3  *Trust Funds*, 133 S. Ct. 1184 (2013); *In re American Intern. Group, Inc. Securities Litigation*,

4  265 F.R.D. 157, 175 (S.D.N.Y. 2010) (concluding, in the context of a class certification motion,

5  that "the Third Amended Complaint nowhere alleges that the Gen Re Defendants made a *public*

6  *misstatement* with regard to AIG, . . . nor do Lead Plaintiffs provide evidence of any such

7  misstatement in their submissions in support of the Motion for Class Certification," and thus that

8  the fraud-on-the-market presumption did not apply (emphasis added)), vacated on other grounds,

9  689 F.3d 229 (2d Cir. 2012).

10      The court noted these deficiencies in the first amended complaint; Scrips, however, failed

11  to include allegations in the second amended complaint that suggest Ironridge made material public

12  statements that were false or that it did not publicly disclose material information.  Consequently,

13  Scrips cannot invoke the fraud-on-the-market presumption of reliance to support its manipulation

14  claim.

15      Even were this not true, moreover, Scrips cannot invoke the fraud-on-the-market

16  presumption of reliance because its shares trade on the OTC market; although it has added

17  allegations that the market in its stock is efficient, those allegations fail to plead the fact plausibly.

18  "[T]o invoke the fraud-on-the-market presumption . . . the plaintiff must (1) show that the security

19  in question was traded in an efficient market (a fact conceded here), and (2) show that the alleged

20  misrepresentations were public."  See *Connecticut Ret. Plans & Trust Funds v. Amgen Inc.*, 660

21  F.3d 1170, 1172 (9th Cir. 2011), aff'd, 133 S. Ct. 1184 (2013); *In re DVI, Inc. Securities*

22  *Litigation*, 639 F.3d 623, 631 (3d Cir. 2011) ( "To invoke the fraud-on-the-market presumption

23  of reliance, plaintiffs must show they traded shares in an efficient market, and the

24  misrepresentation at issue became public"), abrogated on other grounds in *Amgen Inc.*, 133 S. Ct.

25  1184.

26      "The fraud-on-the-market presumption is only available when the plaintiff demonstrates

27  that the security which the defendant's allegedly fraudulent behavior concerned was actively traded

28  in an efficient market."  See *Huberman v. Tag-It Pac. Inc.*, 314 Fed. Appx. 59, 63 (9th Cir. Feb.

11, 2009) (Unpub. Disp.) (citing *Binder*, 184 F.3d at 1064).  As the court recognized in its prior order, numerous courts have held as a matter of law that the OTC market is not efficient.  See *Salvani v. ADVFN PLC*, No. 13-CV-7082 ER, 2014 WL 4828101, *14 n. 9 (S.D.N.Y. Sept. 23, 2014) ("while the NASDAQ is recognized as maintaining an efficient market . . . the Court is unaware of any court holding that the OTCBB . . . meet[s] this same standard" (internal quotation marks omitted)); *Alki Partners, L.P.*, 769 F.Supp.2d at 493 (same); *Burke v. China Aviation Oil (Sing.) Corp.*, 421 F.Supp.2d 649, 653 (S.D.N.Y. 2005) (same); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (concluding that "the presumption of market efficiency, which would support an application of the fraud on the market theory, does not apply [to the OTC stock at issue]"); *Epstein v. Am. Reserve Corp.*, No. 79-CV-4767, 1988 WL 40500, *5 (N.D. Ill. Apr. 21, 1988) ("Although the issue was not briefed, we believe that the over-the-counter market is incapable of meeting the Supreme Court test [as set forth in *Basic*]"); *In re Data Access Sys. Securities Litigation*, 103 F.R.D. 130, 138 (D.N.J. 1984) ("The trading on the over-the-counter market may not constitute an 'active and substantial' market necessary to apply the fraud-on-the-market theory").  Ironridge asserts that no reported decision has held the OTC market *is* efficient, and Scrips cites no authority to the contrary.  On this basis alone, it appears appropriate for the court to conclude that Scrips cannot invoke the fraud-on-the-market presumption of reliance.

Scrips counters that, despite the lack of authority finding the OTC market efficient, it has adequately pled that an efficient market in its stock exists.  Courts typically apply the five factors set forth in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J. 1989), in assessing whether a particular stock meets the efficient market requirement.  *Binder*, 184 F.3d at 1059.  "The *Cammer* factors address 'first, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitragers; fourth, whether the company is eligible to file SEC registration form S-3, as opposed to form S-1 or S-2; and fifth, whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."'"  *Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 571 (C.D. Cal.

2012) (quoting *Binder*, 184 F.3d at 1059 (in turn quoting *Cammer*, 711 F.Supp. at 1286-87)). Efficiency must be pled with particularity under Rule 9(b).  See *In re Turbodyne Technologies, Inc. Sec. Litig.*, No. CV9900697MMM (BQRx), 2000 WL 33961193, *13 (C.D. Cal. Mar. 15, 2000) ("While it is true that *Binder* did not set minimum requirements for pleading an efficient market, Rule 9(b) requires that reliance be pleaded with particularity.  Applying Rule 9(b) standards to the pleading of reliance under a fraud-on-the-market theory, therefore, the complaint must state with particularity the facts upon which plaintiffs base their assertion that Turbodyne's stock traded in an efficient market"); *Greenberg v. Boettcher & Co.*, 755 F.Supp. 776, 782 (N.D. Ill. 1991) ("The cases clearly require a plaintiff to specifically plead facts that show a well-developed, efficient market").[129]

### (1)   Volume

The *Cammer* court identified a large weekly trading volume as one factor indicative of market efficiency because "the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, . . . implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F.Supp. at 1286.   The court stated that "[t]urnover measured by average weekly trading of two percent

---

[129]Scrips argues it has adequately alleged the existence of an efficient market under *Cammer*, but also suggests that the market efficiency of a particular stock is a question of fact inappropriate for resolution in the context of a motion to dismiss. (Opposition at 12-13.)  There is some authority that supports this position. See, e.g., *Salvani*, 2014 WL 4828101 at *10 n. 9 ("[C]ourts in th[e Second] Circuit have often found the question of whether a market is efficient to be a question of fact and therefore not meant to be answered on a motion to dismiss").  Courts in the Ninth Circuit require, however, that when allegations of the existence of an efficient market are pled to invoke a presumption of reliance, the existence of such a market must be pled with particularity.  See, e.g., *Turbodyne Technologies*, 2000 WL 33961193 at *13; *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *24 (S.D. Cal. Jan. 3, 2005) ("Because both parties agree that the *Cammer* factors should determine fraud on the market and Plaintiff has not addressed any of the *Cammer* factors, the Complaint does not adequately plead reliance through the fraud-on-the-market theory"); *Greenberg*, 755 F.Supp. at 782 ("The cases clearly require a plaintiff to specifically plead facts that show a well-developed, efficient market").  These cases clearly contemplate that inadequate allegations of efficiency is an appropriate basis upon which to dismiss a complaint.  The court finds them more persuasive, and elects to follow their approach.

1   or more of the outstanding shares would justify a strong presumption that the market for the

2   security is an efficient one; one percent would justify a substantial presumption." *Id.*

3       Scrips' only allegation regarding this factor is that "the weekly trading volume in Scrips'

4   stock is large enough to at least establish a substantial presumption of efficiency (at well over 1%

5   of the total amount of shares)." It supports the allegation with the trading data it has attached to

6   the second amended complaint.[130]   Scrips does not allege or explain how the referenced data

7   demonstrates that the volume of trading in its stock exceeds a certain percentage of the total

8   number of its outstanding shares. While daily transactions are reflected in the data, there is no

9   indication as to the total number of Scrips' shares that were outstanding when those trades were

10   made. Scrips' allegation that the market has sufficient volume to raise a presumption of efficiency

11   is therefore conclusory and entitled to no weight. See *Alter v. DBLKM, Inc.*, 840 F.Supp. 799,

12   805 (D. Colo. 1993) ("Such conclusory parroting of the legal requirement [concerning weekly

13   trading volume] has been rejected elsewhere, . . . and is similarly rejected here").

14       Although Ironridge does not ask the court to do so, the court *sua sponte* takes judicial

15   notice of the volume of Scrips' shares traded from December 1, 2013 to April 28, 2014.  See

16   *Loveman v. Lauder*, 484 F.Supp.2d 259, 268 (S.D.N.Y. 2007) ("The Court agrees that it may

17   take judicial notice of the closing price and volume of trading of ELC shares on the date in

18   question"); *In re PolyMedica Corp. Sec. Litig.*, 224 F.R.D. 27, 35 (D. Mass. 2004) ("I take

19   judicial notice of the fact that the average daily trading volume also exceeded one hundred

20   thousand shares during the proposed class period (October 26, 1998 to August 21, 2001)"),

21   vacated on other grounds, 432 F.3d 1 (1st Cir. 2005); *Picard, Inc. Profit Sharing Plan v. Perrigo

22   Co.*, No. 1:95cv141, 1996 WL 739170, *3 (W.D. Mich. Sept. 27, 1996) (taking  judicial notice

23   of the fact that defendant's stock  "was actively traded on the NASDAQ National Market System,

24   and that [it] had a trading volume of 350,000 [shares] per day during the class period"). Between

25   December 1, 2013 and April 28, 2014, the volume of Scrips shares traded exceeded one million

26   on only eleven occasions; on only six of those eleven days did the number of shares traded exceed

27   _____

28       [130]SAC, ¶ 29; *id.*, Exh. 5.

1   one percent of the 125,610,436 total shares of common stock listed on Scrips' April 8, 2014 SEC

2   Form 10-k.[131]   That is substantially less than the "1-2% minimum trading volume courts have

3   found to support a finding of market efficiency."  See *Barrie v. Intervoice-Brite, Inc.*, Civil

4   Action No. 3:01–CV–1071–K, 2009 WL 3424614, *10 (N.D. Tex. Oct. 26, 2009); see also *Vinh*

5   *Nguyen*, 287 F.R.D. at 571 (noting that volume of "1% would justify a substantial presumption").

6       Because Scrips' allegation concerning trading volume is not plausible, and because it is

7   contradicted by information that is properly the subject of judicial notice, the court concludes that

8   this factor weighs against a finding that there was an efficient market in its stock.

9                    **(2)   Analyst Reporting**

10      As *Cammer* noted, "it [is] persuasive to allege a significant number of securities analysts

11  followed and reported on a company's stock during the [relevant] period . . . [because] [t]he

12  existence of such analysts would imply . . . reports were closely reviewed by investment

13  professionals, who would in turn make buy/sell recommendations to client investors."  *Cammer*,

14  711 F.Supp. at 1286.  Scrips does not plead that securities analysts followed and reported on its

15  stock.  This factor, therefore, also weighs against a finding that there was an efficient market in

16  Scrips' stock.  Cf. *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 422 (D. Utah 1998)

17  ("Plaintiffs presented no evidence of reports done by securities analysts and Cox states that he

18  found none. The available information about IAS consisted of advertisements, press releases, and

19  other information disseminated by the Defendants themselves. This type of information is not a

20  substitute for reports made by securities analysts. Accordingly, this factor weighs against a finding

21  of market efficiency").

22                   **(3)   Market Makers and Arbitragers**

23      Market makers and arbitragers "ensure completion of the market mechanism; these

24  individuals . . . react swiftly to company news and reported financial results by buying or selling

25  stock and driving it to a changed price level."  *Cammer*, 711 F. Supp. at 1286-87.  "Arbitragers

26  . . . exploit price differences among markets.  [And a] market-maker is one who helps establish

27  ——————————————

28      [131]Mader Decl., Exh. Y at 1.

a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009) (citing *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005)). In *Unger v. Amedisys Inc.*, 401 F.3d 316, 324 (5th Cir. 2005), however, the Fifth Circuit cautioned that "the mere number of market makers, without further analysis, has little to do with market efficiency." Other courts, moreover, have found that, absent additional information concerning "the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so," this factor is of little significance in determining the efficiency of a market. *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996); see also *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001) ("This Court concludes that the mere presence of market makers does not indicate market efficiency").

Scrips alleges that its stock had "numerous market makers and arbitragers, including Knight Capital Americas LLC, Stockcross Financial Services, Inc, BMA Securities, Cantor Fitzgerald & Co., BNY Mellon Capital Markets, LLC, Biltmore International Corp., Wilson-Davis & Co., Inc., Vfinance Investments, Inc. and Guggenheim Investor Services, LLC."[132] While Scrips alleges that there were eight market makers and/or arbitragers in its stock, Ironridge argues that its allegation is conclusory and does not adequately plead efficiency.[133] The court does not agree. At this stage, Scrips' allegation that there were market makers in its stock weighs in favor of a finding that it has sufficiently pled the existence of an efficient market in its stock. As noted, however, this factor, standing alone, is not particularly probative of efficiency. See *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 500 (S.D. Fla. 2003) ("While the Court recognizes that additional information would aid the Court in its determination of efficiency for purposes of class certification, it is not essential as the Court is not making a final determination on efficiency and the application of the reliance presumption at this stage. In sum, the Court finds

---

[132]SAC, ¶ 30.

[133]Motion at 20 n. 9.

1  that the existence of multiple market makers in addition to other factors support efficiency and

2  weigh in favor of class certification in this matter pursuant to the 'fraud on the market' theory");

3  *In re PolyMedica Corp. Sec. Litig.*, 453 F.Supp.2d 260, 268 (D. Mass. 2006) ("As with the

4  previous *Cammer* factor, however, there is no accepted standard by which to judge the sufficiency

5  of the number of market makers.  The Court, therefore, places little weight on this factor, but to

6  the extent this factor is informative, it counsels in favor of a finding of efficiency"); *Levine v.*

7  *SkyMall, Inc.*, No. CIV. 99-166-PHX-ROS, 2002 WL 31056919, *6 (D. Ariz. May 24, 2002)

8  ("The existence of multiple market makers therefore weighs in favor of concluding that the market

9  for SkyMall stock was efficient during the Class Period"); cf. *In re Netbank, Inc. Sec. Litig.*, 259

10 F.R.D. 656, 671 (N.D. Ga. 2009) ("Because the number of market makers alone is of limited

11 usefulness in determining market efficiency, the court finds that this factor is of little help to the

12 inquiry, and that it does not weigh in favor of market efficiency").

13                              **(4)   SEC Form S-3**

14      The fourth *Cammer* factor examines "whether the company is eligible to file SEC

15 registration form S-3, as opposed to form S-1 or S-2." *Binder*, 184 F.3d at 1065 (citing

16 *Cammer*, 711 F.Supp. at 1286-87).  "Form S-3 is reserved for companies whose stock is actively

17 traded and widely followed.  To file a Form S-3, a company must have filed SEC reports for

18 twelve consecutive months and possess a seventy-five million dollar market capitalization level.

19 By contrast, there is no minimum capitalization requirement to file either Form S-1 or S-2.

20 Further, a company need not even meet the reporting requirements spelled out in § 239.13 to file

21 a Form S-1." *Unger*, 401 F.3d at 323 n. 5 (citing 17 C.F.R. §§ 39.11–239.12; 239.13).  If a

22 company is ineligible to file Form S-3 "because of timing factors rather than because the minimum

23 stock requirements set forth in the instructions to Form S-3 were not met," however, this factor

24 will not weigh against a finding of efficiency.  *Cammer*, 711 F.Supp. at 1287.

25      Scrips has not alleged that it files or is eligible to file an SEC Registration Form S-3.

26 Ironridge argues that Scrips does not satisfy the requirements of 17 C.F.R. § 239.13, and thus in

27

28

fact files Form S-1.[134]  It correctly observes that "[e]ligibility to file the S–3 form is predicated upon the SEC's belief that the market for the company's stock already operates efficiently and that further disclosure is unnecessary, as the market price has already accounted for relevant information."[135]  *O'Neil v. Appel*, 165 F.R.D. 479, 502 (W.D. Mich. 1996).  A company's eligibility to file Form S-3, therefore, weighs heavily in favor of a finding that the market in its stock is efficient.  The converse is also true – ineligibility to file a Form S-3 weighs firmly against a finding of efficiency.  *Id.*

Scrips does not demonstrate that it is eligible to file a Form S-3 or that its ineligibility is due to timing.  Thus, the court finds Scrips' ineligibility to file an SEC Registration Form S-3 weighs against a finding that there is an efficient market in its stock.  See *Turbodyne Technologies*, 2000 WL 33961193 at *14 (holding that plaintiffs did not sufficiently plead market efficiency because "[p]laintiffs have not only failed to plead a majority of the factors, but it is clear that an important factor weighing in favor of [a] finding of efficient market is expressly alleged not to exist.  The complaint clearly states that Turbodyne files a Form S–1, not a Form S–3, registration statement"); see also *In re SCOR Holding (Switzerland) AG Litig.*, 537 F.Supp.2d 556, 578 (S.D.N.Y. 2008) ("[T]he Lead Plaintiffs have not offered evidence that Converium had the ability to file an S–3, that there were 'market makers' for Converium stock,  or that the market had reacted to new information.  Thus, four of the five *Cammer* factors weigh against a finding of efficiency during the quiet period").

### (5)    Causal Nexus

The last factor identified in *Cammer* takes into account the fact that "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price . . . is the essence of an efficient market and the foundation for the fraud on the market theory."  *Cammer*, 711 F.Supp. at 1287.  Scrips alleges that "considerable empirical facts show[ ] a cause and effect relationship between financial releases and an immediate response in

---

[134]Motion at 19.

[135]*Id.*; Reply at 8.

1    [its] stock price." It identifies thirteen instances between October 2013 and January 2014 in which

2    press releases about Scrips purportedly caused positive shifts in its stock price.[136]

3            Ironridge contends that Scrips has not only "cherry pick[ed]" the dates it cites to show a

4    causal link between press releases and stock price, but also fails to allege that the press releases

5    caused the price movement.[137]   The court agrees, as an initial matter, that simply pointing to

6    thirteen days on which Scrips' stock price allegedly reacted to press releases is flawed.   "A

7    plaintiff must show that the market price responds to *most* new, material news."   *In re Fed. Home*

8    *Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 180 (S.D.N.Y. 2012)

9    (concluding that a reaction to 28% of news was insufficient).   Ironridge argues that Scrips' stock

10   is volatile, and that Scrips has repeatedly and consistently acknowledged this fact.[138] Scrips' Form

11   10-Q for the period ended September 30, 2014, indicates that in valuing the stock options issued

12   to its employees, Scrips assumed price volatility of 181.27%.[139]   The same form refers multiple

13   times Scrips' "common stock[ having] historically [ ] high volatility" and to "the expected

14   [continued] volatility of [its] common stock."[140]   Scrips Forms 10-Q for the periods ended June

15   30, 2014 and March 31, 2013 similarly state that Scrips' "common stock . . . has a high-historical

16   volatility."[141]

17           Ironridge also asserts that the exhibits to Scrips' second amended complaint belie any

18   purported causal link between press releases and stock price.   It contends data set forth in Exhibit

19   4 indicates that Scrips' stock price fluctuated significantly on many days.[142]   Scrips alleges that a

20   _____

21           [136]SAC, ¶ 31.

22           [137]Reply at 7.

23           [138]Motion at 18.

24           [139]Mader Decl., Exh. V (Form 10-Q) at 23.

25           [140]*Id*. at 10-11.

26

27           [141]*Id*., Exhs. W and X (Forms 10-Q).

28           [142]Motion at 18-19.

1    press release issued October 28, 2013 caused its stock price to increase from $0.23 to $0.28;

2    Scrips' stock price fluctuated wildly that day, however – from a high of $0.42 to a low of

3    $0.25.[143]   The shares were at $0.27 when trading opened; this is one cent less than where the

4    closing price for the day, and fifteen cents below its intraday high.  This type of volatility is not

5    indicative of an efficient market.  See *O'Neil*, 165 F.R.D. at 503 ("In other words, the price

6    history of Embrace stock appears to have been random and volatile.  Plaintiffs have not shown any

7    reliable relationship between changes in price and public announcement of information to which

8    the price changes can reasonably be attributed"); see also *Krogman v. Sterritt*, 202 F.R.D. 467,

9    477 (N.D. Tex. 2001) (holding that there was "no efficient market where price movements were

10   random and volatile"); *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 423 (D. Utah 1998)

11   ("Cox calculated the standard deviation of IAS's stock return, a widely-used measure of volatility,

12   and found it to be 13%, which he concluded was 'relatively high.'  Consideration of all the

13   evidence on this factor does not support a finding of an efficient market").

14           Scrips also alleges that it stock price climbed from $0.12 to $0.14 on December 19, 2013

15   because of a positive orders report.   Once again, however, Exhibit 4 reflects that Scrips' stock

16   opened that day at $0.13, only one cent less than its price at the close.  What Scrips does not

17   explain is why one week earlier, its stock was trading at $0.15 or more.

18           More fundamentally, Scrips does not suggest that there is any causal nexus that accounts

19   for multiple sharp drops in its share price.  Ironridge notes that on August 12, 2013 Scrips shares

20   fell from $0.35 to $0.28; on August 14, 2013, after rebounding from the earlier fluctuation, the

21   shares again fell from $0.38 to $0.31; on September 12, 2013, the stock dropped from $0.23 to

22   $0.14; and on October 23, 2013, it fell from $0.33 to $0.25 cents.[144]   Absent a plausible

23   explanation for these sharp swings, the price spikes Scrips identifies, even if related in some way

24   to the issuance of positive press releases, do not sufficiently demonstrate a cohesive cause and

25   effect relationship between press releases and Scrips' share price.

26   ───────────────

27           [143]SAC, Exh. 4 at 6-8.

28           [144]*Id*.

                                                      56

1    Considering the second amended complaint as a whole – both Scrips' allegations and the

2    trading data in the exhibits attached to the complaint, the court concludes that Scrips has failed

3    adequately to allege a coherent cause-and-effect relationship in which its stock price immediately

4    responded to "unexpected corporate events or financial releases," as opposed simply to trading

5    consistent with its historical volatility.  For these reasons, this factor also weighs against a finding

6    that Scrips' stock traded in an efficient market.  See *O'Neil*, 165 F.R.D. at 503 ("Plaintiffs have

7    not shown any reliable relationship between changes in price and public announcement of

8    information to which the price changes can reasonably be attributed"); *Serfaty*, 180 F.R.D. at 423

9    ("Plaintiffs offer no specific evidence that these, and other significant changes in the price, were

10    in response to information about IAS.  The far more likely conclusion is simply that the price

11    history of IAS was volatile.  Cox calculated the standard deviation of IAS's stock return, a

12    widely-used measure of volatility, and found it to be 13%, which he concluded was 'relatively

13    high.'  Consideration of all the evidence on this factor does not support a finding of an efficient

14    market").

### d.    Conclusion Concerning Reliance

16    Because Scrips fails to allege facts that give rise to a plausible inference of actual reliance,

17    and because it cannot invoke either of the available presumptions of reliance, the court would have

18    to dismiss its Rule 10b-5 claim even had it adequately alleged misrepresentations, omissions, false

19    promises, or manipulative conduct.

### 6.    Whether Scrips Pleads Particularized Facts Giving Rise to a Strong Inference of Scienter

22    Ironridge next contends that Scrips' scienter allegations are inadequate; it notes, in this

23    regard, that the court has twice held that Ironridge's disclosures were inconsistent with an intent

24    to deceive.[145]  Specifically, it asserts that Scrips pleads no facts giving rise to a strong inference

25    of fraudulent intent, and that it cannot do so given the content of the stipulated judgment.  "A

26    complaint will survive only if a reasonable person would deem the inference of scienter cogent

[145]Motion at 20.

1   and at least as compelling as any plausible opposing inference one could draw from the facts

2   alleged." See *Tellabs*, 551 U.S. at 314; *Ixia*, 2014 WL 4978568 at *16 ("To qualify as 'strong'

3   within the intendment of . . . the PSLRA . . . an inference of scienter must be more than merely

4   plausible or reasonable – it must be cogent and *at least as compelling as any opposing inference*

5   *of nonfraudulent intent.*" (citation omitted)).

6       Scrips cites several factors that it argues give rise to a strong inference of scienter:

7   (1) Ironridge's allegedly manipulative trading activity; (2) the adjustment mechanism in the

8   agreement; (3) Ironridge's alleged misrepresentations; and (4) Ironridge's alleged pattern of

9   fraud.[146]  The court addresses each in turn.

10                      **a.      Manipulative Trading Activity**

11      Scrips argues first that Ironridge's manipulative trades evidence scienter.  The court has

12  concluded, however, that Scrips failed adequately to allege manipulative trading.  Even had it

13  done so, moreover, its scienter allegations would fail.  In its prior order, the court noted that "the

14  features of open-market transactions . . . that give rise to an inference of manipulative intent [and

15  noted that they include] for example, [the] timing, size, or repetition of a transaction." *S.E.C.*

16  *v. Masri*, 523 F.Supp.2d 361, 369 (S.D.N.Y. 2007).[147]  Scrips contends that Ironridge's trading

17  activity between December 2013 and April 2014 is indicative of its manipulative behavior.  The

18  court has already found that the allegations do not plead manipulative conduct, however,  and

19  consequently they do not "giv[e] rise to a strong inference that [Ironridge] acted with the required

20  state of mind." *Metzler Inv. GMBH*, 540 F.3d at 1066.  As the court noted in its prior order,

21  under the terms of the stipulation and agreement, Ironridge could sell Scrips' shares when and

22  how it pleased; it is not illegal to sell freely transferrable shares in a publicly traded company.[148]

23  Absent particularized allegations of manipulation, therefore, the stock sales themselves do not

24  evidence scienter.

25

26      [146]SAC, ¶ 38.

27      [147]Order at 45.

28      [148]Order at 43.

### b.      Adjustment Mechanism

Scrips argues that the adjustment mechanism "creates a powerful, extra incentive for the manipulative conduct."[149]  Ironridge counters that there is nothing "inherently suspect" about the adjustment mechanism.[150]  Scrips agreed to the mechanism, which was fully disclosed to it, and approved by the state court as fair.  Accordingly, the adjustment mechanism does not "giv[e] rise to a strong inference that [Ironridge] acted with the required state of mind." *Metzler Inv. GMBH*, 540 F.3d at 1066.

### c.      Ironridge's False Promises and Failure to Disclose

Scrips argues Ironridge "never told [Scrips] that it was going to exploit its rights under the agreement to put downward pressure on the share price," and "never disclosed an intent to subsequently use the issued shares to manipulate the market."[151]  It also asserts that Ironridge used a "bait-and-witch tactic" by substituting a mechanism with multiple adjustments for the proposed single adjustment that was initially proposed.[152]  The court has already considered similar allegations in the original and first amended complaints.  Scrips' first argument fails because it has not adequately alleged manipulative conduct.  Absent allegations that plausibly plead Ironridge's trading activity was manipulative, the only inference that reasonably arises is that Ironridge traded the Scrips shares it held as permitted by the stipulation and agreement.  The stipulation provided that the shares were "freely tradable" and could be "immediately resold . . . without restriction"; it warned that issuance of the shares might "have a dilutive effect [on Scrips' stock], which [could] be substantial."[153]  Indeed, O'Neil expressly cautioned Scrips in his declaration in support of the state court stipulation that "price fluctuations in [Scrips'] stock . . .

---

[149]SAC, ¶ 38.

[150]Motion at 21.

[151]SAC, ¶ 38.

[152]*Id.*

[153]Order at 46 (quoting Stipulation, ¶¶ 6, 11).

1   [were] likely given [Scrips'] trading history and the terms of the [s]tipulation."[154]   The stipulation

2   states that Ironridge was "acting solely in an arm's length capacity," and that each party was

3   "advised as to the terms and legal effect of this [s]tipulation . . . ."[155]   These disclosures are

4   inconsistent with an intent to deceive; absent particularized allegations plausibly suggesting market

5   manipulation, they give rise to an alternate, more compelling inference – that Scrips entered into

6   the agreement knowing that Ironridge could sell the shares it had issued in any manner Ironridge

7   wished.[156]   See *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F.Supp.2d 1092,

8   1142 (E.D. Wash. 2013) ("Robust disclosure of risks and problems further 'negates an inference

9   that the company acted with intent to defraud'"); *In re Dot Hill Systems Corp. Securities*

10  *Litigation*, 594 F.Supp.2d 1150, 1160 (S.D. Cal. 2008) ("Disclosing the precise risks at issue

11  negates an inference of scienter" (internal quotation marks omitted)); *Alfus v. Pyramid Tech.*

12  *Corp.*, 745 F.Supp. 1511, 1520 (N.D. Cal. 1990) (same).

13      The court also finds unavailing Scrips' second argument – that Ironridge engaged in bait-

14  and-switch tactics by proposing one adjustment mechanism initially and substituting another during

15  final negotiations shows "consciousness of something wrongful to hide or at l[e]ast obfuscate."[157]

16  The stipulation contained a merger clause stating that Ironridge had not made "any representations

17  or warranties other than those specifically set forth [in the stipulation]."[158]   Because Ironridge

18  disclaimed any pre-stipulation warranties, Scrips' allegation that it "employed a bait-and-switch

19  tactic" to entice Scrips to enter into the stipulation fails.   Moreover, Scrips' current allegations

20  are at odds with Schneiderman's declaration in support of the parties' *ex parte* application seeking

21  state court approval of the stipulation.   There, Schneiderman noted that the terms of the stipulation

---

[154]O'Neil Decl., ¶ 5.

[155]Stipulation, ¶¶ 11, 16.

[156]Order at 46.

[157]SAC, ¶ 38.

[158]Stipulation, ¶¶ 11, 16.

1  were "fair to, and in the best interest of, [Scrips] and its stockholders."[159]   Finally, Scrips

2  contends that Ironridge denied Bob Schneiderman's requests for Ironridge's trading data.   As

3  noted, Scrips has not sufficiently alleged that the stipulation imposed a duty to disclose on

4  Ironridge.   Nor has it adequately alleged that Ironridge's trading activity was manipulative or

5  otherwise nefarious.   Thus, Ironridge's purported failure to disclose its trading positions, which

6  were publically available in any event, is not evidence of scienter.

7                                   **d.    Pattern of Fraud**

8          The court previously concluded that the original complaint failed to plead facts giving rise

9  to a strong and compelling inference of scienter.   It noted that, although the complaint was replete

10 with allegations of a "scheme to defraud and manipulate," they were conclusory and failed to raise

11 the claim above the speculative level; as a consequence, it found they did not support a cogent and

12 compelling inference of scienter.   See *Twombly*, 550 U.S. at 555 ("Factual allegations must be

13 enough to raise a right to relief above the speculative level").   Scrips contends it has cured this

14 defect in the second amended complaint.   It asserts it has pled a "large pattern of the same conduct

15 producing harmful results," and that this is adequate to support an inference of intent to deceive.

16 See *In re Enron Corp. Sec., Derivative & ERISA Litigation*, 235 F.Supp.2d 549, 693-94 (S.D.

17 Tex. 2002) ("As a factor common to all, the Court initially finds that the scienter pleading

18 requirement is partially satisfied by allegations of a regular pattern of related and repeated conduct

19 involving the creation of unlawful, Enron-controlled SPEs, sale of unwanted Enron assets to these

20 entities in clearly non-arm's length transactions and often with guarantees of no risk, in order to

21 shift debt off Enron's balance sheet and sham profits onto its books at critical times when quarterly

22 or year-end reports to the SEC, and by extension the public, were due, followed in many cases

23 by the undoing of these very deals once the reports had been made").   Ironridge counters

24 that Scrips' allegations of a pattern of fraudulent conduct are conclusory and not supported by

25 particularized facts that give rise to a strong and compelling inference of scienter.   The court

26 agrees.   Scrips alleges:

27  _____

28          [159]Schneiderman Decl., ¶ 8.

1    "The scienter behind [Ironridge's] conduct is shown by, among other things, the

2    fact that the conduct was part of a much wider pattern of illegal and deceptive

3    activity.   Indeed, [Ironridge] has engaged in essentially the same or similar

4    wrongful conduct in connection with the stock of many other companies.   The

5    watchdog website 'Scam Informer' recently observed that '[t]he destruction in

6    stocks [IRONRIDGE] has completed transactions with makes the devastation from

7    Hurricane Irene seem tame by comparison.'   While the Plaintiff is not yet in a

8    position to allege the depredations that IRONRIDGE has wrought with the stock of

9    other companies with the same degree of particularity that it has been able to muster

10   for its own stock, the fact that there are widespread reports of such conduct should

11   play some role – at least at the pleading stage – in bolstering the inference of

12   scienter.   For example, StreetInsider.co, has reported that NewLead Holdings

13   initiated an arbitration against IRONRIDGE in the same time frame as this suit,

14   with nearly the same causes of action asserted here, including allegations of share

15   price manipulation under the same kind of funding vehicle.   It has been reported

16   that Ironridge has already requested and/or received an aggregate of approximately

17   62 million common shares (through July 6, 2014) and received approximately $22.8

18   million of proceeds (based upon information received from Ironridge) on the sale,

19   in NewLead Holdings' belief, of approximately 44 million of common shares

20   through June 30, 2014."[160]

21   Courts typically treat anonymous internet postings as tantamount to confidential witness

22   statements.   See *In re Apollo Group, Inc. Securities Litigation*, No. CV 10 1735 PHX JAT, 2011

23   WL 5101787, *11 n. 7 (D. Ariz. Oct. 27, 2011) ("To the extent that Plaintiffs rely on anonymous

24   internet postings to establish scienter, the only appreciable difference that the Court can ascertain

25   between anonymous internet postings and confidential witness statements is that anonymous

26   internet postings are less reliable than confidential witness statements"); accord *Bartesch v. Cook*,

27

28   [160]SAC, ¶ 38.

62

941 F.Supp.2d 501, 507 (D. Del. 2013) (assessing whether an internet article was sufficiently reliable to meet the PSLRA's standard for pleading scienter); *Tracinda v. DaimlerChrysler AG*, 197 F.Supp.2d 42, 80 (D. Del. 2002) (discussing *McKesson HBOC, Inc. Securities Litigation*, 126 F.Supp.2d 1248 (N.D. Cal. 2000), and stating that "articles can form the basis for adequate pleading under the PSLRA if they are sufficiently detailed to indicate their reliability and are based on an independent investigative effort"). "Accordingly, with regard to anonymous internet postings, it is [Scrips'] burden to plead reliability and knowledge that are indicative of scienter to at least the same extent as it [would have to do] when pleading scienter [based on] confidential witness statements." *In re Apollo Group*, 2011 WL 5101787 at *11 n. 7.

A complaint relying on the statements of confidential witnesses to establish scienter (1) must describe the confidential witnesses with sufficient particularity to establish their reliability and knowledge, and (2) must plead statements by confidential witnesses with sufficient reliability and personal knowledge that are indicative of scienter. See *Zucco Partners*, 552 F.3d at 995. Because Scrips has not alleged facts that support an inference that the internet posters it cites are reliable and in a position to know of Ironridge's purported pattern of fraud, its allegations do not support a strong inference of scienter.

Scrips also alleges that Sims – who purportedly makes all decisions for Ironridge – "has been implicated in a variety of schemes involving fraud and market manipulation related to at least 32 publicly traded companies, all [of which] reveal[ ] a similar scheme involving convertible instruments and/or the issuance of shares based upon the trading price of the respective issuer's common shares and subsequent manipulation of the issuer's stock price for the purpose of receiving additional shares."[161] Scrips cites only one example of this conduct, and its reference to 31 other examples is unsupported and conclusory. In the case Scrips cites – *Hyperdynamics Corp. v. Southridge Capital Mgmt., LLC*, 305 Ga.App. 283, 286 (2010) – the Georgia Court of Appeals concluded that Georgia courts could exercise personal jurisdiction over Sims and other defendants in a case alleging market manipulation. The fact that the court determined that Sims

---

[161]*Id.*, ¶ 35.

1    was subject to personal jurisdiction in Georgia does not demonstrate that allegations he engaged

2    in fraud and manipulation are true.

3         Finally, Scrips alleges that other companies have been harmed by Ironridge, and have filed

4    claims against it:

5         "Among the companies that have been victims of IRONRIDGE's schemes is Green

6         Automotive Company, Inc., which is the subject of a similar stipulation/order in a

7         Los Angeles Superior Court action, under the Section 3(a)(10) exemption.

8         Incredibly, IRONRIDGE actually seeks 6 billion shares in Green Automotive,

9         which is six times the company's total capitalization.  That is a vivid illustration of

10        the absurdly deceptive, abusive and bad faith manner in which IRONRIDGE has

11        been obtaining and implementing the type of stipulation/order at issue here.  In fact,

12        as noted above, the court declined to enforce the same stipulation language at issue

13        here against Green Automotive.   As another, even more vivid example of

14        IRONRIGE's predatory conduct, IRONRIDGE has recently asserted that it is

15        entitled to 27 billion shares of another company, Green Innovations, Ltd.  Plaintiffs

16        counsel, who also represents Green Innovations, can aver that the leadership of that

17        company believes that IRONRIDGE has wronged it in the very same way that

18        IRONRIDGE has wronged the Plaintiff in this action."

19        Scrips also asks that the court take judicial notice of an SEC "Order Instituting

20   Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21(c) of the

21   Securities Exchange Act of 1934."[162]  Scrips argues that the SEC has alleged the "very same

22   pattern of abuse" in that action as Scrips does here, and that this should significantly bolster the

23   inference of scienter that arises from its allegations.[163]  The court cannot agree.  It is well settled

24   that "allegations from other complaints or documents, which are unproved and are contested, may

25

26        [162]Opposition at 4; see also *id.*, Declaration of Carlos Needham ("Needham Decl."), Exh.

27   A ("SEC Order") at 1.

28        [163]Opposition at 14-15.

not be used to establish facts to demonstrate scienter." See *Kyung Cho v. UCBH Holdings, Inc.*, 809 F.Supp.2d 1190, 1203 (N.D. Cal. 2012); *In re Apollo Group*, 2011 WL 5101787 at *10 n. 5 ("[B]ecause allegations from other complaints are unproven and contested, they do not amount to 'facts' sufficient to establish a strong inference of scienter"); *Bartesch*, 941 F.Supp.2d at 507 ("it [is] not appropriate for the Court to give weight to the allegations in [a] *qui tam* case, because such allegations are unproven and contested [and] do not amount to 'facts' sufficient to establish a strong inference of scienter" (internal quotation marks omitted; alterations original)); *Geinko v. Padda*, No. 00-CV-5070, 2002 WL 276236, *6 (N.D. Ill. Feb. 27, 2002) ("Plaintiffs merely have recited facts from other actions. . . . Clearly, this is not enough; the hearsay allegations that Plaintiffs offer in their Amended Complaint are improper, and therefore superfluous, and they will not be considered"); see also *Gaer v. Educ. Mgmt. Corp.*, No. CV 10-1061, 2011 WL 7277578, *2 (W.D. Pa. Sept. 29, 2011) (rejecting an objection to a report and recommendation based on the magistrate judge's refusal to consider the allegations in a *qui tam* complaint as evidence of scienter); *In re Connetics Corp. Securities Litigation*, 542 F.Supp.2d 996, 1005-06 (N.D. Cal. 2008) (striking allegations taken from an SEC complaint).

At the hearing, Scrips argued that the court should give greater weight to the SEC order because it was issued by a government agency rather than a private party. There is no authority suggesting that the allegations in an SEC order, which are unproved and contested, can properly be considered evidence of scienter. More fundamentally, the SEC order does not allege manipulative or fraudulent conduct. It charges alleged violations of § 15(a) of the Securities Exchange Act of 1934,[164] asserting that Ironridge operated as "an unregistered dealer by engaging

---

[164]Section 15(a) of the Securities Exchange Act of 1934 provides:

"It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, banker's acceptances, or commercial bills) unless

in serial underwriting activity, providing related investment advice, and receiving and selling billions of shares in connection with self-described financing services for domestic microcap stock companies . . . explicitly designed to utilize the registration exemption contained in Section 3(a)(10) of the Securities Act of 1933."[165]   Specifically, it alleges that Ironridge violated the Exchange Act by purchasing accounts payable and using court-approved settlement agreements.[166] That, of course, is what Ironridge did in its dealings with Scrips.  The SEC does not allege market manipulation in connection with these transactions or some other form of securities fraud, however; it simply asserts that Ironridge acted as an unregistered broker or dealer.  The word fraud is not mentioned in the SEC order; nor is the word manipulation.  The fact that Ironridge may have violated the Exchange Act by acting as an unregistered dealer is not evidence that it engaged in market manipulation with scienter.

In short, there are no particularized allegations demonstrating a pattern of fraud.  Thus, Scrips' "pattern of fraud" argument fails to support a strong inference of scienter.

### e.   Holistic Review

Even in combination, the facts Scrips pleads regarding scienter do not support a strong inference of scienter.  Given the disclosures in the stipulation, and the lack of particularized allegations concerning Ironridge's purported pattern of fraud and purportedly manipulative trades, the more compelling inference is that Ironridge did not intend to deceive, and that Scrips knew – or should have known – the nature of the transaction into which it had entered.  Holistic review therefore does not demonstrate that it has sufficiently pled scienter.  See *In re Verifone Holdings, Inc. Securities Litigation*, No. CV 07-06140 MHP, 2009 WL 1458211, *10 (N.D. Cal. May 26,

---

such broker or dealer is registered in accordance with subjection (b) of this section."  15 U.S.C. 78o(a).
"The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank."  15 U.S.C. 78c(4).

[165]SEC Order, ¶ 1.

[166]*Id.*, ¶¶ 20-23.

2009) ("There are many allegations in this case, but they fare no better when read in combination than when read independently").  For this reason as well, the Rule 10b-5 claim must be dismissed.

**D.    Whether the Rule 10b-5 Claim Should Be Dismissed With Prejudice**

Ironridge contends that the court should dismiss Scrips' Rule 10b-5 claim with prejudice, and decline to exercise supplemental jurisdiction over the state law claims currently stayed under the *Colorado River* doctrine.  It cites a number of Ninth Circuit cases affirming dismissals without leave to amend where the "plaintiff [was] previously . . . granted leave to amend and . . . failed to add the requisite particularity to its claims."  See, e.g., *Zucco Partners*, 552 F.3d at 1007; *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint").

Scrips has now had three opportunities to plead viable claims.  Despite being informed of its obligation to supply particularized allegations supporting a Rule 10b-5 claim, Scrips merely appended 200 pages of raw trading data to the complaint, leaving the court (and Ironridge) to sift through the data to ascertain which trades were purportedly manipulative and why they were so. The court's review of the data indicates that Ironridge's trades were not manipulative in the manner Scrips suggests.  In its opposition, Scrips argued that "a greater level of particularity in the allegations regarding the transactions at issue" could not be imagined, given the "highly granular transactional details . . . [set forth in the] voluminous set of data analysis that was prepared by an expert."[167]  At the hearing, it initially reiterated this position; later, it conceded that perhaps it had failed to meet its burden under Rule 9(b), and requested a fourth attempt to plead manipulative conduct with the requisite particularity.  Although Scrips asserted that its expert could provide additional analysis, it did not offer any details as to the nature of this additional analysis.  Nor did it suggest how allegations based on further input from the expert would cure the defects noted by the court in this order.  Cf. *Orion Tire Corp. v. Goodyear Tire & Rubber*

---

[167]Opposition at 1.

1   *Co.*, 268 F.3d 1133, 1137 (9th Cir. 2001) ("Where counsel is able to posit possible amendments

2   that would be consistent with the operative complaint and could also possibly state a claim for

3   relief, the complaint should not be dismissed on its face with prejudice").

4        Ironridge countered that Scrips made the very same argument, i.e., that it would supply

5   greater detail, at the hearing on Ironridge's motion to dismiss the *original* complaint.  Indeed, the

6   court even afforded Scrips more time than it ordinarily would to amend the original complaint

7   because Scrips stated that it needed additional time to supply a detailed account of Ironridge's

8   trading activity.  Despite having had three opportunities to plead a viable claim, two of which

9   followed detailed orders noting numerous deficiencies, Scrips has still failed to plead any "specific

10  allegations that [Ironridge] did anything to manipulate the market."  *ATSI II*, 493 F.3d at 103.

11  This leads the court to conclude that leave to amend would be futile.

12       Ironridge also aptly noted that even were Scrips to cure its allegations of market

13  manipulation generally, it has still failed to allege reliance or scienter.  Scrips, in fact, did not

14  address reliance at the hearing, and relied in its most recent complaint on the same inferences of

15  scienter the court previously found insufficient.  Its only reference to scienter at the hearing

16  involved a mischaracterization of the unproved facts alleged by the SEC.  This does not suffice

17  to plead scienter under Rule 10b-5.  In dismissing the first amended complaint, the court warned

18  Scrips that if it failed to address the deficiencies noted in prior complaints, it would likely

19  conclude that further amendment was futile and dismiss the complaint with prejudice.  Given the

20  content of the second amended complaint, and the absence of any specific facts cited by Scrips that

21  would cure the numerous deficiencies noted in this order, the court concludes that grantiong leave

22  to amend would be futile, and dismisses Scrips' Rule 10b-5 claim with prejudice.  See *California*

23  *ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661,

24  673 (9th Cir. 2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile,"

25  citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

26

27

28

1      **E.     Whether the Court Should Exercise Supplemental Jurisdiction Over Scrips'**
2              **State Law Claims**

3              Ironridge argues that the court should decline to exercise supplemental jurisdiction over
4      Scrips' remaining state law claims, citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343
5      (1988).  See *id.* at 350 n. 7 ("[I]n the usual case in which all federal-law claims are eliminated
6      before trial, the balance of factors to be considered under the pendent jurisdiction doctrine –
7      judicial economy, convenience, fairness, and comity – will point toward declining to exercise
8      jurisdiction over the remaining state-law claims").   The court agrees.  Because Scrips' only
9      remaining federal claim has been dismissed with prejudice, the court declines to exercise
10     supplemental jurisdiction over its state law claims, which it has stayed under *Colorado River*.  See
11     28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction
12     over a [state-law] claim [if] . . . the district court has dismissed all claims over which it has
13     original jurisdiction"); *Wade v. Regional Credit Association* , 87 F.3d 1098, 1101 (9th Cir. 1996)
14     ("Where a district court dismisses a federal claim, leaving only state claims for resolution, it
15     should decline jurisdiction over the state claims and dismiss them without prejudice"); *Harrell v.
16     20th Century Insurance Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for
17     a district court to remand remaining pendent claims to state court"); *Kennedy v. Full Tilt Poker*,
18     No. CV 09-07964 MMM (AGRx), 2010 WL 3984749, *3 (C.D. Cal. Oct. 12, 2010) ("With the
19     RICO claim dismissed, the court declines to exercise supplemental jurisdiction over plaintiffs'
20     non-federal claims"); *Anderson v. Countrywide Financial*, No. 2:08-cv-01220-GEB-GGH, 2009
21     WL 3368444, *6 (E.D. Cal. Oct. 16, 2009) ("Since state courts have the primary responsibility
22     to develop and apply state law, and the *[United Mine Workers of America v.] Gibbs* values do not
23     favor continued exercise of supplemental jurisdiction over Plaintiff's state claims, Plaintiff's state
24     claims are dismissed under 28 U.S.C. § 1367(c)(3)").  See also *United Mine Workers of America
25     v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as
26     a matter of comity and to promote justice between the parties, by procuring for them a
27     surer-footed reading of applicable law").
28

### III.  CONCLUSION

For the reasons stated, the court grants Ironridge's motion to dismiss Scrips' Rule 10b-5 claim with prejudice.  The court declines to exercise supplemental jurisdiction over Scrips' state law claims.  The second amended complaint is therefore dismissed in its entirety.


DATED: August 11, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE